# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD L. SANDERS,<br><br>     Petitioner,<br><br>   v.<br><br>RON DAVIS, Warden of San Quentin State Prison,<br><br>     Respondent. | Case No. 1:92-cv-05471-LJO-SAB<br><br>DEATH PENALTY CASE<br><br>MEMORANDUM AND ORDER (1) VACATING THE MARCH 27, 2007 ORDER BIFURCATING EVIDENTIARY HEARING, (2) DENYING CLAIM 38 FOLLOWING EVIDENTIARY HEARING, (3) DENYING PETITION FOR WRIT OF HABEAS CORPUS, and (4) ISSUING CERTIFICATE OF APPEALABILITY FOR CLAIM 38<br><br>(DOC. Nos. 147, 180)<br><br>CLERK TO VACATE ANY AND ALL SCHEDULED DATES AND SUBSTITUTE RON DAVIS AS RESPONDENT WARDEN AND ENTER JUDGMENT |

      Petitioner Ronald L. Sanders (hereinafter "Petitioner"), a state prisoner sentenced to death, is before the Court pursuant to a partial remand by the United States Court of Appeals for the Ninth Circuit of his previously denied petition for writ of habeas corpus (28 U.S.C. § 2254). He is represented in this action by appointed counsel Nina Rivkind.

      Respondent Ron Davis (hereinafter "Respondent") is named as Warden of San Quentin State Prison.[1]  He is represented in this action by Lewis Martinez of the Office of the California

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, Warden of San Quentin State Prison, is substituted as Respondent in place of his predecessor wardens.

Attorney General.

Before the Court for a decision following an evidentiary hearing held October 28 through 30, and November 3, 2008 and subsequent briefing on claim 38, which alleges that trial counsel was ineffective by failing to investigate and present mitigation thereby precluding Petitioner's voluntary, knowing, intelligent and competent waiver of a penalty defense.[2]

Having carefully reviewed and considered proceedings from the evidentiary hearing, the filings and the relevant case law and for the reasons set out below, the undersigned (1) vacates the previously ordered stage two evidentiary hearing, (2) denies claim 38 on the merits, (3) denies the third amended petition on the merits, and (4) issues a certificate of appealability for claim 38.

## I.

## BACKGROUND FACTS

This factual summary is taken from the California Supreme Court's summary of the facts in its September 27, 1990 opinion. These state court factual findings are entitled to a presumption of correctness when fairly supported by the record. *See former* 28 U.S.C. § 2254(d) (1994); *Wainwright v. Witt*, 469 U.S. 412, 426 (1984). Petitioner has not shown that the presumption of correctness does not apply. *McMurtrey v. Ryan,* 539 F.3d 1112, 1118 (9th Cir. 2008) (state court factual findings under pre-AEDPA law are presumed to be correct unless not fairly supported by the record); *Silva v. Woodford,* 279 F.3d 825, 835 (9th Cir. 2002) (same, noting pre-AEDPA § 2254(d) exceptions to deference where factual basis for claim not fully adjudicated in state court); *Bean v. Calderon,* 163 F.3d 1073, 1087 (9th Cir. 1998) (on habeas review, the factual findings of the state court are presumed to be correct unless they are "not fairly supported by the record"); *Paradis v. Arave*, 130 F.3d. 385, 390 (9th Cir. 1997) ("[P]ursuant to 28 U.S.C. 2254(d), the factual findings of the state court are presumed correct.").

A. Guilt Phase

In 1981, Dale Boender and Janice Allen moved to Bakersfield from Oildale.

---

[2] The Court previously denied on the merits all record claims. (*See* DOC. No. 148.)

Boender supported the couple by selling cocaine and marijuana. One of his customers was Brenda Maxwell, but he stopped selling to her because she owed him money from prior transactions. On the morning of January 21, 1981, Maxwell's aunt, Donna Thompson, and defendant Ronald Lee Sanders visited Maxwell. The three decided to rob Boender of drugs and money and agreed to the following plan: Maxwell would entice Boender to her home by claiming she had a friend who wanted to buy a large quantity of cocaine. When Boender arrived, defendant would knock him out and they would rob him. Defendant would then bind Boender with duct tape before leaving. According to their plan, defendant would similarly bind Maxwell so she would appear to also have been a victim. Thompson would arrive later to "discover" and free the pair.

Maxwell's friend, Glen Blackford, was also visiting her at the time but was left in the living room while Maxwell, Thompson, and defendant planned the crime in the bedroom. When they returned to the living room after their planning session, Maxwell told Blackford "[s]omething is going to happen [so] get out of here." Blackford and Thompson then left (as planned) and Maxwell placed several calls to Boender to arrange the deal.

Enticed by the promise of a large cocaine sale, Boender and Allen drove to Maxwell's mobilehome. Allen entered the home and began to sit down next to Maxwell. As Boender stepped through the doorway, defendant emerged from the kitchen and began beating Boender with a two-foot long piece of a pool stick. A struggle ensued but Boender and Allen eventually managed to exit the mobilehome, at which point defendant fled. Boender and Allen then drove off, first to a friend's house but later to a hospital to attend to Boender's injuries. They stayed at a relative's home until Friday, January 23, 1981.

Meanwhile, Thompson and defendant returned to Maxwell's mobilehome to discuss the aftermath of the botched robbery attempt. Maxwell was concerned that Boender would realize she had "set him up," and defendant was worried Boender could identify him. The three drove to a house on Jefferson Street where defendant engaged the assistance of John Cebreros. The group then went to Thompson's house where Maxwell called mutual friends of hers and Boender's to tell them she had been robbed and raped so as to enhance her claim that she had been victimized along with Boender.

On Friday, Boender and Allen decided to return to Boender's apartment. They arrived in the afternoon and told Boender's two roommates, Haney and Weinman, about the earlier assault. Later, Boender and Allen met Boender's former roommate, George Littleton, at a bar; the three of them went to Littleton's apartment around 7 p.m. and shared a small bottle of wine. After shopping for groceries, Boender and Allen returned home. Haney and Weinman were gone for the evening.

While Boender and Allen were preparing dinner, there was a knock at the door. Leaving Allen in the kitchen, Boender went to the front door and opened it, finding Cebreros and defendant standing there, the latter armed with a gun. Although he believed he had only seconds to live, Boender concentrated on their faces so he could remember them if he should see them again. Defendant spun Boender around and pushed him to the floor, face down. He felt someone's knee in his back and something pressed against his neck. Allen emerged from the kitchen and was also made to lie on the floor. Boender's glasses were ripped from his face and both he and Allen were bound and blindfolded.

3

One of the assailants demanded that Boender tell them where he kept his cocaine, and he directed them to Allen's purse. After he told them his money was in his shirt pocket, someone removed it. Boender heard the two assailants rummaging through the apartment but could not tell what was going on. After a few minutes, he was dragged to what seemed like his bedroom. He heard more footsteps, muffled talking, and more banging around the apartment. One of the assailants said he wanted to leave but the other said he wanted to stay. Boender then heard someone approach, felt a blow to the head, and recalled nothing further.

Boender's roommates returned to the apartment in the early morning and discovered the apartment full of smoke. A search revealed food burning in the oven. On further investigation, they discovered Boender in his bedroom, lying in a pool of blood. After calling an ambulance, they noticed that the apartment was in disarray, there were spots of blood around, and a baggie of marijuana was missing. When Haney found Allen's body in his bedroom, he called the police.

Both Boender and Allen had been bound by lengths of electrical cord cut from Boender's vacuum cleaner. Allen sustained a fatal head wound which fractured her skull and lacerated her brain. Boender suffered a skull fracture but was conscious and semicoherent when police arrived. He was not questioned until the next day.

Haney and Weinman told police about Boender's story of the attempted robbery two days earlier, prompting police to contact Maxwell. She falsely told police that Cebreros came to her home, forced her to call Boender, and then beat him up when he arrived. However, she gave them accurate descriptions of defendant and Cebreros as well as the address of the Jefferson Street house where defendant met Cebreros. From his hospital bed, Boender gave descriptions of defendant and Cebreros that matched Maxwell's descriptions.

Cebreros was arrested the next day in front of the Jefferson Street house. In his car, police found a gun similar to that which Boender described as the one used in the attempt to murder him. In Cebreros's boot, police found a baggie of marijuana which was identical to the one taken in the robbery. Both Maxwell and Boender positively identified Cebreros as one of the assailants.

A few days later, Maxwell recanted her story and told police the truth about the bungled robbery attempt. She also told police about the duct tape defendant intended to use to bind Boender. Police found a roll of such tape in Maxwell's home and tests revealed defendant's fingerprints on it. He was arrested and positively identified by Boender in a photographic lineup later that week.

Defendant and Cebreros were tried jointly and they presented an alibi defense. Three defense witnesses testified that on the night of the murder, both defendant and Cebreros were at the home of Cebreros's brother, Salvador, talking, playing chess, and drinking beer. There was also evidence from Boender's neighbors that although two men were seen outside Boender's apartment on the night of the murder, neither one looked like Cebreros or defendant. Finally, there was evidence that defendant had used Maxwell's roll of duct tape for an innocent purpose a few days earlier.

Defendant's first trial ended in a mistrial when the jury could not reach a verdict. On retrial, both he and Cebreros were convicted on all counts. The prosecutor declined to seek the death penalty against Cebreros and he was sentenced to life without the possibility of parole.

4

### B. Penalty Phase

The prosecution produced several witnesses at the penalty phase who described five armed robberies defendant committed in Orange County in 1970. Although none of the witnesses could positively identify defendant at trial, a police expert testified that the fingerprints of the gunman in the five Orange County robberies matched defendant's fingerprints.

James Quinn testified that on October 1, 1970, he was working late at the Allstate Motel in Santa Ana when defendant and a crime partner robbed him at gunpoint. Thomas Ferguson testified that defendant, brandishing a revolver, robbed him on September 12, 1970, while Ferguson was employed as a clerk at the Station Liquor Store in Tustin. Defendant committed an armed robbery in the same establishment on November 20, 1970, this time robbing clerk Fred Turnbull.

Sammy Mitchell testified that he was working in Mitchell's Market in Tustin on October 6, 1970, when defendant robbed him at gunpoint. Defendant was finally arrested after this crime spree while fleeing from yet another armed robbery, this one occurring in a 7-Eleven convenience store, also in Tustin. Defendant confessed his guilt to all five robberies and the police officers to whom he confessed testified at the penalty phase. Defendant was sentenced to state prison and was granted parole in 1973.

Defendant declined to present any evidence in mitigation or make a closing argument. The jury returned a verdict of death within a few hours.

*People v. Sanders*, 51 Cal. 3d 471, 485-89 (1990).

## II.

## PROCEDURAL HISTORY

### A.    State Proceedings

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a March 3, 1982 judgment of the Superior Court of California, County of Kern, Case No. 22079, imposing the death sentence.  (7 CT 1882-83, 1900, 1912-13; March 3, 1982 RT 25-30.)[3]

On January 22, 1982, Petitioner and co-defendant John Cebreros (hereinafter "Cebreros"), were each convicted by jury, on retrial (after one jury was unable to reach a verdict) of one count of first degree murder of Janice Allen (hereinafter "Allen") with special circumstances (murder committed during the commission or the attempted commission of robbery; murder committed during the commission or the attempted commission of burglary;

---

[3] Unless otherwise indicated, throughout this order, "RT" refers to the Reporter's Transcript of the trial itself.

murder to prevent testimony in a criminal proceeding; and murder which was especially heinous, atrocious, and cruel); one count of attempted first degree murder of Dale Boender (hereinafter "Boender"); and one each counts of robbery, burglary and attempted robbery. (RT 1796a-97a; 2 CT 276A, 1695-1704); *see also Sanders*, 51 Cal. 3d at 485.[4]

On January 25, 1982, at the start of Petitioner's penalty phase trial, defense counsel Frank Hoover (hereinafter "Hoover") explained to the trial judge that he had a "serious dilemma" because Petitioner rejected his advice to present a penalty defense. (RT 1822-25.) Hoover stated to the court that Petitioner opted instead not to present any penalty phase evidence. (*Id.*) Hoover stated to the court that Petitioner did not want to participate in the penalty phase (RT 1831), and did not want Hoover to present any penalty phase argument. (RT 1832.)

Pursuant to Petitioner's request, no testimony was presented on his behalf at the penalty phase, there was no defense cross-examination, no evidence was presented in mitigation and the defense waived closing argument. (RT 1851-1919); *see also Sanders*, 51 Cal. 3d at 489. The prosecution presented as aggravating evidence the circumstances of the capital crimes against Allen and Boender; the special circumstances found true; and evidence that Petitioner had confessed to involvement in the five armed robberies in 1970, was convicted of one and served time in state prison. (RT 1851-1919); *see also Sanders*, 51 Cal. 3d at 488.

The jury returned a penalty verdict of death for Petitioner on February 3, 1982. (RT 1929); *see also Sanders*, 51 Cal. 3d at 489. On March 3, 1982, the trial court sentenced Petitioner to death and also imposed determinate terms for the other crimes, staying those terms pursuant to state law. (March 3, 1982 RT 25-30.)

On September 27, 1990, the California Supreme Court on direct appeal set aside two of the special circumstances (i.e., especially heinous, atrocious and cruel murder; and burglary-

---

[4] Unless otherwise indicated, throughout this order, "CT" refers to the Clerk's Transcript on Appeal, "EHRT" to the Reporter's Transcript on Evidentiary Hearing, "EH Ex." refers to an exhibit admitted at Evidentiary Hearing, "SHCP" refers to a state habeas corpus petition, and "SHCP Ex." refers to an exhibit lodged with a state habeas corpus petition. Other transcripts are referenced by date. References are to ECF pagination for electronically filed documents, Bates numbering for CT documents, and internal pagination for the RT, EHRT and for documents not filed electronically. Any reference to state law is to California law unless otherwise noted.

murder), but otherwise affirmed the judgment as to both guilt and penalty.  *Sanders*, 51 Cal. 3d at 485.

On November 28, 1990, the California Supreme Court denied Petitioner's petition for rehearing.  *Id.*, at 547.

The United States Supreme Court denied certiorari on May 28, 1991, *Sanders v. California*, 500 U.S. 948 (1991), and denied rehearing on August 2, 1991, *Sanders v. California*, 501 U.S. 1269 (1991).

On September 1, 1999, the California Supreme Court summarily denied Petitioner's exhaustion petition on procedural grounds and on the merits.  *See* California Supreme Court Case No. S043131.

On September 22, 1999, the California Supreme Court denied on the merits Petitioner's supplemental exhaustion petition (which contained two *Lackey v. Texas* claims alleging his long tenure on death row is cruel and unusual punishment, 514 U.S. 1045 (1995)).  California Supreme Court Case No. S082022; (*see also* DOC. No. 101 at 1).

### B.    Federal Proceedings

On July 13, 1992, Petitioner commenced these proceedings by filing a petition for writ of habeas corpus and applications for stay of execution and appointment of counsel.  (DOC. No. 1.)

On December 20, 1993, Petitioner amended his federal petition to include exhausted and unexhausted claims.  (*See* DOC. No. 37.)  This Court stayed federal proceedings (DOC. No. 48) and on November 7, 1994, Petitioner filed his noted state exhaustion petition.

On November 17, 1999, following state court exhaustion proceedings, Petitioner filed a second amended federal petition asserting 61 claims.  (DOC. No. 100.)  Petitioner's supporting points and authorities were filed on April 6, 2000, (DOC. No. 114) and a supplemental brief was filed on May 22, 2000, (DOC. No. 115).

On August 25, 2000, Respondent filed an answer to the second amended petition with points and authorities, admitting certain jurisdictional and procedural allegations, asserting procedural defenses, and denying all claims 1-61.  (DOC. No. 130.)

On September 5, 2000, Petitioner filed a request to expand the record. (DOC. No. 136.) On September 26, 2000, Petitioner filed a request for evidentiary hearing accompanied by a request to expand the record. (DOC. No. 138.) On October 16, 2000, Respondent filed his opposition to the motion for evidentiary hearing. (DOC. No. 139.) On October 25, 2000, Petitioner filed supplemental points and authorities in support of evidentiary hearing. (DOC. No. 140.)

On November 29, 2000, the Court granted expansion of the record by five declarations along with public records obtained from the Kern County District Attorney's office, in support of claims 1, 9, 14-16, 33, 38-40 and 55. (DOC. No. 141.) Additionally, the Court ordered Respondent to further expand the record with excerpts from the first trial in 1981, specifically the clerk's transcript of jury deliberations (which resulted in a mistrial when the jury was unable to reach a unanimous verdict, returning eleven to one for conviction). (*Id.*); *see also Sanders*, 51 Cal. 3d at 488.

On July 24, 2001, Petitioner lodged a third amended petition adding claim 62 (alleging prosecution's use of false testimony), claim 63 (cumulative prosecutorial misconduct) and claim 64 (actual innocence). (DOC. Nos. 145, 146.)

On August 24, 2001, the Court granted Petitioner leave to file the third amended petition (DOC. No. 147); denied on the merits the third amended petition including claims 1-64; denied Petitioner's further request for expansion of the record and for evidentiary hearing; denied certificate of appealability (DOC. No. 148); and entered judgment for Respondent. (DOC. Nos. 148, 149.)

On September 21, 2001, the Court granted Petitioner's motion to expand the record with certain declarations of investigators and counsel (*see* [third amended petition] exhibits 721, 723, and 726-730), and denied Petitioner's request for reconsideration of claims 14, 15, 22, 38, 39, 62 and 63 and denied Petitioner's request for reconsideration of denial of certificate of appealability. (DOC. No. 154.)

Petitioner filed a notice of appeal of the entry of judgment in favor of Respondent on

September 21, 2001.  (DOC. No. 156.)

On September 27, 2001, the Court denied Petitioner's motion for relief from judgment. (DOC. No. 158.)

### 1.    Reversal by Circuit Court

On July 8, 2004, the Ninth Circuit affirmed in part, reversed denial of the petition as it related to death sentence, and remanded with instructions, *Sanders v. Woodford*, 373 F.3d 1054 (2004), finding that the California Supreme Court failed to either independently re-weigh aggravating and mitigating factors or conduct an appropriate harmless error analysis after it invalided the two special circumstances.

### 2.    Reversal on Certiorari by Supreme Court

The U.S. Supreme Court granted certiorari.  On January 11, 2006, the Supreme Court found the invalid special circumstances did not affect the constitutionality of the death sentence by adding an improper aggravating element and reversed and remanded to the Ninth Circuit. *Brown v. Sanders*, 546 U.S. 212 (2006).

### 3.    Remand by Circuit Court

On March 16, 2006, the Ninth Circuit, on remand, relied in part on its (subsequently vacated - *see Landrigan v. Schriro*, 501 F.3d 1147 (9th Cir. 2007)) *en banc* decision in *Landrigan v. Schriro*, 441 F.3d 638 (2006) (finding colorable defendant's ineffective assistance claim even though defendant himself had instructed counsel not to present mitigating evidence), and reversed this Court's denial of an evidentiary hearing on Petitioner's claim 38 which alleged that defense counsel Hoover provided ineffective assistance by acquiescing in Petitioner's request to forgo a penalty defense.  *See Sanders v. Brown*, 171 F.App'x 588, 595 (2006). Specifically, the Circuit Court remanded for an evidentiary hearing to determine the merits of that claim including a determination of "whether [defense counsel] Hoover's decision not to conduct a reasonable investigation could have constituted ineffective assistance, i.e., whether [Petitioner's] insistence – the rationality of which Hoover at times questioned – that he did not want to present such a defense excused Hoover from his duty to conduct a penalty phase

investigation." *Id.* at 592. The Ninth Circuit affirmed the Court's denial of Petitioner's other penalty phase claims. *Id.* at 595.

### 4. Bifurcated Evidentiary Hearing Following Remand

On March 27, 2007, the Court ordered a bifurcated evidentiary hearing. The first stage hearing was to consider issues of deficient performance, i.e., whether counsel's decision not to investigate mitigation evidence was deficient performance; how the mitigation evidence proffered in this proceeding might have been used by counsel to convince Petitioner to change his mind about not presenting a penalty defense at trial; and whether counsel should have, or could have presented mitigation evidence in spite of Petitioner's objections. (DOC. No. 180; *see also* DOC. No. 190.)

The second stage hearing was to consider issues of prejudice, i.e., whether, had Petitioner changed his mind, the mitigation evidence would have convinced the jury to sentence him to life without parole. (*Id.*) The Court provided that Respondent could contest and controvert the mitigation evidence during the second stage of the evidentiary hearing which would take place after resolution of the first stage. (*Id.*) The Court ordered that the mitigation evidence at the hearing would not be limited to the first stage proffer and would be assumed true for the first stage hearing. (DOC. No. 190.)

#### a. Supreme Court Reversal in *Landrigan v. Schriro*

Subsequently, on May 14, 2007, the Supreme Court on grant of certiorari reversed and remanded the Ninth Circuit's *en banc* decision in *Landrigan v. Schriro*. The Supreme Court found that the failure of Landrigan's counsel to present mitigating evidence was not ineffective assistance where Landrigan himself actively interfered with and refused to allow presentation of such evidence. *See Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (hereinafter "*Landrigan*"). The Supreme Court also noted therein that it had "never imposed an informed and knowing requirement upon a defendant's decision not to introduce evidence." *Id.*, at 479.

As noted, the Ninth Circuit then vacated its *en banc* decision in *Landrigan v. Schriro*.

### b. Reframed Issues for Evidentiary Hearing Following *Landrigan*

Given these events, in June 2007 the Court reframed the inquiry on evidentiary hearing as follows:

> There is a question whether [*Landrigan*] changes the conclusion of the Ninth Circuit on remand regarding the finding of deficient performance in Hoover's decision not to investigate mitigating evidence. [Citation] [*Landrigan*] held that it was not an unreasonable determination for the state court to find there could be no prejudice from counsel's failure to investigate mitigation where the defendant refused to allow the presentation of mitigating evidence. [Citation]
>
> . . .
>
> [*Landrigan*] presents the following question to be answered based on the facts developed at the first stage of the evidentiary hearing: Was trial counsel's decision not to investigate mitigation evidence deficient performance, or was it reasonable in light of [Petitioner's] opposition to presenting a penalty defense? This question will be addressed at the first stage of the evidentiary hearing along with whether [Petitioner] would have changed his mind about presenting a penalty defense had Hoover investigated and discussed the potential effect of mitigation with him, and whether Hoover should have, or could have, presented mitigation in spite of [Petitioner's] objections.

(DOC. No. 208 at 1:26-3:12.)

### c. Stage One Evidentiary Hearing and Post-Hearing Briefing

The stage one evidentiary hearing was conducted October 28 through 30, and November 3, 2008. Petitioner was represented at the hearing by appointed counsel of record, Eric E. Jorstad and Nina Rivkind, and Respondent was represented by Deputy Attorney General F. Brian Alvarez.

At the conclusion of the first stage evidentiary hearing the court sealed the entire transcript at Petitioner's request, consistent with the parties' October 5, 2007 stipulated protective order ("Protective Order") which limits use of privileged information including attorney-client information to Respondent and this proceeding. (DOC. No. 227); *see also Bittaker v. Woodford* 331 F.3d 715, 721-24 (9th Cir. 2003) (petitioner raising a claim of ineffective assistance of counsel waives the attorney-client privilege for purposes of the habeas petition).

The Court has not issued a ruling following the first stage evidentiary hearing.[5]

On December 2, 2008, the Court granted Petitioner's motion to expand the stage one hearing record with [third federal petition] exhibits 2, 10, 11, 13-18, 20-23, 24, 25, 28, 30-36, and 56-133, which are deposition transcript and public records and declarations upon which the opinions of Petitioner's experts are based. (DOC. No. 310.) On July 17, 2009, the Court granted Petitioner's supplemental motion to expand the record with additional like documents, i.e., the August 17, 2007, deposition transcript of Ima Salie; the October 19, 1994 declaration of Robert Cook, Esq.; the October 10, 1994 declaration of Arlene Fangmeyer; and the death certificates of Arlene Fangmeyer, Marian Ann Beadle (aka Marian Sanders), and Dr. Francis A. Matychowiak – all of which were inadvertently omitted from the motion granted on December 2, 2008. (DOC. No. 333.)

The parties filed post-evidentiary hearing briefs including proposed findings of facts and conclusions of law. (DOC. Nos. 321, 322, 329, 336, 339, 342.)

On January 20, 2015, the Court directed the parties to file supplemental briefs specifically addressing the impact of *Landrigan*. Petitioner filed his supplemental brief on March 23, 2015. (DOC. No. 359.) Respondent filed his supplemental brief on May 19, 2015. (DOC. No. 360.) Petitioner filed his reply brief on July 6, 2015. (DOC. No. 365.)

On January 12, 2016, the Court directed the parties provide supplemental briefs specifically addressing whether the mitigation evidence taken as true at the first stage of the evidentiary hearing, as expanded and supplemented, would have convinced the jury to sentence Petitioner to life without parole. Petitioner filed his supplemental brief on April 11, 2016. (DOC. No. 372.) Respondent filed his supplemental brief on June 7, 2016. (DOC. No. 377.) Petitioner filed his reply brief on October 14, 2016. (DOC. No. 389.)

---

[5] At the first stage evidentiary hearing Petitioner presented evidence from himself (DOC. No. 242); his siblings, Donald Steven Sanders (DOC. No. 231), Roger Sanders (DOC. No. 232) and Suzanne Williams (DOC. No. 230); his cousin Bobby Sanders (DOC. No. 228); trial counsel Hoover (DOC. No. 243); trial defense investigator Roger Ruby (DOC. No. 233); *Strickland* expert criminal defense attorney Stanley Simrin (DOC. No. 270); *Strickland* expert criminal defense attorney Susan Sawyer (DOC. No. 266); expert mitigation specialist Russell Stetler (DOC. No. 269); and mental health experts, psychologist Julie Kriegler (DOC. No. 268), psychiatrist Pablo Stewart (DOC. No. 267), and neuropsychologist Nell Riley (DOC. No. 264). Respondent deposed Hoover prior to the first stage hearing and presented his deposition (EH Ex. 38). Respondent presented no live witness testimony at the hearing.

On January 3, 2017, the Court ordered that certain documents relating to the first stage evidentiary hearing be unsealed. (DOC. No. 397; *see also* EHRT 16-17; DOC. No. 227.)

### III.

### JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); *see also Williams v. Taylor*, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2241(d), 2254(a).

### IV.

### APPLICABLE LEGAL STANDARDS

This action was initiated on July 13, 1992. Because this action was initiated before April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) do not apply. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000) (*overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)); *McMurtrey*, 539 F.3d at 1118 n.1; *Webster v. Woodford*, 369 F.3d 1062, 1066 (9th Cir. 2004); *accord Webster v. Chappell*, No. CIV S-93-306 LKK DAD, 2014 WL 2526857, at *7-9 (E.D. Cal. June 4, 2014) *report and recommendation adopted sub nom. Webster v. Warden, San Quentin State Prison*, No. CIV. S-93-0306 LKK D, 2014 WL 4211115 (E.D. Cal. Aug. 26, 2014).

Under pre-AEDPA standards, a writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. *Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1994); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of

state law.  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

However, "a claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." *Hines v. Enomoto*, 658 F.2d 667, 672 (9th Cir. 1981) (*citing Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980)) (*abrogated on other grounds by Ross v. Oklahoma*, 487 U.S. 81 (1988)); *see also Lisenba v. California*, 314 U.S. 219, 236 (1941); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). In order to raise such a claim in a federal habeas petition, "the error alleged must have resulted in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428 (1962); *Henry*, 197 F.3d at 1031; *Crisafi v. Oliver*, 396 F.2d 293, 294-95 (9th Cir. 1968); *Chavez v. Dickson*, 280 F.2d 727, 736 (9th Cir. 1960).  Habeas corpus cannot be utilized to try state issues *de novo*. *Milton v. Wainwright*, 407 U.S. 371, 377 (1972); *see also Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) ("Federal courts are not forums in which to relitigate state trials.")

The state courts' application of law to historical facts is reviewed by the federal habeas court *de novo* as are mixed questions of law and fact.  *See Thompson v. Keohane,* 516 U.S. 99, 110 (1995) (holding that under pre-AEDPA standards federal courts are not required to defer to state court determinations of mixed questions of law and fact); *accord Hoyle v. Ada County,* 501 F.3d 1053, 1059 (9th Cir. 2007); *Thompson v. Borg,* 74 F.3d 1571, 1573 (9th Cir. 1996); *Powell v.. Gomez,* 33 F.3d 39, 41 (9th Cir. 1994); *Ben–Sholom v. Ayers,* 566 F. Supp. 2d 1053, 1060 (E.D. Cal. 2008).

The federal habeas court also "need not defer to state court rulings on questions of law since the federal court is not formally reviewing a judgment, but is determining whether the prisoner is in custody in violation of the Constitution or laws or treaties of the United States." *McMurtrey*, 539 F.3d at 1118 (*quoting Lambrix v. Singletary*, 520 U.S. 518, 523 (1997)). The federal habeas court is to "simply resolve the legal issue on the merits, under the ordinary rules." *Id.* (*quoting Summerlin v. Schriro*, 427 F.3d 623, 628 (9th Cir. 2005)).

The habeas petitioner bears the burden of "proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Townsend v. Sain*, 372 U.S. 293, 312 (1963) (*overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1 (1992)); *accord Silva*, 279 F.3d at 835 ("It is the petitioner's burden to prove his custody is in violation of the Constitution, laws or treaties of the United States.") (*quoting Snook v. Wood*, 89 F.3d 605, 609 (9th Cir. 1996)). To prevail, the petitioner must "convince the district court 'by a preponderance of evidence' of the facts underlying the alleged constitutional error." *McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994) (*quoting Johnson v. Zerbst*, 304 U.S. 458, 469 (1938)) (*abrogated on other grounds by O'Dell v. Netherland*, 521 U.S. 151 (1997)); *accord Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Silva*, 279 F.3d at 835.

The granting of federal habeas relief is appropriate only if the alleged errors "had substantial and injurious effect or influence in determining the jury's verdict." *Hovey v. Ayers*, 458 F.3d 892, 900 (9th Cir. 2006) (*quoting Brecht*, 507 U.S. at 637).

With these standards of review in mind, the undersigned will address Petitioner's claim 38, the subject of the evidentiary hearing upon remand.

## V.

## REVIEW OF CLAIM 38

Petitioner alleges that Hoover was ineffective at the penalty phase by failing to investigate, develop and present then available mitigation evidence proffered during state habeas proceedings, record expansion in this proceeding and the first stage evidentiary hearing, precluding any voluntary, intelligent and competent penalty defense waiver, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.[6] (DOC. No. 147 at 236-39.)

---

[6] Petitioner describes the proffered mitigation evidence as including (1) live testimony as well as documentary evidence, whether lodged or admitted, presented in connection with stage one of the evidentiary hearing, (DOC. No. 300-2); (2) evidence covered in the Court's orders expanding the record, (DOC. Nos. 310, 333); and (3) the declarations, records and documents contained in the exhibits to his petition for writ of habeas corpus, filed in the California Supreme Court in 1994, and lodged in this Court in 2000, (DOC. No. 372 at 10).

### A.    Clearly Established Law – Ineffective Assistance of Counsel

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial.  U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963); *Silva*, 279 F.3d at 836.

The clearly established federal law for ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984).[7]  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  *Strickland*, 466 U.S. at 687; *see also Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).

First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  *Richter*, 562 U.S. at 88, (*citing Strickland*, 466 U.S. at 688); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  *Strickland*, 466 U.S. at 688.

Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence."  *Id.* at 689.  Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.*; *accord Richter*, 562 U.S. at 107.  A court indulges a "'strong presumption' that counsel's representation was within

---

[7] The *Strickland* standard appears consistent with the standard prevailing at the time of trial set out in *People v. Pope*, 23 Cal. 3d 412 (1979) (*overruled on other grounds by People v. Delgado*, 2 Cal. 5th 544, 559 (2017)); *see also In re Fields*, 51 Cal. 3d 1063, 1069, 1078 at  n.8 (1991).

the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (*quoting Strickland*, 466 U.S. at 687); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (*quoting Strickland*, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." *Summerlin*, 427 F.3d at 629. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Nonetheless,

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statement or actions.

*Wiggins*, 539 U.S. at 521, (*quoting Strickland*, 466 U.S. at 690–91); *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112-15 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004) (penalty phase ineffective assistance claim depends on the

17

magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " *Richter*, 562 U.S. at 104, (*quoting Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Richter*, 562 U.S. at 104 (*quoting Strickland*, 466 U.S. at 687). Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." *Richter*, 562 U.S. at 111 (*quoting Strickland*, 466 U.S. at 696).

That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," *id.*, has the defendant met *Strickland's* demand that defense errors were "so serious as to deprive the defendant of a fair trial," *Richter*, 562 U.S. at 104 (*quoting Strickland*, 466 U.S. at 687), i.e., a trial whose result is reliable. *Strickland*, 466 U.S. at 688. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

The basic requirements of *Strickland* apply with equal force in the penalty phase. Thus, petitioner must show that counsel's actions fell below an objective standard of reasonableness and that the alleged errors resulted in prejudice. *Strickland*, 466 U.S. at 687-88. In the context of the penalty phase, just as in the guilt phase, the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Wiggins*, 539 U.S. at 521 (*quoting Strickland*, 466 U.S. at 688).

In issuing its decision following the evidentiary hearing, the Court "reviews *de novo* the evidence elicited through discovery and at the evidentiary hearing in these proceedings and is no

longer constrained by the limitations imposed by § 2254(d)." *Williams v. Davis*, No. CV 00-10637 DOC, 2016 WL 1254149, at *8 (C.D. Cal. Mar. 29, 2016) (*citing Frantz v. Hazey,* 533 F.3d 724, 737 (2008)) ("In sum, where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody *de novo*."); *accord Williams v. Woodford*, 859 F. Supp. 2d 1154, 1161 (E.D. Cal. 2012).

### B.    State Court Direct and Collateral Review of Claim 38

As discussed *post*, on direct appeal the California Supreme Court considered and rejected certain of Petitioner's claim 38 allegations.

Petitioner raised in his state habeas petition these same allegations of ineffective assistance by failure to present mitigating evidence at the penalty phase, which the California Supreme Court summarily denied on September 1, 1999. *See* California Supreme Court Case No. S043131.

### C.    Analysis of Claim 38

Petitioner alleges that Hoover was deficient by failing to investigate, develop and present a penalty phase defense notwithstanding Petitioner's stated intention that no such defense be presented. Petitioner alleges prejudice because the jury was unaware of the proffered mitigation evidence supporting a sentence other than death. (DOC. No. 147 at 238-39.)

Specifically, Petitioner argues that Hoover fell below then existing professional norms by (i) accepting appointment notwithstanding that he was unqualified for capital defense; (ii) failing to request assistance of second counsel; (iii) failing to identify, locate, investigate, interview and prepare mitigation witnesses, (iv) failing to obtain records of, and investigate and retain an expert to review and opine upon mitigating aspects of Petitioner's life history, (v) failing to investigate and impeach aggravating witnesses and evidence, (vi) failing to advise Petitioner of potentially mitigating social history and mental health evidence, how it might be presented and how it might impact the sentencing verdict, (vii) failing to reject Petitioner's uninformed and incompetent penalty defense waiver, and (viii) failing to present any mitigation argument on Petitioner's

behalf. (DOC. No. 147 at 236-39; *see also* DOC. No. 359 at 2-4); *Sanders*, 171 F.App'x at 595.

As discussed *post*, Petitioner argues that the following types of then available mitigation evidence were not presented to the jury:

1) Petitioner's psychosocial history including evidence of multi-generational poverty and deprivation, frequent relocation, mental illness and alcoholism, abuse and neglect; the divorce of his parents; a violent step-father; and rejection by the military following his under-age enlistment.

2) Petitioner's personal attributes of protectiveness of his family, generosity to friends and artistic talent.

3) Petitioner's developmental and cognitive deficits including anxiety disorder, Attention Deficit/Hyperactivity Disorder (hereinafter "ADD-H"), Post-Traumatic Stress Disorder (hereinafter "PTSD"), poly-substance abuse and mental impairments and illness including bipolar disease.

4) Evidence mitigating Petitioner's criminal history including mental impairments and drug use at the time of the crimes, and his tendency to accept blame for others including as reflected in his more severe sentence than his equally culpable co-defendants in the noted 1970 armed robberies.

5) Evidence that the capital crimes were not highly aggravated.

(DOC. No. 147 at 238-39.)

### 1. Preliminary Matters

#### a. No Waiver by Respondent

Petitioner argues that Respondent's failure to file a brief responsive to Petitioner's April 10, 2009 post-hearing brief constitutes a waiver or concession of Petitioner's proposed findings therein.

The Court rejects this argument as unsupported. Petitioner has not demonstrated a voluntary and knowing waiver by Respondent. *See Johnson*, 304 U.S. at 464 (a waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege).

20

Notably, the Court's order scheduling post-hearing briefing did not require either party file a reply brief. (DOC. No. 309 at 378-79.)

### b.    Scope of Remand

Petitioner argues the Ninth Circuit's memorandum decision remanding this case for evidentiary hearing includes the Circuit Court's determination that Hoover was deficient by failing to adequately investigate mitigating evidence.

However, this Court previously rejected such argument when it ordered a bifurcated evidentiary hearing. (DOC. Nos. 180, 190.) The Court rejects Petitioner's re-argument of this issue in his post-hearing briefing (DOC. No. 206 at 6, 32), for the reasons previously stated.

### 2.    Petitioner has not Demonstrated Deficient Performance

Petitioner alleges that Hoover was unqualified to represent him, unreasonably failed to investigate, develop and present mitigation evidence and improperly acquiesced in his waiver of a penalty defense. The Court rejects these allegations for the reasons that follow.

### a.    Appointment as Petitioner's Counsel

Petitioner alleges that Hoover lacked sufficient capital defense knowledge and experience and failed to seek appointment of qualified second counsel. (DOC. No. 321 at 13-19.)

Petitioner points out that his case was Hoover's first and only capital homicide case. (EH Ex. 12 at ¶¶ 14, 18.) He argues that Hoover's representation violated ABA Standards for Criminal Justice (hereinafter "ABA Standards") because Hoover knew he lacked the capital habeas knowledge and experience necessary to effectively represent Petitioner and nonetheless failed to take steps to educate and inform himself. (EH Ex. 5 at ¶¶ 17, 58-59; EHRT 303); *see also Bond v. Beard*, 539 F.3d 256, 289 (3d Cir. 2008) (counsel without capital experience who took full responsibility for capital sentencing trial found ineffective for lack of experience and preparation).

However, Petitioner fails to demonstrate that on these facts Hoover was unqualified and that Hoover failed to associate with experienced capital counsel. The record reflects that Hoover was an experienced prosecutor. (EH Ex. 12 at ¶¶ 3-15; EH Ex. 38 at 5-6, 9; EHRT 102.) Prior

to his appointment to represent Petitioner, Hoover spent six years with the Kern County district attorney's office as a deputy handling cases that included non-capital homicides, three special circumstance cases and over one hundred jury trials. (EHRT 98-102; *see also* EH Ex. 12 at ¶¶ 3-17.) Hoover then entered a private civil and criminal practice. (*Id.*; *see also* DOC. No. 305 at 7.) Petitioner's case was his first appointed case. (EHRT 104.)

Hoover refrained from accepting appointment in this matter until he was assured he could provide competent capital representation. He testified that he did not seek and initially declined the appointment because a capital defense appointment represented "a huge undertaking"; he had not defended a capital case before; and at the time Kern County allowed appointment of only one attorney. (EHRT 107; EH Ex. 12 at ¶ 18.) He "felt that [he] really wasn't qualified without at least co-counsel having death penalty experience." (EHRT 107.) He accepted appointment (EH Ex. 12 at ¶ 18; EH Ex. 38 at 13-15; EHRT 104-08) only when informed that a more experience capital attorney, James Faulkner (hereinafter "Faulkner") was representing co-defendant John Cebreros in the joint trial. (EH Ex. 12 at ¶ 18; EHRT 107-108; EH Ex. 38 at 15.)

Petitioner faults Hoover for not consulting with Faulkner or Stanley Simrin (hereinafter "Simrin") who replaced Faulkner as counsel for co-defendant Cebreros in the joint guilt phase trial shortly after Hoover's appointment, regarding the penalty phase. (EH Ex. 12 at ¶ 58; EH Ex. 8 at ¶ 45; EHRT 325.) He points out that Hoover could not draw upon any synergy with co-defendant's counsel at the penalty phase because Petitioner and Cebreros had separate sentencing proceedings; Petitioner's sentencing proceeding preceded Cebreros; and the prosecution determined not to seek the death penalty against Cebreros.[8] (EH Ex. 8 at ¶2; EH Ex. 12 at ¶ 65.)

Hoover concedes that he did not request co-defendant's counsel assist with the penalty phase (EH Ex. 38 at 26), which was not part of the joint trial. But at that time, Kern County did not provide for second counsel in capital cases. (EH Ex. 6 at ¶ 14; EHRT 322.) Simrin, an experienced capital defense attorney practicing in Kern County, testified at the evidentiary

---

[8] Co-defendant Cebreros was sentenced to LWOP following Petitioner's death sentence and the prosecutor's withdrawal of his request for the death sentence against Cebreros. (RT 1933-34.)

hearing that it was not then practice of the Kern County Superior Court to appoint two attorneys to capital case defense.  (EHRT 321-22; *see also* EH Ex. 8 at ¶ 12.)  Petitioner's *Strickland* expert, investigator Russell Stetler (hereinafter "Stetler"), similarly testified at the evidentiary hearing.  (EHRT 270.)

Petitioner cites to the opinion of his *Strickland* expert, capital defense attorney Susan Sawyer (hereinafter "Sawyer") and argues that in any event Hoover should not have expected assistance from co-defendant's counsel during the joint trial because of the potentially divergent and conflicting interests of co-defendants Petitioner and Cebreros.  (EH Ex. 5 at ¶¶ 24-30.)  Especially so at the penalty phase, he argues, as only one of the co-defendants was the actual killer (*id.* at ¶¶ 26-27) and the identity of the actual killer as between co-defendants Cebreros and Petitioner was in issue and potentially mitigating.  (*Id.* at ¶¶ 24-30.)  Sawyer also opined that Hoover failed to take advantage of other then available capital defense resources.  (*Id.* at ¶¶ 16-30; EH Ex.'s 136-38.)  All this, according to Sawyer was deficient penalty phase performance.  (EH Ex. 5 at ¶¶ 22, 30; EHRT 295-96.)

But Sawyer conceded during her testimony at the evidentiary hearing that Hoover did not have an obligation to refuse appointment as sole counsel - stating only that he should have looked "long and hard" at the decision.  (EHRT 303.)  Hoover for his part believed that he could gain some benefit from the experience of co-defendant's counsel during the joint trial.  (EH Ex. 12 at ¶ 65.)  Notably, any issue of conflict between defendants relating to which of the two played the dominant role in the capital crimes (*see e.g.*, EH Ex. 12, Ex. 2 thereto at ¶ 6) appears to attenuate when considered in the context of the applicable felony murder rule and the joint alibi defense.  Petitioner has not demonstrated that on the basis of such purported conflict or otherwise, Hoover was unreasonable in believing he could draw upon the capital defense experience of counsel for co-defendant Cebreros and the joint defense investigation.

Hoover was forthcoming that he was not well-versed in penalty phase rules and procedures including as to mitigation evidence and lingering doubt.  (EH Ex. 12 at ¶¶ 25, 57.)  Pointedly, joint defense counsel Simrin testified at the evidentiary hearing that "Hoover, due to

his lack of experience, did not really know what to do in a capital case." (EH Ex. 8 at ¶ 20.)  But in addition to his long-lived participation with Simrin in the joint defense, Hoover testified that he independently conducted legal research regarding presentation of a mitigation defense, if only minimal research.  (EH Ex. 12 at ¶ 57.)

Additionally, Petitioner has not demonstrated on the evidentiary record that Hoover's penalty phase performance was deficient due to his then existing caseload.  (EH Ex. 12 at ¶ 56.)  Hoover testified that as a solo practitioner he had "the pressure and deadlines of [his] other cases."  (EH Ex. 12 at ¶ 56.)  He testified that in 1981 "[he] was handling one federal civil case and four or five on-going Superior Court civil cases" and that he had "more than one attorney could do even with sharing some of the guilt phase work in this case with Stan Simrin, to prepare for and try the guilt phase of the case."  (*Id.*)

However, Petitioner has not pointed to facts in the evidentiary record that Hoover's other cases impacted to any material extent his penalty phase performance in Petitioner's case.  *See Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014) (heavy caseload and inexperience of capital defense attorney not basis for ineffective assistance claim absent specific acts or omissions that may have resulted from such inexperience and other professional obligations).

### b.  General Penalty Defense Investigation

Petitioner alleges that any defense investigation Hoover did conduct was untimely and insufficient to develop relevant facts.  (*See* Doc. No. 321 at 16-23, 80-104, *citing* the ABA Standards § 4-4.1 [2d ed. 1982 Supp.]); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing 1 ABA Standards § 4–4.1) ("[I]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.").

Petitioner argues that Hoover failed to personally direct what turned out to be only a general investigation of Petitioner's background and potentially mitigating circumstances; an investigation where no witnesses were interviewed or prepared to testify on Petitioner's behalf at the penalty phase.  (DOC. No. 329 at 10:15-20, *citing* EH Ex. 12 at ¶¶ 43, 52, 54, EHRT 122);

24

*see also Sanders*, 171 F.App'x at 590.

Petitioner goes on to argue that by the time of his conviction, it was too late to complete a sufficient penalty defense investigation. (*See* EH Ex. 5 at ¶¶ 19, 33-42, 74; EH Ex. 6 at ¶ 14; EH Ex. 8 at ¶¶ 12-15; EH Ex. 12 at ¶¶ 24, 31, 63; EH Ex. 19 at ¶¶ 2-3); *see also Williams*, 529 US. at 395 (counsel deficient where penalty phase preparation begun one week before trial). Especially so here, given that only four days intervened between the guilt phase verdict return on January 22, 1982 and the scheduled start of the penalty phase set for January 26, 1982. (EH Ex. 12 at ¶ 34.)

However, for the reasons discussed, *post*, Petitioner has not shown that Hoover's general investigation was unreasonable given the joint defense strategy and the facts and circumstances Hoover faced in this case.

### i.    *Background Investigation*

Hoover testified at the evidentiary hearing that he focused on the guilt phase defense until the conviction, at which time he turned his full attention to the penalty phase. (EH Ex. 12 at ¶ 26.) The joint defense strategy was to go to trial as quickly as possible so that the prosecutor would have the least chance to prepare his case and witnesses. (*See* EH Ex. 12 at ¶ 20.) Hoover reasoned that the prosecution case was "remarkably weak" (EHRT 120) and there was a lack of physical evidence linking Petitioner and Cebreros to the capital crimes. (EH Ex. 12 at ¶ 27; *see also* DOC. No. 321 at 19-31.) He believed that he could win acquittal. (EH Ex. 12 at ¶¶ 20, 22, 31; EH Ex. 38 at 18.)

To this end, Hoover testified that he and Simrin collaborated on the case and shared investigation results. (*Id.*) Petitioner suggests the collaboration was not a close one; especially as to any needed penalty defense. He notes that Roger Ruby (hereinafter "Ruby"), Simrin's defense investigator, testified at the evidentiary hearing that he rarely spoke with Hoover's team and did not personally do any work with respect to Hoover's investigation for the penalty phase. (EHRT 87-91; EH Ex. 19 at ¶¶ 4-5; EH Ex. 8 at ¶ 1.)

However, the record suggests that Hoover's investigative team worked to some extent

with Ruby throughout the investigation of the joint defense. (RT 1464.) Although the guilt phase strategy of quickly going to trial may have shortened the time available for penalty defense investigation, Hoover's defense team nonetheless investigated the penalty defense from the outset. Immediately upon his appointment, Hoover went to the jail to meet with Petitioner (EHRT 108-11), and in Hoover's words began "check[ing] Petitioner out." (EH Ex. 12 at ¶ 27; *see also* DOC. No. 321 at 19-31.)

Hoover started the case investigation that day, retaining investigator Gerald Dodd (hereinafter "Dodd") (EHRT 112) with whom Hoover had a good working relationship. (EHRT 112-13.) This even though Hoover was unaware whether Dodd had ever investigated a penalty phase defense. (EH Ex. 12 at ¶ 49.) Hoover directed Dodd to check out "the whole personal background of [Petitioner] and to … go to the jail and interview him and get what information he could, corroborate whatever he could, and find out what he could about [Petitioner]." (EHRT 114, 116.) Hoover testified at the evidentiary hearing that he gave this direction "[i]n the unlikely event that [Petitioner] changed his mind [about the penalty defense objection]…." (EHRT 152.)

Hoover concedes that he did not give Dodd specific instructions regarding the investigation because Hoover assumed based on Dodd's experience as an investigator that he knew what to do. (EH Ex. 12 at ¶ 49.) Dodd began investigating Petitioner's background (EHRT at 112-16) including the little personal information Petitioner had provided to Hoover (*id.*, EH Ex. 12 at ¶¶ 27, 49); information that largely could not be corroborated as discussed, *post*.

Dodd's investigation also included information not provided by Petitioner relating to five armed robberies in which Petitioner participated in 1970 in Orange County, California and his resultant felony conviction. (EH Ex. 12 at ¶ 29; *id.* at Ex. 2 thereto; EHRT 152.) Hoover had the defense team obtain police records and search for the involved officers and witnesses to the robberies. (EH Ex. 12 at ¶ 29; *id.* at Ex. 3 thereto.) Hoover testified that defense investigator Donald Bond (hereinafter "Bond"), who worked with Dodd, provided a written report on

1  Petitioner's criminal history (EHRT 153-54) relating to potential aggravating circumstances
2  (EHRT 154-55).

3      Hoover testified that Petitioner provided essentially no assistance during the course of the
4  investigation.  (EHRT 154-55.)  Hoover testified that Petitioner's objection to a penalty defense
5  was one of the reasons he did not conduct more than a general penalty defense investigation.
6  (EHRT 147.)  Hoover also cited the press of his other cases (EH Ex. 12 at ¶ 56) and the joint
7  defense strategy focused on winning the guilt phase (EH Ex. 12 at ¶¶ 16-17, 53, 56, 65).  Even
8  so, the record reflects that Hoover met with Petitioner approximately eight times prior to the first
9  trial.  (EH Ex. 12 at 10; EHRT 111-12, 119-26.)  Petitioner maintained at all times that he was
10  not guilty.  (EHRT 110.)

11      Even prior to the first trial, Petitioner expressed his feelings about the death penalty
12  (EHRT 111) and that he did not want Hoover to do anything that would result in a life without
13  the possibility of parole ("LWOP") sentence.  (EHRT 120.)  Instead, he wanted Hoover to work
14  for an acquittal.  (*Id*.)  Petitioner remained consistent in these feelings through the penalty phase.
15  (EHRT 123.)  As discussed, *ante* and *post*, the record suggests Hoover presented a vigorous guilt
16  phase defense while directing a general investigation of facts having potential mitigating value.

17      **(1)    Criminal History**

18      Petitioner alleges that Hoover was deficient by failing to investigate and present evidence
19  mitigating his criminal history.

20      However, the record suggests that Petitioner was uninterested in discussing and assisting
21  with the penalty defense.  (EHRT 144-45.)  Petitioner early on told the defense team he had a
22  master's degree, a job and no criminal background.  (EHRT 115.)  Defense investigator Dodd
23  confirmed that Petitioner had no criminal record in Kern County.  (EH Ex. 12 at ¶ 27.)  Hoover
24  relied upon this information provided by Petitioner in bringing a pre-trial bail motion.  (EHRT
25  117; EH Ex. 38 at 51; 5 CT 1182, 1193.)

26      But then, prior to the first trial, the prosecution provided Petitioner's rap sheet which
27  showed a prior armed robbery conviction, other armed robberies and a juvenile court record.

28

(EHRT 117-19; EH Ex. 12 at ¶ 28; 5 CT 1219, 1229.)  Hoover testified that he was shocked. (*Id.*)  When confronted with this new information, Petitioner stated he thought his criminal history was sealed as juvenile records.  (EH Ex. 12 at¶ 28; EHRT 119, 155.)

Petitioner blamed Hoover, alleging that Hoover deficiently "did not look for criminal records in other counties because he was not aware and did not ask whether [Petitioner] had lived in other counties. . . ."  (DOC. No. 329 at 9-10, *citing* EH Ex. 12 at ¶ 27; EHRT 115, 145, 277-78.)  Petitioner argues that Hoover should have expected to get inaccurate information because that is often the case with criminal defendants.  (EH Ex. 5 at ¶ 57; EHRT 272, 304-05, 329; EH Ex. 6 at ¶ 30.)

Petitioner also argues that Hoover did not fully investigate the noted armed robberies and conviction and failed to follow-up on the information he was able to obtain.  (EH Ex. 5 at ¶ 53; EH Ex. 12 at ¶ 29; EH Ex. 6 at ¶ 28, *citing* EH Ex. 39 at Ex. 3 thereto.)  He suggests that Hoover did not provide Dodd with instructions and feedback necessary to focus Dodd's investigation. (*See* EH Ex. 5 at ¶¶ 50-53; EH Ex. 6 at ¶¶ 26-27; EHRT 120.)  For example, Petitioner contends that Hoover did not obtain the files of prior defense attorneys and the related court files.  (EH Ex. 5 at ¶¶ 53-54; EH Ex. 6 at ¶ 27.)

However, Hoover stated in his 2007 habeas declaration that upon learning from the prosecution of Petitioner's 1970 armed robberies and convictions, he directed a preliminary investigation of the related aggravating evidence including locations and contact information for law enforcement officers and witnesses.  (EH Ex. 12 at ¶ 29; *see also id.* at Ex. 3 thereto.) During the first trial, Hoover had Dodd investigate and report on Petitioner's criminal history (EH Ex. 12 at ¶ 29; EH Ex. 41 at ¶ 13; EH Ex. 38 at 46; EH Ex. 42; EHRT 152) including as to each of the five armed robberies (EH Ex. 6 at ¶ 28, *citing* EH Ex. 38 at 46 as corrected on February 10, 2008).

As noted, Hoover testified this investigation of potential penalty defense facts was made in case Petitioner "changed his mind" about mounting a penalty defense.  (*Id.*; EHRT 152-55.) Defense investigator Dodd also obtained copies of booking records – all summarized in Dodd's

report.  (*Id.*)  Hoover also testified on cross-examination at the evidentiary hearing that he believed he did have Dodd contact witnesses to the robberies.  (EHRT 154.)

The record suggests that Petitioner's penalty defense objection, lack of candor and lack of participation limited Hoover's general investigation.  Hoover testified in his habeas declaration that he did not believe he could have gone very far with a background investigation without Petitioner's cooperation and participation.  (EH Ex. 12 at ¶ 53.)  In this regard, Hoover seems to have had scant access to such cooperation and participation given Petitioner's penalty defense objection and his seeming inability to provide information that could be corroborated.  (*See* EHRT 145.)

It seems that the misinformation provided by Petitioner, more than Hoover's alleged failure to direct Dodd's investigation (EHRT 114, 120) negatively impacted the defense team's efforts to obtain accurate criminal history information.  (*Id.*)  This is especially so given the limited investigatory resources generally available at the time of Petitioner's trial.

### (2)    Employment, Educational and Social History

Petitioner alleges that Hoover was deficient by failing to investigate his employment, educational and social background and arrange for preparation of a social history for the penalty phase jury.  (EHRT 152.)

As noted, Petitioner initially told Hoover that he had a graduate degree in geology and a job in an oil related business, but apparently provided no specifics.  (EHRT 114-15.)  However, according to a contemporaneous police report, Petitioner was unemployed around the time of his arrest on the capital crimes.  (1 CT 44-45.)  Later, the defense team was able to glean some prior employment documentation from family members (EH Ex. 41 at ¶ 12; EHRT 122) and from documents at Petitioner's residence (EHRT 128).

After the January 22, 1982 conviction and special circumstance findings, Hoover directed investigator Dodd to further investigate Petitioner's social, employment and educational background in preparation for the penalty phase.  (*Id.*; EH Ex. 12 at ¶ 50; *see also* EHRT 114-115, 122; EH Ex. 41 at ¶ 13; EH Ex. 42.)   Dodd did so, reviewing the employment

documentation found in Petitioner's home. (EH Ex. 12 at ¶ 51 and Ex.'s 6-12 thereto; EH Ex. 47.) Dodd was able to confirm some prior employment information based upon his discussions with Petitioner (EH Ex. 38 at 48; EHRT 131) and these documents (EHRT 128, 131; EH Ex. 12 at Ex. 6-12 thereto.) However, Dodd learned a prior employer "did not think too much of [Petitioner.]." (*Id.*)

Dodd's associate, investigator George Glenn (hereinafter "Glenn"), who apparently worked with Ruby "throughout the investigation" (RT 1464), provided Hoover with a written report dated January 25, 1982 (one day before the scheduled start of the penalty phase) and related notes summarizing the available education and employment information including the noted employment information reviewed by Dodd (EH Ex. 45; EH Ex. 12 at Ex.'s 6-12 thereto), again concluding therein that Petitioner's employers had nothing good to say about him (*id.*; EH Ex. 46; EHRT 132-33).

Hoover apparently viewed the confirmation of prior employment as potentially helpful to the defense. (EHRT 131.) However, Hoover did not follow-up with employer(s) (*id.*), finding such matters "totally irrelevant" given that Petitioner would not allow presentation of any penalty defense. (EH Ex. 38 at 54.)

Petitioner argues that Hoover deficiently investigated his educational and social background, failing to contact then available family members and others for mitigating information. (DOC. No. 321 at 24-31; *see also* EH Ex. 41 at ¶ 12; EHRT 119-22; EH Ex. 37 at ¶ 3, regarding his sister Suzanne Williams [hereinafter "Suzanne"]; EHRT 80-81, Ex. 27 at ¶¶ 5, 6, regarding his brother Donald Steven Sanders [hereinafter "Steve"]; Ex. 24 at ¶¶ 4, 5, 7, regarding his cousin Bobby Sanders [hereinafter "Bobby"]; Ex. 17 at ¶ 58, regarding his mother Lois Raymond aka Tomi Sanders [hereinafter "Tomi"]; Ex. 25 at ¶ 35, regarding his father Don Sanders [hereinafter "Don"]; and Ex. 22 at ¶ 29 regarding his cousin Allen Eugene Sanders [hereinafter "Eugene."].)

For example, Petitioner points to Steve, who testified at the evidentiary hearing that he was not contacted by the defense team during Petitioner's trial (EHRT 80-81) and that he learned

of Petitioner's penalty defense objection only after the final verdict (*id.*). Petitioner points to Bobby, who spoke to Petitioner by phone a number of times during his trial (EHRT 81-86); Bobby testified at the evidentiary hearing that he was not contacted by Hoover and learned this was a death penalty case only after sentencing (*id.*). Hoover failed to contact Steve and Bobby even though Steve and Bobby were then available and known to Hoover. (EH Ex. 12 at ¶ 52.)

However, the record suggests that Hoover did contact certain family members regarding Petitioner's case and penalty defense. In January of 1982, during the guilt phase trial Hoover asked Dodd to locate Petitioner's father, Don. (EHRT 135; EH Ex. 12 at ¶ 49.) Dodd had investigator Glenn locate Don in a hospital in Maryland, but Glenn was unable to talk with Don or provide any information about him at that time. (EH Ex. 12 at ¶¶ 44, 49; *see also id.* at Ex. 5 thereto.) During this same period, Hoover spoke with Petitioner's wife, Marian, about the trial including Petitioner's penalty defense objection, (EHRT 126-27; EH Ex. B at 774-75), although it appears that Marian preferred not to testify to avoid disclosing Petitioner's violence toward her. (EHRT 134; EH Ex. 38 at 39; *see also* EH Ex. 1 at ¶ 213); *see e.g., Lang v. Cullen*, 725 F. Supp. 2d 925, 1028 (C.D. Cal. 2010) (counsel may reasonable forego presenting background evidence when the investigation discovers mostly harmful evidence).

Petitioner's younger brother, Roger Sanders (hereinafter "Roger") testified at the guilt phase of the second trial. (EHRT 31-32, 1435-50.) Hoover briefly met with Roger at Roger's workplace (EHRT 54-55) and asked him what Petitioner was like and whether Roger would be willing to testify at the penalty phase (EHRT 48-51). Roger testified that Hoover did not specifically ask him anything about the penalty phase. (EHRT 53.) He testified that there was no mention of Petitioner's objection to a penalty phase defense. (EHRT 52-54). Nevertheless, Roger seems to concede that Hoover did ask him about Petitioner's family history. (EHRT 52-54.)

Suzanne, Petitioner's sister, was a prosecution witness at the second trial and maintained close contact with their parents. (EH Ex. 37 at ¶ 2; EHRT 59, 61-62.) She testified at the evidentiary hearing to her belief that she did speak with Hoover during Petitioner's trial (EHRT

63), but was uncertain whether she talked with Hoover about Petitioner's background and upbringing (EHRT 72). Suzanne testified that she was aware of Petitioner's penalty phase objection (EHRT 64-65), although she did not remember talking to Petitioner about it (EHRT 67). Suzanne conceded that around the time of Petitioner's trial the family members were geographically distant and did not communicate well with each other (EHRT 69-71.) This suggests the defense team faced similar challenges during its investigation.

As discussed *post*, just prior to the penalty phase, Hoover succeeded in bringing Petitioner's parents, Don and Tomi, to Bakersfield to talk with Petitioner about his penalty defense objection. (EHRT 135-37.) According to Hoover, this was to ensure the objection was a "personal, honest, conscious, sober decision." (EHRT 137.)

### c.    Decision to Forego a Penalty Defense

Petitioner alleges that Hoover was deficient by foregoing further investigation as well as development and presentation of a penalty defense. (DOC. No. 321 at 92-104.)

Petitioner argues that Hoover's general investigation was insufficient to support a reasoned response to Petitioner's objection and a strategic decision to forego further penalty defense investigation. (*See* DOC. No. 321 at 111-112; EH Ex. 1 at ¶¶ 230-37; EH Ex. 5 at ¶¶ 44, 95-104; EH Ex. 6 at ¶¶ 18, 37-39; EH Ex. 8 at ¶¶ 18, 47; EH Ex. 9 at ¶¶ 62-79.)

He argues that Hoover's alleged deficiencies also left Petitioner unaware of the then available mitigating evidence causing Petitioner to become more entrenched in his objection to a penalty defense. (*See* EH Ex. 5 at ¶¶ 65, 91-94; EH Ex. 6 at ¶¶ 9, 16, 21; EH Ex. 8 at ¶¶ 33-39; EHRT 283); *see also Allen v, Woodford*, 395 F.3d 979, 1001 (9th Cir. 2004) (counsel ineffective where investigation of potential mitigating evidence was untimely, hasty, and incomplete).

Relatedly, Hoover stated in his habeas declaration that

> [U]pon reflection, I wish I had not taken [Petitioner] at face value. I should have investigated [Petitioner's] background more thoroughly and earlier in the case. Although [Petitioner] seemed adamant about his position, I did not have an adequate understanding of his make-up. If I had, I may have been able to better react to his objection to LWOP before we reached the penalty phase.

(DOC. No. 321 at 112:18-22, *citing* EH Ex. 12 at ¶ 63.)

However, for the reasons discussed *ante* and *post*, Petitioner has not demonstrated that Hoover was unreasonable in his decision to forego a penalty defense given the facts and circumstances facing Hoover.

### i.    *General Duty to Investigate*

Petitioner alleges that Hoover had a general duty to investigate the penalty defense notwithstanding Petitioner's objection to that defense.  In support, he points to 1981-82 norms in Kern County (*see* EH Ex. 6 at ¶ 14; EHRT 270), suggesting that Hoover had a general duty to conduct an early penalty phase investigation (*see* DOC. No. 321 at 80-104, *citing* the ABA Standards § 4-4.1 at 4-53-55 [2nd ed. 1980]; EH Ex. 135; EH Ex. 9 at ¶¶ 31-33, 45; EHRT 297, 306-08, 317; EH Ex. 5 at ¶ 32; EH Ex. 8 at ¶ 12); *see also Bell v. Ohio*, 438 U.S. 637, 642 (1978) ("[S]entencer, in all but the rarest kind of capital case, [must] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (same).  He argues this general duty to investigate was the standard practice in Kern County in 1981, even when a client objected.  (*See* DOC. No. 321 at 80-104.)

Petitioner also points to the heightened importance that attaches to a capital mitigation investigation and argues Hoover was required to ensure his existing caseload did not impair his capital representation.  (EH 135, ABA Standards § 4-1.2); *see also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[T]he imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing because '[t]he Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy.' ").

Petitioner's *Strickland* experts and the defense team for co-defendant Cebreros suggest that in Kern County at that time, capital defense counsel commonly had their investigators research and gather penalty defense information and prepare a penalty defense prior to trial.  (EH Ex. 8 at ¶¶ 13-15; EH Ex. 19 at ¶¶ 2-3; DOC. No. 329 at 13-14, *citing* EH Ex. 135.)  Notably, the

defense team for co-defendant Cebreros discussed penalty phase procedures and options early in the case and were ready with the penalty defense prior to the end of the guilt phase in the first trial.  (EH Ex. 19 at ¶ 5; EHRT 320.)

Although ABA Standards are merely guidelines and not the bellwether of what is objectively reasonable attorney conduct,  *Bobby v. Van Hook*, 558 U.S. 4, 7-9 (2009), Ninth Circuit authority on counsel's duty to investigate appears clear that

> [B]ecause the defendant's background is so important in the sentencing process, [i]t is imperative that all relevant mitigation information be unearthed for consideration; failure to do so [falls] far short of professional standards. [Citations] Because of the importance of background in convincing a jury to spare a defendant's life, the Supreme Court has recognized that it is ineffective for counsel to fail to present such evidence to the jury.  [Citation]

*Lang*, 725 F. Supp. 2d at 1038, *citing Boyde v. Brown*, 404 F.3d 1159, 1176 (2005), and that

> [W]hile we have emphasized that "[t]he client's wishes ... inform our view of the reasonableness of a particular course of action taken by counsel," [Citation] ("[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."), in most circumstances a lawyer may rely on his client's decision against presenting mitigating evidence only after completing an appropriate investigation and only where the client's decision is "informed and knowing." [Citation] ("A defendant's insistence that counsel not call witnesses at the penalty phase does not eliminate counsel's duty to investigate mitigating evidence or to advise the defendant of the potential consequences of failing to introduce mitigating evidence, thereby assuring that the defendant's decision regarding such evidence is informed and knowing.") [Citation] ("A defendant's insistence that counsel not call witnesses at the penalty phase does not eliminate counsel's duty to investigate mitigating evidence or to advise the defendant of the potential consequences of failing to introduce mitigating evidence, thereby assuring that the defendant's decision regarding such evidence is informed and knowing."). [Citation] ("[T]rial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." [Citation] ("While not directly addressing a situation where a client purportedly seeks to prohibit an attorney from investigating his background, these guidelines suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes." [Citation]

*Stankewitz*, 365 F.3d at 722; *accord Strickland*, 466 U.S. at 691; (*see also* EH Ex. 5 at ¶¶ 31-35).

### ii.    *Circuit Court findings on Remand Regarding Hoover's Performance*

In remanding claim 38 back to this Court, the Ninth Circuit observed that Hoover's

investigation consisted of

> [A] general interview with [Petitioner] regarding his background; a review of some of [Petitioner's] papers in a suitcase at his house, resulting in documents confirming [Petitioner's] employment in Canada between 1976 and 1977 and with the Getty Oil Company; a telephone call that confirmed that [Petitioner's] father was being treated in a hospital in January 1982 (Hoover did not interview [Petitioner's] father or speak with him on the phone); identifying the whereabouts of certain family members, but conducting no interviews; and conducting some "witness location searches (but not interviews)" for [Petitioner's] prior crimes in 1970.

*Sanders*, 171 F.App'x at 590. The Circuit Court went on to note that

> Subsequent research by [Petitioner's] attorneys has revealed substantial mitigating evidence. Most of this involves [Petitioner's] life history and family background. From this, [Petitioner] argues that he could have presented evidence that he suffered extensive abuse and mistreatment, particularly from his father, and that he grew up in a household with severe domestic violence; that his mother was clinically depressed; that there was a history of neglect, substance abuse, pervasive poverty and transience in the family; that [Petitioner's] sister died as a result of drug abuse; that [Petitioner] spent time in several youth detention centers, in addition to time in prison for armed robbery; that he served in the Army, although he was later honorably discharged for having enlisted under the age of 18; and that after his imprisonment for armed robbery conviction, he was successfully employed, married and receiving good reports from his probation officers. [Petitioner] also argues that an investigation would have revealed evidence mitigating his robbery conviction, including the fact that he was heavily intoxicated at the time and was fully cooperative with police.
>
> Significantly, [Petitioner] contends that an investigation into mitigating circumstances would have also brought forth evidence that he was easily persuaded and had difficulty making major decisions on his own. For example, [Petitioner] underwent a psychiatric evaluation that revealed he "performed poorly on tasks which required complex or divided attention"; that he had "cognitive inflexibility, that is, he was unable to use error feedback to modify his problem solving approach"; that he was diagnosed with attention deficit disorder; and that he suffered post-natal complications. Reports from prison psychiatrists and counselors suggested that [Petitioner] was "a weak, emotionally immature person with dependency needs who was easily influenced in the past," and that he was "easily led by peers."

*Sanders*, 171 F.App'x at 590-91.

Significantly, the Ninth Circuit, in remanding claim 38 relied in part upon the "relatively low bar" set by its (subsequently vacated) *en banc* decision in *Landrigan v. Schriro. See* 441 F.3d at 650 (*quoting Earp v. Ornoski,* 431 F.3d 1158, 1170 (9th Cir. 2005)). The *en banc* Circuit

35

Court provided that an attorney has a duty "to develop and present mitigating evidence, even when dealing with capital defendants who are uninterested in helping or even actively obstructive in developing a mitigation case." 441 F.3d at 642 (*quoting Rompilla*, 545 U.S. at 380-83). But as reflected in the Court's reframed inquiry on evidentiary hearing, the Supreme Court later raised the bar in *Landrigan* by finding that counsel's failure to present mitigating evidence is not ineffective assistance where the petitioner actively interferes with and refuses to allow presentation of such evidence, 550 U.S. at 478, regardless of whether Petitioner's actions are informed and knowing, *id.* at 479.

### iii.    *Petitioner's Failure to Participate in and Objection to a Penalty Defense*

Petitioner alleges that Hoover was deficient by failing to elicit, develop and present then available mitigating evidence regardless of any lack of cooperation, objection, or interference with the penalty defense on his part.

Petitioner argues that he was forthcoming with personal information. (EH Ex.'s 46, 48, 49, 50-1, 53.) Alternatively, Petitioner argues that Hoover should have known not to expect that the balance of information Petitioner provided would be correct because defendants generally are not reliable reporters of their life histories. (EH Ex. 5 at ¶ 57; EH Ex. 6 at ¶ 30; EHRT 329.) He argues the latter made it all the more imperative that Hoover start his penalty investigation early. (*Id.*)

Hoover testified that he was shocked and upset by the noted misinformation provided by Petitioner (EHRT 117-19) and that as a result he had reason to question any information provided by Petitioner. (*See* EHRT 144-46; *see also* EH Ex. 38 at 42.)

However,

[A] defendant's lack of cooperation does not eliminate counsel's duty to investigate." [Citation] ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty"). [Citation] ("[A]lthough the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands"); [Citation] (determining that defendant's lack of cooperation did not excuse counsel from further investigating mitigation evidence, especially given that "counsel was aware [that the defendant suffered] childhood abuse and there was essentially no other significant mitigating evidence to present to the

36

jury"). Thus, a client's "opposition to calling family members or experts as witnesses does not excuse an attorney from interviewing experts and family members or from investigating documents containing mitigating evidence. [Citation]

*Lang*, 725 F. Supp. 2d at 1054. There seems no debate that "a defendant's lack of cooperation does not eliminate counsel's duty to investigate." *Hamilton v. Ayers,* 583 F.3d 1100, 1118 (2009).

But even so, Petitioner has not demonstrated on the instant record that Hoover curtailed or terminated his investigation solely as a result of misrepresentations and lack of cooperation on Petitioner's part. (EH Ex. 12 at ¶ 26.) As noted, shortly after his appointment to the case Hoover's defense team began the investigation of potentially mitigating facts relating to Petitioner's social, family and criminal background. (EH Ex. 39 at ¶¶ 27, 30; EH Ex. 8 at ¶ 50; EH Ex. 8 at ¶ 18); *see also Correll v. Ryan*, 539 F.3d 938, 943 (9th Cir. 2008) (capital sentence defense investigation should include defendant's social background including issues of family abuse, mental impairment, physical health history and substance abuse history, criminal history and the aggravating evidence the prosecution intends to introduce).

But here, Hoover was almost immediately faced with Petitioner's objection to presenting any penalty defense in mitigation. The record reflects that prior to the first trial (which ended in a hung jury and a mistrial - *see* EHRT 111-12, 122), Petitioner instructed Hoover that

> [He] did not want me to do anything that would result in a sentence of life without the possibility of parole. He wanted me to work on the case and get an acquittal, which is what he felt the evidence should get for him.

(EHRT 120; *see also* EH Ex. 31 at ¶ 2; EH Ex. 12 at ¶ 24.)

Petitioner told Hoover that an LWOP sentence would be worse than death and was unacceptable to him. (*Id.*; *see also* EH Ex. 38 at 20; EH Ex. 31 at ¶ 2; EHRT 112.) He told Hoover after the conviction and prior to the penalty phase that if given LWOP he would try to get shot while escaping. (EH Ex. 12 at ¶ 35; EH Ex. 38 at 30-31; EHRT 139.)

Hoover disagreed with Petitioner, but put off discussing in earnest his penalty objection

1   until after the conviction (EH Ex. 38 at 21-22) because Hoover did not believe do so would be

2   "fruitful" but rather might "hurt [their] relationship" (*id.* at 32-33). Petitioner suggests this

3   shows that Hoover essentially abandoned him to a death sentence. (DOC. No. 321 at 119; EH

4   Ex. 8 at ¶ 23.)

5       However, the record reflects that Hoover did engage Petitioner on the penalty defense

6   and the objection to it, at least to some extent. Hoover was direct with Petitioner, telling him that

7   the penalty defense objection was nonsense. (EH Ex. 12 at ¶ 35.) Hoover told Petitioner that

8   LWOP could be commuted by the Governor. (*Id.*) He told Petitioner that he should put on a

9   penalty defense and that Petitioner "needed to be real serious, he needed to be real sure of

10  himself." (EH Ex. 38 at 31.) He told Petitioner not rely on any notion that a death penalty

11  sentence would be more readily reversed by the California Supreme Court than would be an

12  LWOP sentence. (*Id.*; *see also* EHRT 139-40.)

13      Petitioner remained unpersuaded (EH Ex. 31 at ¶ 9), directing Hoover to focus on

14  winning acquittal (EHRT 120). Hoover seems to have understood Petitioner to be directing

15  investigation only of guilt phase issues rather than penalty phase issues. Significantly in this

16  regard, Petitioner refused to participate in the penalty investigation. (*Id.*; *see also* EHRT 144-

17  45.) Petitioner went on to reaffirm his penalty objection in open court during the penalty trial.

18  (RT 1836, 1844-45.) There Hoover advised the trial judge that he had discussed Petitioner's

19  position "with numerous attorneys . . . with his family, with my family, with people in the state

20  public defender's office, people on the street, courts, judges." (RT 1842-43.) Although Hoover

21  later acknowledged that he may have "overstated" these efforts "in the heat of the moment."

22  (EH Ex. 12 at ¶ 59), he nonetheless believed that he must have called the state public defender's

23  office. (*Id.*) He also stated that he recalled generally discussing this problem with "colleagues,

24  friends and family." (*Id.*)

25      The record suggests that Hoover was clear with Petitioner that his penalty objection and

26  apparent direction that Hoover not further investigate or present a mitigation defense was an

27  unwise position that would not be better received on appeal, but rather would actually lead to a

28

death sentence. (EHRT 126-28.) Nevertheless, Petitioner refused to put on any mitigation defense.

### iv.    *Hoover's Acquiescence in Petitioner's Objection*

Petitioner alleges that given the facts of this case, Hoover was duty bound to follow his professional judgment and present a penalty defense. (DOC. No. 321 at 92-99; EH Ex. 8 at ¶ 12; EH Ex. 12 at ¶ 60; RT 1838-43; EH Ex. 5 at ¶¶ 72-72, 119.) He argues that Hoover, having conducted only a general investigation, improperly acquiesced in his objection. (EH Ex. 12 at ¶¶ 51-55; EH Ex. 42.) He argues that "neither [Hoover] nor [his] investigator contacted or interviewed any member of [Petitioner's] family, or anyone else who knew him to discuss what testimony they might have been able to give on [Petitioner's] behalf at the penalty phase." (EH Ex. 12 at ¶ 53.) He argues that the defense team did not seek out then available life history records. (EH Ex. 41 at ¶ 12.)

These deficiencies, Petitioner argues left Hoover's without information sufficient to make an informed strategic decision on the penalty objection. (DOC. No. 342 at 7, *citing* DOC. No. 339 at 6:2-4; *see also* EH Ex. 12 at ¶ 40; EH Ex. 41 at ¶ 14; EH Ex. 38 at 31, 52-53.) Especially so, he argues given Hoover's professional judgment that a vigorous penalty defense should be presented (*see* DOC. No. 321 at 20-21; 131; EH Ex. 8 at ¶ 30); and Hoover's testimony that he did not rely exclusively on Petitioner's threat (to act out in court), discussed *post*, in determining not to present a penalty defense (EHRT 156).

Petitioner also argues that the decision whether to present a penalty defense was for Hoover, not Petitioner. He points to authority that counsel controls all trial decisions except "whether to plead guilty, waive a jury, testify on one's own behalf, or to take an appeal." (DOC. No. 321 at 94, *citing Florida v. Nixon*, 543 U.S. 175, 187 (2004), *quoting Jones v. Barnes*, 463 U.S. 745, 751 (1983), *citing Wainwright v. Sykes*, 433 U.S. 72, 93, n.1 (1977); *accord People v. Cook*, 40 Cal. 4th 1334, 1343 (2007); *see also* EH Ex. 5 at ¶ 69; EH Ex. 135 [ABA Standards § 4-5.2]; EH Ex. 5 at ¶¶ 66-70; EH Ex. 8 at ¶¶ 22, 28; RT 1823, 1839.) He notes that Hoover did not provide the trial court with any authority on point for this issue. (RT 1829, 1838-43; EH Ex.

12 at ¶ 60.)

The California Supreme Court considered and rejected on direct appeal Petitioner's allegation that Hoover provided constitutionally inadequate representation by acceding to Petitioner's objection to presentation of available mitigating evidence, stating that

> At least in the absence of evidence showing counsel failed to investigate available mitigating evidence or advise defendant of its significance [Citation – footnote omitted] we cannot say defendant's trial attorney provided ineffective assistance of counsel.

*Sanders*, 51 Cal. 3d 526.

There appears no significant debate that defense counsel has an "obligation to conduct a thorough investigation of the defendant's background," *Williams*, 529 U.S. at 396, and to develop and present mitigating evidence, *Wiggins*, 539 U.S. at 521-23. Yet it appears that counsel's actions in these regards may be based on informed strategic choices made by the defendant and on information supplied by him. *See Strickland*, 466 U.S. at 691.

To this end, both the Supreme Court and the Ninth Circuit have held that counsel's limited investigation, development and presentation of a penalty defense can be reasonable in the face of a Petitioner's active refusal to cooperate in and obstruction of the defense. *See e.g., Hamilton*, 583 F.3d at 1118-19. In *Landrigan,* the defendant actively obstructed counsel's investigation and objected to counsel's presentation of mitigation evidence. 550 U.S. at 478. Landrigan himself instructed mitigation witnesses in his case not to testify. *Id.* He interrupted counsel's presentation of mitigating evidence stating he did not want a penalty defense and that "if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.* at 470.

In the Ninth Circuit, the extent to which a capital defendant controls defense decisions appears to be an open question, with the *en banc* court suggesting defense decisions, if fully informed, rest with the client. *Summerlin*, 427 F.3d at 638; *see also Jeffries v. Blodgett,* 5 F.3d 1180, 1197 (9th Cir. 1993) (no deficient performance where defendant refused to allow counsel to present any mitigation evidence other than brief testimony by his brother regarding his artistic abilities, a decision he made "after a weekend of discussions with his brother and with counsel,"

and one his counsel told the court that defendant had made "knowingly, voluntarily and intelligently" and "after a weekend of soul searching").

Here, given this legal backdrop and the facts and circumstances that Hoover faced and for the reasons discussed *ante* and *post*, Hoover was not deficient in acquiescing in Petitioner's apparently reasoned and informed decision not to present a mitigation defense possibly resulting in an LWOP sentence. (EHRT 138); *see also Jeffries*, 5 F.3d at 1198 (defendant's participation in the direction of his own defense not a waiver of counsel).

The Court rejects as surmise Petitioner's further argument that *Landrigan*, by negative implication supports his position. He argues that the attorney must decide whether to present mitigation evidence because *Landrigan* did not impose a "knowing and intelligent" requirement upon defendant's decision regarding introduction of such evidence. (DOC. No. 206 at 17, *citing* L*andrigan*, 550 U.S. at 479.) The Court is unpersuaded by this argument.

### v. *Hoover's Request for a Continuance and Assistance with Petitioner's Objection*

Petitioner alleges that Hoover was deficient by failing to seek additional information and assistance with this case even though he knew that he lacked sufficient knowledge and experience to respond to Petitioner's objection and defend him at the penalty phase. (DOC. No. 321 at 5-11, 23-24.) Especially so, Petitioner argues given that his objection went beyond mere rejection of LWOP; Petitioner objected to a death sentence as well. (EH Ex. 12 at ¶¶ 24, 37-38.)

But it appears that Hoover sought out help with these circumstances and requested additional time from the trial court to deal with Petitioner's ongoing objection. The record reflects that the penalty phase was scheduled to start on January 26, 1982, just four days after the guilt and special circumstance findings. (EH Ex. 38 at 40-41.) During the intervening days, Hoover met with Petitioner, who remained intransigent in his refusal to put on a penalty phase defense. (EH Ex. 12 at ¶¶ 34, 38.) Petitioner was not interested in listening to what Hoover had to say; their discussion of the details of a penalty defense was "muted." (EH Ex. 38 at 55.)

At a January 25, 1982 hearing on Petitioner's objection, Hoover informed the court and prosecution of the "serious dilemma" he faced; that Petitioner rejected his advice to put on a

vigorous penalty defense and that Petitioner's decision seemed a reasoned one.  (EH Ex. 12 at ¶ 36; *see also* RT 1823-43.)

Petitioner himself then confirmed his penalty objection to the trial judge, alluding to the "approximately 20 reasons that I believe are my basic fundamental thought processes that I have believed in for most of my adult life and the feelings that I do have about life without parole is unacceptable."  (EH Ex. 12 at ¶ 36.)  Petitioner told the judge that he was not acting upon any perceived advantage on appeal, but rather pursuant to the "20 reasons" underlying his objection.  (RT 1825-26.)  Hoover believed Petitioner was serious and sincere in stating his inability to accept "living in a cage for the rest of his life" for a crime he consistently maintained he did not commit.  (EH Ex. 12 at ¶¶ 37-38.)

Hoover requested a continuance for "a reasonable time" to persuade Petitioner to change his mind and additional resources to deal with these circumstances.  (EH Ex. 12 at ¶ 36; RT 1823-43.)  The trial court granted a continuance to February 1, 1982, this to allow Hoover to seek assistance with Petitioner's refusal to put on a penalty defense.  Notably, the trial court stated that it would grant Hoover "a continuance, but not a long one."  (RT 1824-25.)  Hoover's request seven days later for a further continuance was denied.  (RT 1834-35.)

### (1)    Assistance Requested by Hoover

Hoover advised the court that he felt Petitioner had given his penalty objection rational, lucid and honest consideration.  (RT 1842-46.)  Hoover asked for the court's assistance given his disagreement with Petitioner and Petitioner's acknowledgment that "it's possible he is not himself." (RT 1824.)  Hoover noted that he and Petitioner had a good relationship up to that point.  (EHRT 327.)  Hoover advised the trial court that Petitioner felt he was innocent and found either sentence, death or LWOP, to be unacceptable.  (RT 1837-38.)  In response to questions by the trial judge, Petitioner stated his objection was not a response to any perceived advantage on appeal, but rather grounded in the "approximately 20 reasons," held for most of his adult life.

Specifically, Hoover asked the trial court to have Petitioner examined by a medical professional to determine whether he was oriented and rational and competent to a waive penalty

defense. (EH Ex. 12 at ¶ 46; EH Ex. 38 at 60-61; RT 1824-25.) Hoover also asked the trial court that Petitioner be allowed to speak with a lawyer who might disabuse him of any notion that appeal of a death sentence has a better chance of succeeding than appeal of an LWOP sentence. (*Id.*; EHRT 142-43.) The trial court agreed, as discussed below.

### (2) Evaluation by Psychiatrist, Dr. Matychowiak M.D.

The trial court appointed a psychiatrist, Francis Matychowiak, to examine Petitioner. (RT 1828.) Petitioner welcomed the psychiatric consultation. (RT 1825-26.)

Dr. Matychowiak reviewed Petitioner's criminal record (EH Ex. 43 at 1-3) and interviewed him in jail on January 27, 1982. (EH Ex. 42 at 1.) Dr. Matychowiak, in his January 29, 1982 report concluded that Petitioner showed

> [N]o evidence of mental disease, defect, or lack of substantial capacity to understand the nature and purpose of the proceedings in court and is presently able to cooperate in a rational manner with counsel in presenting a defense. I would consider him sane at the present time.

(EH Ex. 43 at 5.) Dr. Matychowiak stated that Petitioner "feels he's quite rational and has a list of twenty-six or seven reasons written for his point of view." (EH Ex. 12 at Ex. 4 thereto at 1.) Dr. Matychowiak stated that Petitioner "feels he is not the kind of human being that will spend the rest of his life in prison." (*Id.*) Dr. Matychowiak stated that Petitioner felt "that there would be a lot of grounds for appeal" and "that if one had the death sentence and there were review or an appeal, one could get a lighter sentence." (*Id.* at 2.) Dr. Matychowiak stated that Petitioner "insists on his present innocence and the realization of his present predicament with being convicted . . . [and he] is protesting it in whatever way he can." (*Id.* at 5.)

According to Dr. Matychowiak, Petitioner was

> [N]ot wanting his identity to change. He wants to stay as he is. He feels he is a family man and to feel he could never make love to his wife or have another child would be unacceptable. He thinks it would be cruel to his family and an unfair cost to society. He has no desire to become institutionalized.

(*Id.* at 2.) Dr. Matychowiak concluded that Petitioner

> [W]as oriented for time, place, and person [with] no evidence of hallucinations,

43

delusions, or ideas of reference [and no evidence of] bizarre mentation or unusual ideation. [Petitioner] denied true depression, indicating mostly at the present time that he is rather disillusioned but not bitter. [Petitioner] appeared to be of above-average intelligence.

(*Id.* at 4.)

Hoover reviewed Dr. Matychowiak's report and found it to be confirmation that Petitioner was competent, sane and capable of making a penalty defense decision of his own free will. (EH Ex. 12 at ¶ 46; EHRT 144.) Hoover observed on the record at the start of the penalty phase that Petitioner displayed "no mental aberration." (EHRT 121.) The trial judge agreed. (RT 1844.)

Petitioner contends Hoover should have done more. He faults Hoover for his conceded failure to seek assistance from a mental health expert following Petitioner's initial objection to a penalty defense. (EH Ex. 12 at ¶ 61.) He faults Hoover for not providing Dr. Matychowiak with background information and legal context. (EH Ex. 6 at ¶ 38.) He faults Hoover for not using Dr. Matychowiak as a potential source of mitigating information and to change Petitioner's mind regarding his penalty phase position; all things Hoover conceded. (*See* EH Ex. 38 at 60-63; EH Ex. 12 at ¶ 46.) Petitioner notes in these regards that habeas mental defense experts, Drs. Kriegler and Stewart, found Dr. Matychowiak's report to contain potentially mitigating information about trauma, personality and psychological problems that could and should have been further investigated. (EH Ex. 1 at ¶ 239; EH Ex. 9 at ¶¶ 75-77.)

However, these arguments are unpersuasive given the facts and circumstances in this case. As discussed more fully below, Petitioner has not demonstrated that his penalty objection alone would or should have placed Hoover on notice of a need for evaluation by a mental health professional given the paucity of facts in the record suggesting a lack of sanity or competency or a mitigating mental condition or deficit.

Moreover, Dr. Matychowiak was appointed by the trial court to evaluate Petitioner pursuant to Evidence Code 1017 and limited thereby. (EH Ex. 12 at Ex. 4 thereto at 1.) Petitioner has not identified information that Hoover could and should have provided to Dr. Matychowiak in this circumstance. Nor did Dr. Matychowiak in the course of his evaluation

44

request any information not otherwise available to him and relevant to the evaluation directed by the trial court.  (EH Ex. 12 at Ex. 4 thereto.)  Significantly, Dr. Matychowiak's report largely recites the relevant background and legal context.  (*Id.*)

Furthermore, Hoover was not unreasonable by failing to use Dr. Matychowiak as a means of persuading Petitioner from his penalty objection, or as a source of mitigating evidence.  This conclusion follows from the discussion, *ante* and *post*, suggesting that Hoover's acquiescence in Petitioner's penalty objection and waiver was not unreasonable.  Petitioner's reliance upon his habeas experts in suggesting mitigating value in social history factors included in Dr. Matychowiak's report is unpersuasive for the reasons discussed below.

Petitioner's testimony at the evidentiary hearing that he could not recall his interview with Dr. Matychowiak (EHRT 356-60) is not evidence otherwise.

### (3)    Counseling by Attorney Cook

The trial court appointed Robert Cook, Esq. (hereinafter "Cook") to further counsel Petitioner regarding his penalty defense objection.  (EH Ex. 38 at 57-58; EHRT 143; RT 1828.)  Hoover recommended Cook because he "has some recent experience in a situation just like this. . . ."  (RT 1828.)  The record reflects that Cook was "a very experienced attorney . . . who had handled several death penalty cases himself."  (RT 1845.)  The trial judge found Cook to be a "highly competent criminal lawyer."  (*Id.*)

Cook met with Petitioner and reported back to Hoover that Petitioner was serious about his decision not to present a penalty defense and that Petitioner was not posturing to set up an appeal.  (EH Ex. 12 at ¶ 47.)  At the penalty phase hearing, Cook testified that "there was some ambivalence in [Petitioner's] feeling about this."  (RT 1836-37.)  Cook went on to testify that he "was opposed to the manner in which [Petitioner] wanted to proceed [and that] perhaps a little more time would be beneficial so that we could discuss the matter with his father and mother and other people."  (*Id.*)

However, Petitioner's noted statements to Dr. Matychowiak, Hoover and the trial court do not appear to suggest any ambivalence either in his penalty defense objection or the reasons

for it.  Significantly, Cook did not suggest a need for any further investigation of penalty phase issues.  (EHRT 143-44.)  To the extent Cook mentioned possible benefit from parental involvement the record reflects that Hoover did arrange a meeting between Petitioner and his parents, discussed below.

Petitioner complains that Hoover did not use Cook to determine whether Petitioner could be persuaded to change his mind on the penalty objection.  (EH Ex. 38 at 58-59.)  He faults Hoover for not consulting with Cook about how to change Petitioner's mind and for not asking Cook to try and change Petitioner's mind.  (EH Ex. 12 at ¶ 12.)  But Hoover's acquiescence in Petitioner's objection and waiver and threshold failure to persuade Petitioner from his penalty objection was not deficient, for the reasons discussed *ante* and *post*.

### (4)  Petitioner's Meeting with his Parents

During the week prior to the penalty trial, consistent with attorney Cook's noted suggestion and against Petitioner's express wishes (EH Ex. 31 at ¶ 5), Hoover brought Petitioner's divorced parents, Don and Tomi, from out of state to talk with him about his penalty defense objection.  (EHRT 136-37; EH Ex. 12 at ¶¶ 42, 44; EH Ex. 38 at 33-34; EH Ex. 31 at ¶ 5; RT 1843.)  Hoover stated that he arranged this visit to ensure Petitioner was serious about not presenting a penalty defense and to help make a complete record on appeal.  (EH Ex. 12 at ¶ 47; EHRT 135-37.)  After the meeting, the parents told Hoover that Petitioner was serious about his penalty decision.  (EH Ex. 12 at ¶ 41; *see also* RT 1835-36.)

Petitioner argues that the meeting with his parents went badly and was not helpful.  (EHRT 366; EH Ex. 31 at ¶ 5.)  He stated that his parents had not been in a room together with him since their divorce when he was eight years old, and that this situation opened old scars from Petitioner's troubled family history.  (EHRT 367; EH Ex. 1 at ¶¶ 230, 232, 234-36; EH Ex. 5 at ¶ 103; EH Ex. 6 at ¶ 37; EH Ex. 9 at ¶¶ 70, 78; EH Ex. 24 at ¶ 11; EH Ex. 31 at ¶ 5.)  He relies upon his habeas experts and argues that had Hoover investigated his family history, Hoover would have known that the parental meeting would simply cause Petitioner to become more convinced of his decision not to mount a penalty defense.  (EH Ex. 1 at ¶¶ 230-34; EH Ex. 9 at ¶

78.)

But the evidentiary record suggests otherwise.  Hoover felt that Petitioner had confidence in him as a trial attorney.  (EHRT 363-65.)  Hoover knew that Petitioner believed his family loved and supported him.  (EHRT 370-71.)  Hoover, could reasonably have believed that the parental meeting might ensure a grounded and reasoned penalty decision.  Especially so given Petitioner's testimony at the evidentiary hearing that his penalty objection was motivated by something other than appeal tactics (EHRT 372-73), and Cook's agreement that a parental meeting might be a means of moving Petitioner from his objection.

Hoover admitted that he did not ask the parents to try and persuade Petitioner to change his mind about the objection.  (EH Ex. 12 at ¶ 43.)  But for the same reasons discussed *ante* and *post*, Hoover's acquiescence in Petitioner's penalty objection and waiver (EHRT 138), and his failure to persuade Petitioner from his objection were not unreasonable.  Notably, Hoover's confidence in these matters was such that he would not have presented mitigation evidence over Petitioner's objection (EHRT 141), and instead would have asked the court to relieve him as counsel.  (*Id.*)

### vi.    *Petitioner's Waiver of Penalty Defense*

Petitioner alleges that any decision he expressed to waive a penalty defense was not an informed, knowing and competent decision.

Following the continuance for mental evaluation and further consultation, Hoover reported the court that Petitioner was unrelenting in his objection.  (RT 1834); *see also Sanders*, 51 Cal. 3d at 525.  Hoover motioned for a further continuance to "allow [him] more opportunity to try to consult and counsel [Petitioner] to get him to change his essential position."  (RT 1834-35.)  The trial court denied the motion for further continuance.  (*Id.*)

Petitioner himself then testified in open court to his discussions with Hoover, Matychowiak, Cook and his parents, and to his continuing objection.  (RT 1835-36.)  The trial judge then told Petitioner "what a bad mistake he [was] making" and had Petitioner confirm his objection on the record and that his penalty objection was not gambit for better chance on appeal.

(DOC. No. 360 at 11 *citing* RT 1825, 1831.)  Petitioner responded that he had thoroughly discussed his penalty defense objection with Dr.  Matychowiak, Hoover and Cook.  (*Id*. at 11 *citing* RT 1834-1835.)

Petitioner confirmed to the trial court that he did not want Hoover to "present any evidence or to ask questions of the prosecution's witnesses and that he personally would not make a statement to the jury."  (RT 1835-36, 1844-45); *see also Sanders*, 51 Cal. 3d at 525.  This even though the trial court pointed out that members of Petitioner's family were then present in the courtroom and (according to Hoover) available to provide testimony on his behalf.  (*Id.*)

The California Supreme Court, on direct appeal considered and rejected Petitioner's allegation that he did not waive presentation of mitigating evidence, stating that

> Following the jury's verdict of first degree murder with four special circumstances, defense counsel Hoover explained to the trial court that defendant wished that no mitigating evidence be presented on his behalf at the penalty phase of the trial. Mr. Hoover stated that "I believe [defendant's] position is that life without parole is unacceptable to him. He cannot accept that as an alternative whatsoever; and for that reason does not want me to ask the jury for that alternative. He does not consider it to be viable. He cannot reconcile it in his own mind. As I explained to the court, this again causes me a dilemma. This attitude is not new. It's something that hasn't just come up between us. I find that it differs substantially from my advice." After observing that he was unsure whether he had the power to present mitigating evidence over the express wishes of his client, Mr. Hoover requested the court appoint a medical expert to examine his client.
>
> The trial court, concerned that defendant may have been relying on an erroneous belief that his chances for a reversal on appeal would be enhanced if he declined to participate in the penalty phase, asked defendant if that was the basis for his decision. Defendant replied in the negative, explaining that he had "approximately 20 reasons that I believe are my basic fundamental thought processes that I have believed in for most of my adult life and the feelings that I do have about life without parole is [that it is] unacceptable."
>
> The court then appointed Robert Cook, an experienced criminal defense attorney, to counsel defendant about his decision, as well as Dr. Matychowiak - apparently a psychiatrist - to examine him.
>
> The parties returned to court a week later. Defendant had consulted with both Cook and Matychowiak but had not changed his mind about participating in the penalty phase of the trial. After noting that members of defendant's family were present in court, the court questioned defendant further and discovered that he had instructed Mr. Hoover to refrain from cross-examining the prosecution's penalty phase witnesses. In addition, defendant stated he would not be himself addressing the jury.

48

When defendant was asked whether he desired the death penalty, Mr. Hoover explained: "[defendant] has indicated that he doesn't want me to do anything which would have the ultimate [effect] of receiving a sentence of life without the possibility of parole, a sentence which he finds to be as objectionable to him as the sentence of death and because of that reason, because of his feeling in this regard he would just as soon not present any evidence at this time." Mr. Hoover conceded that he did not believe defendant's position was irrational and that he believed defendant was sincere in his belief. Later, he underscored defendant's position: "I want to make the record clear that he is not requesting one sentence or the other. He finds both sentences objectionable...."

The trial court tried one last time to persuade defendant to change his mind, asking, "Mr. Sanders, does it continue to be your position that you do not wish your counsel to ask any questions nor present any evidence in this penalty phase of the trial?" Defendant responded: "That is correct, your Honor." The prosecutor thereafter presented his penalty phase evidence. After the prosecutor gave his closing argument to the jury, Mr. Hoover waived argument and the case was submitted to the jury.

We have identified two potential theories which may cast doubt on a penalty verdict when a capital defendant decides to forgo presentation of mitigating evidence at the penalty phase. First, the absence of mitigating evidence may undermine "the state's interest in a reliable penalty determination." [Citation] Second, a defense counsel's performance may be deemed constitutionally inadequate if he or she simply accedes to his client's wishes instead of "making an independent tactical judgment about the presentation of the mitigating evidence." [Citation] Defendant relies on both theories in urging that we reverse the penalty judgment.

As to the state's independent interest in achieving a reliable penalty verdict, however, we recently concluded that a defendant's failure to present mitigating evidence generally does not render the verdict unreliable in the constitutional sense. "[T]he required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements." [Citation]

We have also disapproved of the suggestion … that counsel necessarily provides constitutionally inadequate representation when he or she accedes to a client's wishes and declines to present available mitigating evidence at the penalty phase of a capital trial. [Citation] At least in the absence of evidence showing counsel failed to investigate available mitigating evidence or advise defendant of its significance [Citation] we cannot say defendant's trial attorney provided ineffective assistance of counsel.

Defendant notes that in contrast to other cases involving this issue [Citation] he presented absolutely no mitigating evidence in this case. In addition, there was no defense closing argument and counsel did not even cross-examine the prosecution witnesses. (Defense counsel did register several objections during the questioning of the prosecutor's witnesses, however.) Thus, he argues, the jury was left with nothing to "weigh" against the People's penalty phase evidence, thereby

49

effectively foreclosing a verdict of life without the possibility of parole.

> In light of our recent decisions … we conclude these circumstances do not support a reversal of the penalty judgment. Defendant's knowing and voluntary decision to forgo his right to present mitigating evidence, cross-examine adverse witnesses, and present closing argument at the penalty phase of his trial estops him from now claiming an entitlement to a reversal based on those decisions. [Citation]

> Finally, defendant claims his decision to forgo presentation of evidence at the penalty phase of his trial was tantamount to a guilty plea without the consent of his counsel in violation of [California Penal Code] section 1018. That section states in pertinent part: "No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall any such plea be received without the consent of the defendant's counsel."

> We reject defendant's argument because we find the premise faulty: his decision to refrain from offering evidence is not tantamount to a guilty plea and is thus not governed by section 1018. His choice did not amount to an admission that he believed death was the appropriate penalty, nor did he give up his right to confront or cross-examine those testifying against him at the penalty phase. [Citation] Moreover, his decision refusing to take part in the penalty phase did not necessarily make it any more likely that his jury would find death was the appropriate penalty. The jury could, for example, have found mitigating factors from evidence presented at the guilt phase. We conclude the scope of section 1018 is not so broad as to embrace defendant's decision of nonparticipation in the penalty phase of his trial.

*Sanders*, 51 Cal. 3d at 524-28.

### (1)     "Informed and Knowing" Waiver of Penalty Defense

Petitioner alleges that his apparent waiver was not "informed and knowing." He argues the conviction left him "stunned and devastated" (EH Ex. 31 at ¶ 3), "overwhelmed" and "just emotionally and mental shut down" (EH Ex. 1 at ¶ 226; EH Ex. 5 at ¶ 109; EH Ex. 9 at ¶ 67; EHRT 355). He points out that Hoover was similarly upset by the conviction. (EH Ex. 12 at ¶¶ 22, 33; EH Ex. 38 at 25.)

Petitioner argues that he did not understand the penalty phase and that Hoover avoided explaining it and discussing his penalty objection. (EH Ex. 5 at ¶¶ 65, 91-94; EH Ex. 6 at ¶¶ 9, 16, 21; EH Ex. 8 at ¶¶ 33-39.) He argues that his waiver was not informed by the proffered mitigation evidence (DOC. No. 321 at 66-71, 93-104; EH Ex. 1 at ¶¶ 98, 103-04, 232; EH Ex. 5 at ¶¶ 74-79; EH Ex. 6 at ¶ 18), which he suggests would have assisted in overcoming his reasons for objecting to a defense for LWOP by allowing discussion of the mitigating evidence and the

consequences of not presenting it to the jury.  *See Stankewitz*, 365 F.3d at 722; *accord see Summerlin*, 427 F.3d at 638-39.  Petitioner's *Strickland* expert, attorney Sawyer agrees in these regards.  (*See* EH Ex. 5 at ¶¶ 43, 85-86.)

Petitioner argues that these deficiencies caused him to become more convinced of his penalty objection.  (*Id.*; EHRT 283.)  He points to his habeas declaration signed eighteen years after trial, wherein he states that

> [H]ad I understood at the time I decided to forego a penalty defense what I know now about the choices in presenting mitigating evidence and had [Hoover] discussed the possible mitigating evidence with me, I would have decided to go ahead and present a penalty defense including as least some mitigating evidence.

(EH Ex. 30 at ¶ 2.)  Especially so, he argues in that Hoover's incomplete investigation left him unable to appreciate that: his LWOP anxieties were not uncommon (EH Ex. 5 at ¶ 47), presenting a penalty defense would not have prevented him from continued insistence of his innocence (EH Ex. 5 at ¶ 87; *see also* EH Ex. 6 at ¶ 20; EH Ex. 1 at ¶ 233; EH Ex. 9 at ¶ 72), his objection may have been influenced by his fabricated life story including his misrepresentations to Hoover (*see* EH Ex. 12 at ¶ 27; EH Ex. 38 at 42-44; EH Ex. 9 at ¶¶ 63-64; RT 115), and his decision may have been influenced by his neurocognitive impairments and institutional background (EH Ex. 1 at ¶¶ 66, 192, 194, 196, 226; EH Ex. 9 at ¶¶ 65, 68-69; EH Ex. 8 at ¶¶ 34-39).

Petitioner notes that on habeas review Hoover himself suggested additional investigation into Petitioner's background might have been helpful in responding the penalty objection.  (EH Ex. 39 at ¶¶ 63, 97.)

### (a)     *"Informed and Knowing" Requirement*

Petitioner argues that in the Ninth Circuit a defendant's decision not to present mitigating evidence must be "informed and knowing" and that it may be inappropriate for counsel to acquiesce in such a decision.  *See Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003) (defendant's decision not to present mitigating evidence must be informed and knowing).

51

1   Especially so, he argues in capital cases where the Circuit Court has stated that

> This standard does not only mean that the defendant's waiver must be an informed decision, but also that it must be a competent one. If a client has elected to forego legal proceedings that could avert the imposition of the death penalty, then a court must make the determination whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*Summerlin,* 427 F.3d at 639, (*quoting Rees v. Peyton,* 384 U.S. 312, 314 (1966)); *see also Silva*, 279 F.3d at 838 (defendant must make "informed and knowing" judgment where he directs counsel to discontinue mitigation defense investigation including as to the potential consequences of that decision).

It follows that upon a finding such a decision was voluntary, informed and competent a criminal defendant's decision to limit a mitigation defense will be sustained. *Summerlin*, 427 F.3d at 639. To be voluntary, informed and competent, the *Summerlin* court held that the waiver must occur after counsel has "conduct[ed] an adequate investigation," and "provide[d] the advice necessary for the client to provide informed consent to forego a mitigation defense." The waiver must be the client's "unequivocal direction," and the court must ensure "that [it] was a competent, voluntary, intelligent, informed, and knowing decision." *Id.* at 639-40.

### (b)    *Explaining the Penalty Process and Sentencing Options*

Petitioner argues that Hoover did not engage him on the penalty phase process until after the conviction (EH Ex. 12 at ¶ 26), and that even then Hoover did so deficiently. He suggests the mistrial where the jury hung eleven to one for conviction should have demonstrated to Hoover the need to presently address the penalty defense with Petitioner. (EH Ex. 38 at 23; EH Ex. 12 at ¶ 31.) Especially so, Petitioner argues because he strongly believed in his innocence (EH Ex. 12 at ¶ 21; EHRT 110) and felt he would be acquitted (EH Ex.'s 24, 31, 39; EHRT 166-69, 363) and return home (EH Ex. 24 at ¶ 5; EHRT 85-86; *see also* EH Ex. 24 at ¶ 5).

Petitioner argues particularly that Hoover was pre-occupied with the guilt phase (EH Ex. 38 at 19, 22; EH Ex. 12 at ¶ 26) and failed to explain the penalty phase procedure, issues and

options and prepare him for the penalty trial. (EH Ex. 5 at ¶¶ 82-89, 105-08; EH Ex. 6 at ¶¶ 17, 35; EH Ex. 8 at ¶¶ 20-21, 24; EH Ex. 12 at ¶¶ 20, 24; EH Ex. 38 at 20-21, 54; EH Ex. 40 at ¶ 8; RT 1823; EHRT 126.) This, he contends prevented an informed and knowing decision regarding a penalty defense. (EH Ex. 38 at 20-21; RT 1823.)

As noted above, Petitioner objected both to a death sentence and to an LWOP sentence. (RT 1837; *see also* EHRT 352.) He argues that Hoover did not clearly explain these two sentencing options; what an LWOP sentence meant and where and how he would be housed and what programming and privileges would be available. (EH Ex. 31 at ¶ 2.) Hoover, for his part appears to concede he did not provide specifics on such matters. (EH Ex. 12 at ¶ 39.)

Nevertheless, Petitioner's awareness of the only two possible sentencing outcomes he faced seems apparent from: his colloquy with the trial court regarding his penalty objection (RT 1835-45), Hoover's habeas statements (EH Ex. 12 at ¶ 25), Petitioner cited fundamental beliefs underlying his penalty objection including his noted approximately 20 reasons referenced at trial (EHRT 352-53), and Dr. Matychowiak finding that Petitioner's objection was a form of protesting his conviction (EH Ex. 12 at Ex. 4 thereto at 5; *see also* EH Ex. 12 at ¶ 34).

Though Hoover admits he did not turn his full attention to the penalty phase until the guilt conviction and special circumstance findings (EH Ex. 12 at ¶ 26), he testified that he is sure he did discuss the penalty phase process with Petitioner. (EH Ex. 38 at 23-24; EHRT 120.) As early as Petitioner's first trial (resulting in the mistrial), Hoover discussed with Petitioner the penalty phase process "in a nutshell" including as to presentation of aggravating evidence by the prosecution and mitigating evidence including background and character evidence by the defense; and that the jury would then make a sentence determination of either LWOP or death. (EHRT 125; *see also* RT 1824-44.) Hoover's trial testimony was consistent that he "[had] explained to [Petitioner] how [an LWOP defense] would work, what would be involved, [and the] basic tenants of what our evidence would consist of." (RT 1823); *see also Sanders*, 171 F.App'x at 590.

After the conviction and prior to the penalty phase, Hoover also talked to Petitioner about

appeals, possible pardons and commutations of death and LWOP sentences, and that Petitioner would not necessarily serve an LWOP at San Quentin. (EHRT 139.) Relatedly, Hoover testified at the evidentiary hearing that Petitioner was then aware of discovery in this case including the aggravating evidence the prosecution would present. (EHRT 126.)

Having received this information, Petitioner remained convinced that "life without parole [was] unacceptable to him . . . [and he] told Hoover that he could not accept [a life sentence] as an alternative whatsoever, and for that reason [did] not want [Hoover] to ask the jury for that alternative." *Sanders*, 171 F.App'x at 590.

Petitioner points out Hoover's concession that he may not have explicitly explained the two sentencing options (EH Ex. 12 at ¶ 25), and that he was not well versed in the rules and procedures for the penalty phase. (*Id.*) Yet for the reasons stated, Hoover reasonably could have felt that Petitioner understood his penalty phase options were death and LWOP - terms which Hoover believed were obvious to Petitioner. (EH Ex. 12 at ¶ 25.)

Petitioner makes much of his statement to Dr. Matychowiak that "[he] does not want [Hoover] to argue in favor of a death penalty, he simply wants to avoid the penalty of life without parole, and feels that the court will just simply have to decide on something or anything else other than that[ ]." (EH Ex. 39 at Ex. 4 thereto at 1.) Petitioner argues this statement suggests his confusion over what the sentencing options actually were. But this statement viewed in context seems to suggest merely a reassertion of his objection to LWOP and insistence upon his innocence. For instance, Dr. Matychowiak goes on to report in the next sentence that "[Petitioner] feels he is not the kind of human being that will spend the rest of his life in prison." (*Id.*) Similarly, Hoover told the trial judge that although Petitioner "would like to leave the courtroom and go home [because] he thinks he is innocent of these offenses [ ] he understands that is not a choice he has." (RT 1837; *see also* EH Ex. 1 at ¶ 241.)

Petitioner has not demonstrated on the evidentiary record that a lack of information as to penalty phase process and sentencing options factored into his reasons for objecting to and protesting a penalty defense. Dr. Matychowiak's report suggests as much, that Petitioner

understood his sentencing options to be either death or imprisonment for the balance of his life. (EH Ex. 12 at Ex. 4 thereto at 1-2.)

### (c) **Mitigating Social History Evidence**

Petitioner alleges Hoover failed to use then available social history information to persuade him to present a defense and to show that his penalty objection was not informed and knowing. (*See* EH Ex. 12 at ¶ 45.) Petitioner points to allegedly sympathetic and mitigating evidence discussed *post* and summarized here that suggests a multigenerational history of poverty, alcoholism, mental illness and abuse; a youth replete with frequent family moves, divorce, deprivation and physical and emotional abuse and consequent problems at school and with the California Youth Authority (hereinafter "CYA"); and problems with law enforcement as an adult. He also points to his attempt to escape these problems by underage enlistment in the military and his subsequent honorable minority discharge.

Petitioner argues that family members were then available to testify as to these matters. (*See e.g.*, EH Ex. 27 at ¶¶ 6-7 [Steve]; EH Ex. 29 at ¶¶ 10-11 [Roger]; EH Ex. 37 at ¶ 5 [Suzanne]; EH Ex. 24 at ¶¶ 7-8 [Bobby]; EH Ex. 38 at 34-35 [Don and Tomi]; *see also* RT 1842-49.) Petitioner argues that further investigation would have revealed other individuals whom he trusted and respected, who could have assisted in overcoming his LWOP objection, an objection that is common among capital defendants, without getting into painful family history and wounds. (EH Ex. 5 at ¶¶ 47, 102; EH Ex. 6 at ¶¶ 19, 37; EH Ex. 8 at ¶ 33.)

Specifically, Petitioner lists the following individuals whom Hoover could and should have enlisted to overcome Petitioner's penalty objection:

1) Grandmother Ruth Sanders (hereinafter "Grandmother Ruth") (EH Ex. 1 at ¶¶ 126-28, 232; EH Ex. 5 at ¶ 102; EH Ex. 6 at ¶ 37; EH Ex. 24 at ¶ 13; EH Ex. 27 at ¶ 2; EH Ex. 28 at ¶ 12; EH Ex. 37 at ¶ 4). Petitioner points out that Grandmother Ruth lived near Bakersfield, attended some of the trial including the hearing on Petitioner's penalty objection (EH Ex. 31 at ¶ 8; RT 1832), and Petitioner loved and respected her (EH Ex. 1 at ¶ 232; EH Ex. 31 at ¶ 8).

2)      Cousin Bobby (EH Ex. 24 at ¶ 3), to whom Petitioner was close and with whom Petitioner communicated while in jail on the murder charges. *(Id.* at ¶ 4.) Bobby, had he known of Petitioner's penalty objection, would have "talked some sense" into Petitioner. (*Id.* at ¶ 7.) Bobby lived in Southern California, close to the trial. (*Id.* at ¶ 4.) Bobby Sanders testified at the evidentiary hearing that Petitioner may have felt shame and family dishonor and a need to prove his innocence to his family. (*Id.* at ¶¶ 9-10.)

3)      Petitioner's siblings Steve, Suzanne, Roger, who were available and would have helped Hoover persuade Petitioner to mount a penalty defense. (EH Ex. 27 at ¶¶ 5, 6, 7; EH Ex. 28 at ¶¶ 7, 11; EH Ex. 37 at ¶¶ 2, 5.)

4)      Petitioner's friend Arelene Fangmeyer, who was available to help Petitioner. (EH Ex. 1 at ¶ 204; EH Ex. 5 at ¶ 102; EH Ex. 11 at ¶¶ 8-12; EH Ex. 14.)

5)      Petitioner's relatives including Donald Salie (EH Ex. 20 at ¶ 37); Ima Salie (EH Ex. 21 at ¶ 115; EH Ex. 142 at 53); Allen Sanders (EH Ex. 22 at ¶ 29); and Loretta Scarborough (EH Ex. 33 at ¶ 33), who were available to help Petitioner.

Petitioner revisits Hoover's allegedly inadequate investigation. Petitioner cites to the opinions of his habeas experts and argues that Hoover could not have understood the mitigating value of social history information he failed to obtain. He argues that Hoover lacked a full understanding of Petitioner's feelings of shame and concern for the well-being of family members - feelings not uncommon among capital defendants. (*See* EH Ex. 5 at ¶¶ 35, 40-45; EH Ex. 6 at ¶¶ 29-30.) He notes Hoover's testimony at the evidentiary hearing that "[Petitioner's] sibling and some other relatives would have been available and willing to talk to [Petitioner] about his predicament and urge him to allow me to present a penalty defense. I probably should have enlisted their help." (EH Ex. 12 at ¶ 63.)

However, Petitioner has not demonstrated the proffered mitigation evidence of his social history would have materially informed his penalty objection, for the reasons discussed below and summarized here.

Hoover explained to Petitioner that the penalty phase was the opportunity to present favorable character and background information and to explain the prosecutions aggravating factors - with a view toward getting an LWOP sentence. (EHRT 125.) It appears that Petitioner knew his family members, his parents, grandmother Ruth and sister Suzanne were available in court at the penalty trial to offer testimony on his behalf. (RT 1843.) Petitioner's wife Marian, who ultimately preferred not to testify due to Petitioner's violence against her (EHRT 112-155), regularly attended his trial and frequently spoke with Hoover including about Petitioner's penalty objection (EHRT 126-27).

Yet Petitioner, apparently in protest of his conviction and consequent inability to accept his sentencing options, remained unyielding in his objection to a penalty defense (*see e.g.*, RT 1836, 1843-45), so much so that he threatened to act out (EHRT 156); and to try and get himself killed in prison if he were to get LWOP (EHRT 139). *Cf. Hamilton*, 583 F.3d at 1117-18 (counsel deficient for limiting mitigation investigation upon defendant's failure to assist the defense team); (*see also* DOC. No. 342 at 5 n.1).

Notably, this Court in its August 24, 2001 order denying the petition found that on the record then before the Court it was not reasonably likely that further mitigation investigation would have changed Petitioner's mind about waiving a penalty defense. (DOC. No. 148 at 66-67; *see also* RT 1824-44.) The Court found that Petitioner had decided against a penalty defense even though family members were available to testify and after extensive discussion with counsel, the trial court, third party counsel and a mental health expert. (*Id.*)

Petitioner has not demonstrated that his failure to appreciate the mitigating value of such proffered social history evidence motivated his penalty objection, or that such mitigation evidence would have overcome his objection given the facts and circumstances of this case. His citation to *Porter v. McCollum* is not evidence otherwise, and is factually distinguishable. 558 U.S. 30 (2009). In *Porter* the deficient attorney failed entirely to interview family members or even attempt to obtain school, medical or military records. *Id.,* at 39-40. In contrast, Hoover and his defense team accomplished the general investigation discussed above.

1          *(d)    Mitigating Mental Health History Evidence*

2          Petitioner alleges that Hoover failed to use then available mental history evidence to

3    persuade him to present a penalty defense and to show that his penalty decision was not an

4    informed, knowing and competent decision.  (EH Ex. 12 at ¶¶ 46, 55, 61-62.)

5          Petitioner argues the pre-penalty trial evaluation by Dr. Matychowiak was too little, too

6    late.  He argues that if mental health experts had been enlisted earlier, they could have assisted

7    Hoover in addressing Petitioner's penalty objection.  (EH Ex. 5 at ¶ 42); *see also Hendricks v.*

8    *Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (counsel who fails to investigate his client's

9    apparent mental impairment as a mitigating factor at the penalty phase, without a supporting

10   strategic reason, is deficient).

11         Petitioner supports these arguments by pointing to allegedly sympathetic and mitigating

12   evidence discussed *post*, and summarized here, that he suffers cognitive impairments and

13   conditions which likely affected his decision not to present a penalty defense.  (*See* EH Ex. 1 at ¶

14   237; EH Ex. 9 at ¶ 65; EH Ex. 9 at ¶¶ 62-79.)  He contends that given the mental history

15   evidence proffered in this proceeding, Hoover was unreasonable for not "consulting with a

16   psychologist or psychiatrist to help [him] deal with [Petitioner's] request that there be no penalty

17   defense because he did not want an LWOP sentence."  (EH Ex. 12 at ¶ 61; EH Ex. 138; *see also*

18   DOC. No. 321 at 115.)  This is especially so, he argues, given that the penalty objection itself is

19   suggestive of mental problems.  (EH Ex. 6 at ¶ 39; EH Ex. 9 at ¶ 63.)

20         However, for the reasons discussed below, summarized here, Petitioner has not

21   demonstrated that his mental health mitigation proffer would have materially informed his

22   penalty objection and waiver given the facts and circumstances of this case.

23         Hoover testified at the evidentiary hearing that "at no time did [he] believe Petitioner had

24   any mental impairment."  (EHRT 121.)  He testified that during the entirely of his trial,

25   Petitioner was fully oriented, took extensive notes and seemed able to express himself and

26   comprehend the proceedings.  (*Id.*)  Similarly, co-defendant attorney Simrin testified at the

27   evidentiary hearing that he did not notice any mental deficits in Petitioner (EHRT 323), and that

28

Petitioner had no trouble expressing himself (*id.* at 324).

Dr. Matychowiak, in his January 29, 1982 report stated that Petitioner was sane and showed no evidence of mental disease or defect. (EH Ex. 43 at 5.) He stated that Petitioner "insist[ed] on his present innocence and the realization of his present predicament with being convicted . . . [and he] is protesting it in whatever way he can." (*Id.*) He stated that Petitioner had a written list of twenty-six or twenty-seven reasons supporting his point of view. (EH Ex. 12 at Ex. 4 thereto at 1.) He stated that Petitioner felt he "is not the kind of human being that will spend the rest of his life in prison." (*Id.*)

Hoover testified that his efforts to gain information from Petitioner about his background including mental health history were "continually thwarted … by … false information." (EHRT 113-19, 124, 145-49.) Petitioner responds that the false information he provided to Hoover at the start their relationship reflected an idealized fantasy life inconsistent with then available life history information. According to Petitioner, this alone should have put Hoover on notice early on of the need for evaluation by and consultation with a mental health expert. (DOC. No. 267 at 7-8, 21, 23, 28.)

But for the reasons stated, this seems not a case where defense counsel was aware of "evidence to suggest that the defendant [was] impaired," so as to give rise to a duty to investigate the defendant's mental state. *See Douglas*, 316 F.3d at 1085. Relatedly, defense habeas expert Dr. Stewart seems to concede that Petitioner alleged mental conditions and anxieties caused him to present as more intelligent than he is, and to mask, deny and refuse to discuss his symptoms and the negative factors in his sociopsychological background.

This case then seems similar to *Doe v. Woodford*. 508 F.3d 563 (9th Cir. 2007). There the petitioner alleged defense counsel was ineffective by failing to investigate potential mental state defenses. 508 F.3d at 567. That court was unpersuaded, noting the absence of evidence showing the petitioner was impaired; two pre-trial psychiatric evaluations that found petitioner was competent to stand trial and not suffering any mental impairment; and defense counsel's tactical decision that mental defenses would have been inconsistent with the trial defense. *Id.* at

568-69.

Here, Petitioner makes similar mental impairment allegations that seemingly run counter to the noted contemporaneous psychiatric evaluation by Dr. Matychowiak; the anecdotal observations of the trial court, Hoover and others present at trial; and the joint alibi defense at trial. Petitioner's further suggestion that Dr. Matychowiak's report in combination with Petitioner's institutional records relating to his armed robbery conviction (EH Ex. 12 at Ex. 4 thereto; SHCP Ex.'s 669-72) should have put Hoover on notice of Petitioner's "troubled mental state" (*see* DOC. No. 342 at 11), is unpersuasive. These sources document Petitioner's anger, insecurity and personality disorder features, but with no apparent indication of mental illness, disease, disorientation or delusion. This evidence reasonably suggests only minimal mitigating value.

Additionally, to the extent Petitioner's penalty objection was made in protest of his capital conviction as suggested by Dr. Matychowiak, he has not demonstrated that his failure to appreciate any mitigating mental health evidence motivated his objection and would have assisted in overcoming it.

(e)     *Evidence Mitigating the Aggravating Facts and Circumstances*

Petitioner alleges that then available evidence mitigating the aggravating facts and circumstances of his capital crimes and prior criminal history and conviction could have been used to persuade him to present a penalty defense and show that his penalty objection was not an informed and knowing decision.

Petitioner alleges that as a result of Hoover's deficiencies, his penalty phase trial consisted of the prosecution presenting evidence and argument in aggravation without any defense cross-examination of witnesses or presentation of evidence in mitigation or argument for a sentence less than death. (RT 1851-1919.) Whereupon the jury sentenced Petitioner to death. (RT 1929.)

However, for the reasons discussed below and summarized here, Petitioner has not demonstrated that proffered evidence allegedly mitigating these aggravating circumstances

would have materially informed his penalty objection. This is especially so to the extent Petitioner's objection was motivated by a desire to protest his conviction rather than considerations of mitigating evidence or the lack thereof.

### (A)    Facts and Circumstances of the Capital Crimes

Petitioner alleges Hoover failed to present him with then available evidence that the crimes against Allen and Boender were not highly aggravated. He argues these crimes did not involve circumstances commonly regarded as highly aggravated such as multiple murder, sexual assault or torture, but rather involved a murder during a failed attempt to rob Boender of drugs and money. (RT 109-16, 165-67, 200, 644-45, 661-67, 1065-66); *see also Sanders*, 51 Cal. 3d at 485-89. He argues that he solicited the participation of co-defendant Cebreros only to resolve his concern that Boender could identify him from the earlier botched attempted robbery. (*Id.*; RT 128-29.) The latter purpose, he suggests, is not highly aggravating.

However, the potential mitigating value of such evidence appears minor given the facts and circumstances of this case. The prosecution's case in aggravation presented evidence of Petitioner's conviction of first degree murder with four special circumstances found true including murder robbery and murder to prevent testimony in a future criminal proceeding relating to the botched robbery and prior assault upon Boender. (RT 1912-15.)

"What is important at the [sentence] selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (*citing Zant v. Stephens*, 462 U.S. 862, 879 (1983)); *accord Ervin v. Davis*, No. 00-CV-01228-LHK, 2016 WL 3253942, at 5* (N.D. Cal. June 14, 2016). That is, "[t]he purpose of [California Penal Code section] 190.3(a) is to provide the jury with discretion to consider the specific context behind a particular case when making its sentencing decision … the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Ervin*, 2016 WL 3253942, at *7.

Here, the record suggests that Petitioner participated in planning the first attempted robbery and was the assailant therein. (1 CT 39, 43, 127-35, 412; RT 228-29.) Petitioner

solicited Cebreros, a friend who "owed him a favor" (RT 130) and trial witness Maxwell to participate in completing the intended robbery and eliminating the victim witnesses to the earlier attempted robbery. Notably, Petitioner called in the favor Cebreros owed him in order to accomplish these ends. During the course of the capital crimes Petitioner was armed with a handgun and the victims were blindfolded, bound, placed in separate rooms and bludgeoned, Allen fatally so. (RT 131-92, 644-45, 661-67, 1065-66; 1 CT 16; 2 CT 419-32); *see also Sanders*, 51 Cal. 3d at 485-89. Allen's head wound was severe; her brain matter was exposed externally. (RT 475.) Even in that condition, she remained alive for "some period of time." (RT 479.)

During the sentence selection phase, evidence that defendant committed the capital murder for which he was convicted is one of the most crucial circumstances of the crime admissible as a capital sentencing factor under Penal Code section 190.3(a). *People v. Jackson*, 58 Cal. 4th 724, 754 (2014). In assessing the likelihood of whether a proper penalty phase presentation would have rendered a different result, the court must assess petitioner's crime and his responsibility in the context of the evidence adduced in the guilt phase. *Webster*, 2014 WL 2526857, at *44. "[T]he gruesome nature of [a] killing [does] not necessarily mean that the death penalty was unavoidable." *Douglas*, 316 F.3d at 1091. Similarly, the failure to present mitigating evidence may render the sentencing determination neither fair nor reliable even in the face of substantial evidence of aggravation. *Hendricks*, 70 F.3d at 1044. But as in this case, the prosecution has the right to establish the gruesome consequences of the crime. *See Jackson*, 58 Cal. 4th at 756 (*citing People v. Mills*, 48 Cal. 4th 158, 205 (2010)).

For the reasons stated, *ante* and *post*, and given the relatively weak mitigation value of Petitioner's proffered evidence, the aggravating evidence appears to be of sufficient weight to support a finding that a jury would not have sentenced petitioner to life without the possibility of parole had they been presented with the available mitigation evidence. *Cf. Webster*, 2014 WL 2526857, at *46 ("[H]ad the jury been able to place petitioner's excruciating life history on the

mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.").

### (B)    Facts and Circumstances of the 1970 Armed Robberies

Petitioner alleges Hoover failed to present him with then available evidence that his participation in and conviction relating to 1970 armed robberies were not highly aggravated.  He argues that he was only eighteen at the time of the robberies, needed money and did not intend to harm anyone.  (*See* RT 1855-1894; EH Ex. 1 at Ex.'s 328-29 thereto.)  He argues that he was then suffering alleged mental conditions and impairments and poly-substance abuse, discussed *post*.  (*Id.*)  He argues that he tended to accept blame for others, (*id.*), suggesting that he received a more severe sentence than equally culpable co-defendants in these robberies (*id.*).

Petitioner also argues that Hoover failed to present him with then available mitigating evidence regarding his positive adjustment to prison life during his 3 year incarceration on the robbery conviction including his programming for drug treatment (EH Ex. 124 at 6; EH Ex. 1 at ¶ 180), above average participation in work assignments (EH Ex.'s 127, 129), participation in prison educational programming including junior college courses (EH Ex. 129), and his low rating for violence (EH Ex. 128 at 2).

However, as was the case above, the potential mitigating value of such evidence appears minor given the fully developed evidentiary record and the facts and circumstances of this case. Petitioner pleaded guilty to one of the robberies and was sentenced to state prison.  (EH Ex. 1 at ¶ 181; EH Ex. 1 at Ex. 366 thereto; *see also* RT 1844-1911.)  Although Petitioner reportedly stated at the time of these crimes that he only stole enough to live on since he could not find a job, and that he was using LSD, hashish and marijuana up to three times a week (EH Ex. 1 at ¶ 177), the following facts relating to his participation in these crimes suggests only minor mitigating value.

The jury heard testimony from eight witnesses to Petitioner's participation in five armed robberies in Orange County in 1970.  Although he committed the robberies with two accomplices, Petitioner was identified as the leader; the one who gave the orders; the one armed

with and brandishing a six inch revolver; and the one who threatened the victims with injury and death. (RT 1851-1911.) Petitioner admitted the robberies were committed to get money to buy not only food, but also drugs, including heroin. (*See* EH Ex. 1 at Ex. 367 thereto at 2.)

Moreover, as discussed below, this evidence could undermine mitigation value to the extent potential mitigation witnesses were unaware of it. (*See* DOC. No. 377 at 11, *citing Allen v. Woodford*, 395 F.3d at 1003-1004 [proposed mitigation witnesses did not know of Allen's crimes].)

Petitioner's institutional records from his incarceration on the robbery conviction could undermine mitigation value by revealing his episodes of instability and difficulty programming in the general population; a history of deep anger against prison staff and authority figures; and a history of unarmed and armed violence. (SHCP Ex.'s 669-72.)

The mitigating value from evidence of Petitioner's alleged poly-substance abuse surrounding the 1970 robberies, and alleged mental health conditions and deficits appears to be minor, for the reasons discussed *ante* and *post.* It is notable that the record does not appear to suggest Petitioner was altered during these crimes, which in part were committed to fund his use of illicit drugs.

Additionally, Petitioner was presumptively aware of all these matters. Yet he persisted in his penalty objection, suggesting a further basis for discounting the mitigation value of this evidence.

(C)     **Lingering Doubt**

Petitioner alleges that Hoover failed to present him with then available evidence that lingering doubt of his guilt could have mitigated the facts and circumstances of the capital crimes and special circumstances found true.

Petitioner points to uncertainty in the evidentiary record regarding his involvement in the murder of Allen and the attempted murder of Boender including whether he was the actual killer or an accomplice. (DOC No. 372 at 90-93; RT 145, 687-93, 790-92, 1005, 1526); *see also Sanders*, 51 Cal. 3d at 485-89. He questions the reliability of victim witness Boender (*id.*; *see*

*also* RT 636-844, 1133, 1151-53), and the credibility of immunized accomplice Maxwell (*id.*; *see also* RT 160-65, 200-05).  He questions the lack of physical evidence connecting him to the crime scene and the alleged existence of evidence potentially inculpating third parties (*id.*; *see also* RT 144-45, 166-67, 200-01, 995-99, 1294-1344).  He suggests his fingerprints were on a roll of duct tape allegedly meant for use during the botched first robbery (RT 387, 397-401) only because he had innocently used the tape to move a stove from that location the day following the capital crimes (RT 1435-67).

But the mitigating value of such lingering doubt evidence appears minor.  Surviving victim Boender positively identified Petitioner as the assailant in the botched robbery and as an accomplice in that robbery; witness Maxwell provided corroboration.  (1 CT 110; RT 857-58; 901-03); *see also Sanders*, 51 Cal. 3d at 485-89.  Boender described the voice of the murder scene assailant who wanted to stay on scene as "very, very calm." (2 CT 426.)  Notably, the victim of one of the Orange County robberies described Petitioner as "very" calm, "almost as if … rehearsed." (*See* RT 1881.)

The joint alibi defense that Petitioner and Cebreros were at the home of the latter's brother drinking beer and playing chess the night of the capital crimes (RT 1236-77) appears inconsistent with Petitioner's statement to authorities at the time of his arrest that he was home with his wife the entire evening of the capital crimes (RT 1487), as well as with his separate statement to authorities that he was at the sheriff's office that same evening trying to ascertain why authorities were looking for him (RT 1488).

Petitioner recruited Cebreros for the capital crimes after he expressed the need to eliminate Allen and Boender as witnesses to his assault during the first attempted robbery.  (*Id.*) When Cebreros was arrested after the capital crimes he had in his possession a gun similar to the weapon Boender said Petitioner brandished the night of the murder.  (*Id.;* RT 903-10.)

Furthermore, Petitioner has not demonstrated any error in the jury instructions which might have impacted a lingering doubt defense.  The guilt phase instructions included the elements of the charged offenses.  (7 CT 1743-1775.)  The penalty instructions included relevant

guilt phase instructions and covered accomplice theory on the special circumstances found true. (7 CT 1890.)

Petitioner has not demonstrated on the evidentiary record that the duct tape he allegedly used the day after the capital crimes to innocently move a stove at witness Maxwell's mobile home was same roll of duct tape recovered by the police. Moreover, Petitioner did not mention moving the stove to arresting authorities. (RT 1486.) The stove later photographed by defense investigator Glenn had no duct tape on it. (RT 1466-67.)

At bottom, even if Hoover was then unaware that "under California law lingering doubt could be argued in mitigation at a capital penalty phase" (EH Ex. 12 at ¶ 57; EH Ex. 5 at ¶ 23), evidence of lingering doubt in this case would have had little mitigating weight, for the reasons stated. In any event, Petitioner expressly instructed Hoover not to present a penalty phase argument. (RT 1851-1919.)

(f)     *Other Theories*

Petitioner offers other theories to show his penalty waiver was not informed and knowing. He points to his request that Hoover object to prosecution penalty witness testimony (RT 1848-49) as suggesting his waiver was not the unequivocal waiver he purported to make and thus not an "informed and knowing" waiver. But even if, as appears the case, Hoover did object during the questioning of certain of the prosecution penalty witnesses, *see e.g., Sanders*, 51 Cal. 3d at 527, this seemingly would not alone detract from Petitioner's express waiver of mitigating evidence, cross-examination and argument, nor alone demonstrate Petitioner's waiver was other than informed and knowing.

Petitioner also argues that Hoover sought the pre-penalty phase hearing not as a means of resolving Petitioner's objection, but only to make a record for appeal. (EH Ex. 12 at ¶¶ 40-42.) For example, he argues that Hoover never inquired at the hearing about Petitioner's twenty or so reasons for objecting to a penalty defense. (EH Ex. 12 at ¶ 36.) Hoover for his part concedes he did not ask Petitioner about his approximately twenty reasons (EH Ex. 12 at ¶ 36), and that he was interested in building the record on appeal (*id.* at ¶¶ 42, 46). But even if building the record

for appeal motivated Hoover to hold the pre-penalty phase hearing, Petitioner has not demonstrated that this alone rendered his waiver of a mitigating evidence - including from family members then present in court - anything other than knowing and informed, particularly given Petitioner's apparent interest in the prospects for appeal. (*See e.g.*, EH Ex. 12 at Ex. 4 thereto at 2.)

(g)    *"Informed and Knowing" Requirement Post-Landrigan*

Petitioner argues that a penalty defense waiver must be "knowing and informed" notwithstanding the Supreme Court's statement in *Landrigan* that

> [W]e have never imposed an "informed and knowing" requirement upon a defendant's decision not to introduce evidence.

550 U.S. at 479.

Here, as in *Landrigan*, Petitioner appears to have refused meaningful engagement with counsel on penalty defense issues while at the same time interfering with the preparation and presentation of mitigating evidence. 550 U.S. at 478; *see also Williams v. Woodford*, 384 F.3d 567, 622 (9th Cir. 2004) (defendant's wishes regarding counsel's representation are not to be ignored entirely); *cf. Silva*, 279 F.3d at 838 (requiring that a lawyer who abandons mitigation investigation at the direction of his client must have adequately informed defendant of the potential consequences of that decision and must be assured that his client has made "informed and knowing" judgment); *Stankewitz*, 365 F.3d at 722 (requiring that counsel investigate mitigating evidence and discuss it with defendant to obtain informed and knowing waiver).

As noted, the Supreme Court in *Strickland* stated that

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [¶] The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statement or actions.

466 U.S. at 690-91.

For the reasons stated *ante* and *post*, even if Petitioner had demonstrated his purported penalty waiver was not "knowing and informed," *Landrigan* appears to dispense with such a requirement given the facts and circumstances of this case. Petitioner has not persuaded the Court otherwise.

### (2)     Competence to Waive Penalty Defense

Petitioner alleges that his lack of information about the penalty process, mitigation and mitigating evidence in combination with his mental deficits and impairments prevented him from understanding and agreeing to presentation of a penalty phase defense. This he claims resulted in his incompetent waiver of a penalty defense.

Petitioner points to the testimony of defense habeas experts including psychiatrist Dr. Stewart, discussed below, that at the time of his waiver Petitioner was "significantly impaired" by cognitive errors that may have led him to believe he had a penalty phase option other than death or LWOP, i.e., an option of simply doing nothing. (EH Ex. 9 at ¶¶ 75-76.) As an example of such impairment, Dr. Stewart points to Petitioner's noted misstatement to Dr. Matychowiak that the first jury hung seven to five for conviction (when in fact that jury actually voted eleven to one for conviction). (*Id.*).

Yet the factual record seems to belie Petitioner's claim his penalty objection was influenced by mental deficit or impairment. As discussed above, the trial judge, Hoover, Dr. Matychowiak, attorney Cook, and attorney Simrin all observed Petitioner and all agreed that he was then seemingly competent and not acting under mental impairment or aberration. *See Harris v. Vasquez*, 949 F.2d 1496, 1525 (1990) ("[I]t is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."); *see also Williams*, 384 F.3d at 611 (holding counsel's decision not to further investigate mental defense was reasonable in light of conclusions of mental health experts). Notably, counsel has no duty to pursue neurological experts when a qualified forensic psychiatrist did not indicate that additional testing was indicated, *Walls v. Bowersox*, 151 F.3d 827, 835 (8th Cir. 1998), and the

defense position could be fully developed without professional assistance, *Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998).

Significantly, Petitioner took notes during trial and "never seemed to be under any particular inability to comprehend or understand or express himself." (EHRT 121.) Both Hoover and the trial judge stated on the record at the beginning of the penalty phase that they had seen no "mental aberration" in Petitioner. (RT 1844.) Hoover then stated with regard to the penalty defense objection that he had "no doubt" Petitioner "knows what he is talking about." (RT 1844; *see also* RT 1823-26.)

Dr. Matychowiak's examination contemporaneous with the penalty trial resulted in findings that Petitioner was fully oriented and of above average intelligence with no evidence of delusions. (EH Ex. 12 at Ex. 4 thereto at 2.) Petitioner acknowledged to Dr. Matychowiak the reasons and reasoning underlying his penalty defense objection including that "there would be a lot of grounds for appeal" and "that if one had the death sentence and there were review or an appeal, one could get a lighter sentence." (*Id.*) This evidence appears to suggest penalty trial competence.

As discussed above, the contemporaneous observations of Cook and Simrin were that Petitioner did not demonstrate any mental impairment or deficit during his capital proceedings. Dr. Matychowiak found that Petitioner was then competent for purposes of his penalty defense objection. (*Id.* at 5.) The fact that by the time of the evidentiary hearing, Petitioner could not recall all of his "[twenty] reasons" for not wanting a penalty defense and could not recall being examined by Dr. Matychowiak (EHRT 352-59; EH Ex. 31 at ¶ 4), is not evidence otherwise.

Additionally, the Court notes that there is no pending incompetence or incompetent waiver claim in this proceeding. The Court previously denied claim 35 which alleged that Petitioner was mentally incompetent when he waived the penalty defense. (*See* DOC. No. 329 at 21, *citing* DOC. No. 148 at 57-60.) The Ninth Circuit affirmed this claim denial. *Sanders*, 171 F.App'x at 595.

For these reasons and those discussed below, the weight of the opinions of defense

habeas experts, rendered decades after trial that Petitioner may have suffered mental deficits and impairments secondary to a history of anxiety, ADD-H, PTSD, mixed substance abuse, bipolar disorder and head trauma is not such as to demonstrate that on the facts and circumstances of this case that his penalty waiver at trial was other than competent.

### vii.    Interference with and Obstruction of Presentation of the Penalty Defense

Petitioner alleges that notwithstanding his objection and waiver, Hoover was duty bound to put on a penalty defense. He cites to defense habeas expert Sawyer and argues that he did not interfere in Hoover's ability to conduct a penalty investigation (*see* EH Ex. 5 at ¶¶ 48-49), as follows.

Petitioner argues that Hoover had investigatory "free rein" (EH Ex. 12 at ¶ 53) and no tactical reason for limiting the general penalty investigation he conducted (*id.*, at ¶ 48). For example, he argues that Hoover was free to investigate his background and contact his wife, family and friends. (EH Ex. 12 at ¶ 53; EHRT 134.) He argues that he did not provide mitigation leads to Hoover in these regards because none were requested. (EHRT 145.)

However, as discussed, *ante*, it appears that Petitioner's steadfast objection to presentation of any mitigating evidence left him uninterested in assisting the penalty defense team. Hoover testified at the evidentiary hearing that little of what he learned from Petitioner could be corroborated and he did not want to waste time chasing false leads. (EHRT 145-46.)

The Ninth Circuit has acknowledged that then prevailing ABA Standards directing a thorough background investigation, *see* ABA Standards § 4-4.1 comment at 4-55 (2d ed.1980); *Silva,* 279 F.3d at 840, did not address a situation such as the instant where defendant appears to prohibit investigation and presentation of any mitigating evidence. *Stankewitz,* 365 F.3d at 722; *see also Sanders*, 171 F.App'x at 592-93; *cf. Summerlin*, 427 F.3d at 637-39 (spontaneous objection to presentation of one witness does not excuse failure to present penalty-phase defense absent any indication defendant was instructing attorney not to present any mitigation evidence and aggravation rebuttal).

Here, the record suggests Petitioner's penalty objection had a broad sweep. Petitioner

instructed Hoover not to introduce any mitigating evidence, cross-examine prosecution witnesses, or argue for mitigation. (RT 1832, 1836.) Hoover stated at the penalty trial that "[Petitioner] has made up his mind on this matter. [He] is not an irrational person and so to the extent that I cannot take a position contrary to my client, the court cannot force me to put on [a penalty defense] any more than the court can force me to call [Petitioner] as a witness during the defense of this case." (RT 1843.) Hoover could reasonably have understood Petitioner's instruction to preclude presentation of any mitigation evidence, presumptively obviating efforts by the defense team to further investigate and develop such evidence. *Cf. Silva*, 279 F.3d at 839-40 (defendant's penalty defense objection precluded only calling his parents as mitigation witnesses - it did not preclude counsel's background investigation).

Furthermore, when Hoover told Petitioner the trial court might relieve him or order a penalty defense over Petitioner's objection (EHRT 124; *see also* EH Ex. 12 at ¶ 48), Petitioner responded with a threat, that if his objection was ignored he would "jump up and say things so that he would be disliked by the jury." (*Id.*) Petitioner responds that Hoover did not take this threat seriously. He points to Hoover's statement in his 2007 habeas declaration that "[Hoover] did not believe that [Petitioner] actually would have interfered with the penalty trial . . . [that Petitioner] was just letting off steam in a stressful situation . . . [and that Petitioner's] comment did not affect [Hoover's] decision about how to handle the penalty phase." (EH Ex. 12 at ¶ 48.)

But more recently, at the 2008 evidentiary hearing Hoover testified that he believed Petitioner was serious in this threat. (EHRT 149, 156.) Hoover testified that Petitioner was determined to foul up any penalty defense by being demonstrative, standing up in court and acting out so that the jury would not be sympathetic toward him. (EHRT 124, 149, 156; EH Ex. 12 at ¶ 48); *see also Cox v. Del Papa*, 542 F.3d 669, 682-683 (9th Cir. 2008) (*Landrigan's* prejudice preclusion applicable where defendant continuously and strenuously objected to the proposed use of drug mitigation evidence).

Hoover further testified at the evidentiary hearing that Petitioner at times became animated and that Hoover was convinced by Petitioner's "presence, the way that he expressed it

to me" that the threat to act out "was likely to happen." (EHRT 156.) The fact that Petitioner's threat to act out occurred only days prior to the penalty trial is not alone a basis to discount his threatened interference with any presentation of mitigating evidence. (*See* DOC. No. 329 at 19.)

Furthermore, based on Petitioner's ongoing penalty objection and unequivocal penalty defense waiver in open court and his consistent direction that no mitigating evidence be presented, Hoover's more recent testimony may be credited and any inconsistency in his earlier in time habeas declaration statements may be discounted. Even if that were not the case, Hoover testified at the evidentiary hearing that Petitioner's threat was merely a non-determinative factor in his decision to forego a penalty defense. (EHRT 155-56.)

As noted, Petitioner was counseled in his penalty defense decision by Hoover, attorney Cook, the trial court and (according to Dr. Matychowiak's report) members of Petitioner's own family. Petitioner demonstrated no susceptibility to further consultation on penalty defenses and the risks and consequences of his penalty phase objection. *See Summerlin*, 427 F.3d at 638. This does not appear to be a case like *Silva*, where the defendant foreclosed only certain aspects of the penalty defense. 279 F.3d at 847. Instead, for the reasons stated, Petitioner seems to have clearly, knowingly, competently and broadly objected to and waived presentation of mitigation evidence notwithstanding concerted efforts to persuade him otherwise.

Petitioner confirmed at the penalty trial that he did not want to present a mitigation defense (RT 1831-45) even though family members, his parents, Grandmother Ruth and sister Suzanne were then available in court. (RT 1843; *see also* DOC. No. 148 at 66.) According to Hoover's statements to the trial court, these potential witnesses were then able to testify in mitigation. (RT 1843.) Hoover did not call any witnesses to testify in mitigation.

Petitioner suggests that Hoover could not have presented mitigation testimony from family members by pointing to Hoover's concession in his 2007 habeas declaration that he had not interviewed or prepared any family witnesses to testify. (EH Ex. 12 at ¶¶ 43, 52, 54; EHRT 122.) But Petitioner has not demonstrated that by virtue of this *post hac* statement alone, these witnesses had not been interviewed or prepared by the defense team, or were necessarily

unavailable to testify at the penalty phase including any continuance thereof. Hoover summed up these circumstances by stating that "[i]t's a question of having talked to Mr. Sanders. I believe that he sincerely wishes that we sit here and let the state present its case." (RT 1843); *see Strickland*, 466 U.S. at 691 ("[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

Petitioner notes Hoover's testimony that he was unsure what he would have done if Petitioner had relented in his objection or the trial court had ordered a penalty defense. (EHRT 141-42.) Hoover testified that "[he] hadn't done anything to prepare for [a penalty defense] and [h]ad never done one" (EH Ex. 38 at 62) such that he might have needed a continuance (EHRT 147; EH Ex. 38 at 63). Petitioner argues a penalty defense could not have been prepared as quickly as Hoover might have contemplated. (*See* EH Ex. 1 at ¶¶ 6-243; EH Ex. 5 at ¶¶ 35-42, 56, 74-76, 107; EH Ex. 6 at ¶¶ 24, 29, 32; EH Ex. 8 at ¶¶ 12-20, 25-27; EH Ex. 19 at ¶ 3.)

However, this argument is based upon speculation. Petitioner did not change his mind. The trial court did not order Hoover to present a penalty defense. It remains that in the wake of Hoover's general investigation and the pre-penalty phase evaluation and counseling, Petitioner maintained his penalty objection and waiver and actively interfered with and obstructed presentation of potentially mitigating evidence. *Cf.*, *Jackson v. Calderon*, 211 F.3d 1148, 1161-62 (9th Cir. 2000) (counsel deficient by minimally investigating and preparing mitigation defense upon the mere expectation the penalty phase would not be reached and without any request for a continuance).

Moreover, the record reasonably suggests that any disinclination in the trial court to grant a further pre-penalty continuance had to do not with Hoover's alleged deficiencies, but rather with Petitioner's intransigence in his penalty defense position.

### (1) Application of *Landrigan* to Hoover's Performance

Petitioner argues that *Landrigan* is not a basis for finding Hoover's conduct reasonable. He argues the holding in that case applies not to *Strickland's* performance prong, but rather to *Strickland's* prejudice prong. (*See* DOC. No. 336 at 8.) He argues that notwithstanding

*Landrigan,* Hoover had a duty to adequately investigate mitigating evidence. (*See* DOC. No. 329 at 20.)

Petitioner also distinguishes *Landrigan*, arguing that unlike the defendant in *Landrigan* who actually disrupted the penalty phase proceedings in court, Petitioner merely threatened to "jump up and say things so that he would be disliked by the jury." (EH Ex. 12 at ¶ 48.)

The Supreme Court in *Landrigan* found that counsel's failure to present additional mitigating evidence cannot be a basis for *Strickland* prejudice where the defendant instructed witnesses not to testify and repeatedly interrupted counsel's presentation of mitigation evidence. *See* 550 U.S. at 477; *see also Hamilton*, 583 F.3d at 1118-19.

Applying *Landrigan*, the Ninth Circuit has stated that

> A defendant's lack of cooperation does not eliminate counsel's duty to investigate. *See* 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980) ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.").
>
> …
>
> We recognize that both the Supreme Court and we have found that a defendant's refusal to cooperate in the penalty phase may render counsel's limited investigation and presentation of mitigating evidence reasonable under the circumstances. [Citation]

*Hamilton*, 583 F.3d at 1118-19.

Here, for reasons stated *ante* and *post*, Petitioner has not demonstrated that *Landrigan* precludes a finding that Hoover's decision to forego penalty defense was reasonable given the facts and circumstances he faced.

### viii. *Persuading Petitioner from his Penalty Objection*

Petitioner alleges that Hoover's was deficient by failing to persuade him to present a penalty defense, particularly, he argues, given that: Hoover believed that a vigorous penalty defense should be presented (EH Ex. 5 at ¶¶ 110-15; EH Ex. 8 at ¶¶ 23, 29; EH Ex. 12 at ¶ 40; EH Ex. 38 at 31, 52-53; EH Ex. 41 at ¶ 14), Petitioner did not want to be executed (EH Ex. 5 at ¶ 66; EH Ex. 8 at ¶ 29), Petitioner had followed Hoover's advice prior to his conviction (EH Ex.

12 at ¶¶ 22-23; EHRT 126, 138), and Petitioner had given Hoover free reign to investigate the case and make most strategic decisions (EH Ex. 12 at ¶¶ 23, 53; EHRT 138).

### (1)    Duty of Persuasion

Petitioner argues that Hoover had a "duty to try to educate or dissuade [him] about the consequences of his actions." *Lang*, 725 F. Supp. 2d at 1054, (*citing Sil*va, 279 F.3d at 847) (reviewing a 1982 California trial).  He argues that Hoover could not make a reasoned tactical decision otherwise because his incomplete investigation left him unaware of the proffered mitigation evidence and the nature and strength of a mitigation defense.  *See Summerlin*, 427 F.3d at 631 (*citing Silva*, 279 F.3d at 847) (counsel has a duty to try to persuade defendant to present mitigating evidence and counsel cannot make a reasoned tactical decision if he does not even know what evidence is available).

Additionally, in *Lang* the district court stated that

> Counsel [has a] duty to try to educate or dissuade [the defendant] about the consequences of his actions. [Citation] [Counsel] did not satisfy this standard, as he did not advise petitioner of the most basic fact—that absent the presentation of mitigation evidence, the jury would be compelled to sentence him to death. [Counsel] did not inform petitioner of the mandatory language of the penalty phase jury instruction, and what it meant given that [the prosecutor] intended to introduce petitioner's prior convictions and they would constitute aggravating circumstances. Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant. [Citation]

725 F. Supp. 2d at 1054-55.

Petitioner faults Hoover for his habeas statements that the decision whether to present a penalty defense was for Petitioner (EH Ex. 12 at ¶¶ 39, 56, 61; EH Ex. 40 at ¶ 21; EHRT 119, 120-21, 145-46; *see also* RT 1824-44), not as a tactical matter (EH Ex. 38 at 53), but rather a moral one (EH Ex. 12 at ¶¶ 40, 60; *see also* EHRT 127-28, 138; EH Ex. 38 at 32).

Petitioner also cites to his habeas experts who suggest resistance to LWOP is common and that Hoover could and should have persuaded Petitioner from his objection.  (EHRT 283-84, 311-13; EH Ex. 5 at ¶¶ 77-80; EH Ex. 6 at 9, 18-19; EH Ex. 8 at ¶¶ 33-39, 45.)

It appears that Hoover's ambivalence over whether he was professionally bound to try

and move Petitioner from his penalty objection persisted into habeas proceedings.  *See Lang*, 725

F. Supp. 2d at 1057 (*quoting Summerlin*, 427 F.3d at 638) ("[T]he allocation of control between

attorney and client typically dictates that 'the client decides the 'ends' of the lawsuit while the

attorney controls the 'means,' (*quoting Marcy Strauss*, *Toward a Revised Model of Attorney–*

*Client Relationship: The Argument for Autonomy,* 65 N.C. L. REV. 315, 318 (1987).").  Hoover,

in his 2007 state habeas declaration stated that

> I still am not convinced that it was my duty to persuade [Petitioner] to present a
> penalty phase.  But perhaps I should have made a concerted effort to change [his]
> mind.

(EH Ex. 12 at ¶ 64.)

Assuming arguendo that Hoover had such a duty of persuasion, the record suggests that

he reasonably discharged that duty given the noted facts and circumstances he faced in this case

and for the reasons discussed below.

### (2)    Attempts to Dissuade Petitioner

Petitioner alleges that Hoover's failure to persuade him from his objection amounted to

an abdication of Hoover's legal duty.  (*See* EH Ex. 8 at ¶ 22.)

 Petitioner argues that Hoover failed to adequately explain the sentencing options; the

mitigation evidence that could have been presented; and where and how an LWOP sentence

might have been carried out.  (EHRT 309-17; EH Ex. 5 at ¶¶ 68, 83-84, 110; EH Ex. 8 at ¶¶ 28-

29, 44; EH Ex. 12 at ¶ 25; EH Ex. 31 at ¶ 2.)

However, the record reflects that Hoover's legal advice to Petitioner was consistent, that

he should take a "vigorous defense posture, asking the jury for a verdict recommending life

without the possibility of parole."  (RT 1823.)  Hoover discussed Petitioner's penalty phase

objection approximately three times prior to the first trial.  (*See* EH Ex. 12 at ¶ 24.)  Following

the conviction, Hoover met with Petitioner in the jail to again discuss his LWOP objection.  (*Id.*

at ¶ 34.)  Although Hoover was unsure during his evidentiary hearing testimony whether he told

Marian of Petitioner's refusal to mount a penalty defense and asked her to speak with him about

it (EH Ex. 12 at ¶ 45; EH Ex. 38 at 36-41; EHRT 126), investigator Glenn's reports suggest that in fact Hoover did so (*see* EHRT 134-35, 149-52; EH Ex.'s 42-47).

Petitioner responded by reiterating that he could not accept LWOP; objected to both LWOP and death; refused to put on a penalty defense; and threatened suicide by guard were he to receive an LWOP sentence. (EH Ex. 12 at ¶¶ 34-35.) This even though Hoover specifically counseled Petitioner that the governor could commute an LWOP sentence and that he should not rely on a belief the California Supreme Court would reverse a death sentence in his case. (*Id.*)

As noted, Hoover requested and received a continuance to test the competence, volition and certitude of Petitioner's penalty objection and waiver. Although Hoover told the trial court that he "felt like [he] must accede to [Petitioner's] wishes [he stated that] he cannot do so without some assistance from the court." (RT 1823-24.) Following the mental evaluation by Dr. Matychowiak, counseling by attorney Cook and the visit with his parents, Hoover had reason to conclude that Petitioner was then oriented and rational in his objection. (*See e.g.,* RT 1825.)

Hoover came to believe he could not move Petitioner from his objection. (EH Ex. 12 at ¶ 39; EH Ex. 38 at 32-33.) Hoover also expressed concern that Petitioner might follow through on his threat of suicide should he receive an LWOP sentence. (EH Ex. 12 at ¶ 40); *see also Jeffries,* 5 F.3d at 1197-98 (defendant's decision not to present a penalty defense found to be informed and knowing given his consistent statements and those of his counsel and defendant's refusal to defend based upon his professed innocence).

As discussed, *post*, the record suggests reason to discount the opinions of defense habeas experts that Hoover unreasonably failed to persuade Petitioner from his objection. Notably, defense *Strickland* expert Sawyer arrived at her opinions without ever having interviewed Petitioner; relying instead on the reports of others. (EHRT 313.) Although mental defense experts Kriegler, Riley and Stewart each interviewed Petitioner, their interviews took place decades after the trial and while Petitioner was taking pain medication. (EH Ex.'s 1-3, 9.)

Petitioner's habeas experts do not appear to suggest how and why Hoover acted unreasonably given the facts and circumstances he faced at the 1982 trial. (*See e.g.*, EH Ex. 9 at

¶¶ 12, 71.)  That attorney Simrin may have persuaded several defendants in separate matters to abandon penalty defense objections is not alone a basis for finding Hoover was unreasonable for failing to do so on the instant facts.  (EHRT 328.)

Significantly, attorney Simrin, who represented co-defendant Cebreros during the joint guilt phase trial, remained unsure whether Hoover could have persuaded Petitioner to change his mind.  (EHRT 330.)  Simrin conceded that each individual defendant is different in this regard.  (*Id.*)  Defense expert Sawyer was similarly uncertain whether Petitioner could have been persuaded from this penalty objection given the facts and circumstances of this case.  (EH Ex. 5 at ¶ 120.)

Petitioner again argues that family members would have counseled him about his penalty objection had the defense team contacted them.  (*See* DOC. No. 228 at ¶¶ 6-8; DOC. No. 230 at ¶ 5; DOC. No. 231 at ¶ 7; DOC. No. 232 at ¶¶ 10-11.)  Yet it appears from Dr. Matychowiak's January 28, 1982 report that Petitioner's parents, wife and step-son had discussed his penalty objection with him; disagreed with his objection; and suggested to him that "where there's life there's hope and therefore one should opt for a continuing life."  (EH Ex. 12 at Ex. 4 thereto at 2.)

*Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."  *Richter*, 562 U.S. at 110.  Hoover was constitutionally required to make reasonable choices.  *Van Hook*, 130 S.Ct. at 17, *citing Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).  For the reasons stated, Petitioner has not demonstrated that Hoover failed to do so here.

The Court rejects as unsupported in the evidentiary record Petitioner's argument that Hoover had a professional and personal interest in waiving a penalty defense because Hoover was unprepared to put on such a defense.  (*See* DOC. No. 321 at 74:8-16.)

The Court also rejects Petitioner's argument that Hoover should have sought out assistance with Petitioner's penalty objection additional to that discussed above.  Hoover stated at trial that in addition to the noted defense team efforts, he had discussed Petitioner's objection

78

with "his family, my family, people in the state public defender's office, people on the street, courts, [and] judges." (RT 1842-43.) While Hoover may have been somewhat uncertain at the time of his 2007 habeas declaration whether he discussed this matter with a court or judge other than the trial court (EH Ex. 12 at ¶ 59), he nonetheless stated his belief that he consulted with the other noted sources (*id.*).

### ix. *Penalty Defense over Petitioner's Objection*

Petitioner alleges that Hoover was deficient by failing to present a penalty defense over his objection. (EHRT 8, *citing* DOC. No. 208 at 2-3.)

Petitioner argues that Hoover should have followed his legal judgment and presented a penalty defense. (*See* DOC. No. 321 at 113, *citing Douglas*, 316 F.3d at 1087-88) (defendant told the court that he did not want to put on certain mitigating evidence, and over defendant's protest counsel presented some mitigating evidence); *see also Clabourne v. Lewis*, 64 F.3d 1373, 1386-87 (9th Cir. 1995) (counsel ineffective at penalty phase by giving up and failing to present mitigating evidence); *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (counsel ineffective by failing to present any humanizing evidence during penalty phase where there was no tactical reason for this omission).

Petitioner points to the testimony of purported defense *Strickland* expert and mitigation investigator Stetler that resistance and threats against a penalty defense are not uncommon and typically can be resolved by investigating life history and mitigation evidence and counseling the defendant away from the objection. (EHRT 262-67, 283-84, 294; *see also* EH Ex. 8 at ¶ 33.) Stetler opined that Hoover's penalty phase investigation was essentially too little too late. (EHRT 287.) Stetler also discounted Dr. Matychowiak's trial opinion as based upon too little information (EHRT 282) and no social history (EHRT 292).

But Stetler, a non-attorney, did not testify as a mental health expert and did not in any event call Dr. Matychowiak's testimony into questions based on evidentiary facts in the record. Nor does Stetler's testimony appear to fully consider the facts and circumstances facing Hoover in this case. Stetler conceded during cross-examination that he had never met Petitioner (EHRT

295), and that Petitioner provided "lots of unreliable information" to Hoover during his criminal proceeding (EHRT 272). Moreover, Stetler seemed to agree that days before the penalty phase, Hoover "laid out to [Petitioner] . . . the particulars of the penalty phase of the trial . . . ." (EHRT 288.)

Defense *Strickland* expert Sawyer opined that Hoover either should have put on a penalty defense or had Petitioner represent himself. (EHRT 309-17; EH Ex. 5 at ¶ 120.) However, Sawyer admitted that she had never put on such a defense over a client's objection. (EHRT 318.) Nor does Sawyer explain how proceeding *pro se* might have benefitted Petitioner.

Attorney Simrin agreed that a penalty defense should have been mounted over Petitioner's objection. (EH Ex. 8 at ¶¶ 30-32.) Yet in arriving at this conclusion, Simrin seems not to have specifically considered all the facts and circumstances facing Hoover in this case including Petitioner's defense waiver, active interference with and obstruction of a penalty defense and threat to disrupt in court proceedings should a penalty defense be presented. (*See id.* at ¶¶ 30-50.) Nor does Simrin appear to suggest that he had any personal experience with such circumstances. For the reasons stated and those summarized below, Petitioner has not demonstrated that Hoover's failure to put on a penalty defense over Petitioner's objection was unreasonable.

Petitioner consistently objected to a penalty defense. He waived the defense in open court following the continuance for counseling, mental evaluation and the visit with his parents. Petitioner demanded of Hoover that mitigation evidence not be presented. Petitioner threatened to disrupt the defense. He refused to allow any presentation of mitigation testimony including by members of his family then present in court. Petitioner went so far as to threaten to get himself killed in prison should he receive an LWOP sentence. The above noted authority cited by Petitioner in support of his argument that Hoover should have presented a defense over his objection is factually distinguishable in these regards.

Furthermore, the trial court accepted Petitioner's penalty defense waiver. Petitioner did not request relief from his waiver or withdraw his objection to a penalty defense. It appears that

Hoover's admittedly "minimal legal research whether [he], as the attorney, had the authority to present a penalty defense over [his] client's objection" (EH Ex. 12 at ¶ 60), did not suggest counsel's obligation to present a defense on the facts and circumstances of this case.

The record reflects that during his testimony at the evidentiary hearing Petitioner suffered some apparent memory lapses. He could not recall interviews with Dr. Matychowiak, attorney Cook, or habeas expert Dr. Riley, (EHRT 353, 355, 360); or his threats to interfere with the penalty phase; or his threats to get himself killed should he have received an LWOP sentence (EHRT 362-63); or Hoover's advice that he put on a penalty defense (EHRT 375-76). However, this lack of recollection does not contravene the noted evidence and is not alone evidence that Hoover's failure to put on penalty defense over his objection was unreasonable.[9]

Petitioner's re-argument that Hoover was unprepared to present any mitigating evidence fails for the reasons discussed above and in any event is speculative. (*See e.g.*, EH Ex. 12 at ¶ 54; EH Ex. 38 at 62.) For example, when Hoover arranged for Petitioner's parents to be brought from out of state to meet with Petitioner, he told them that if Petitioner changed his mind, they would be asked to testify at the sentence determination trial. (EH Ex. 12 at ¶ 43.) Petitioner did not change his mind. The parents were present in court at the penalty trial and with that knowledge Petitioner refused to allow any mitigating evidence or testimony.

It appears that here, as in *Landrigan,* "as far as [Petitioner was] concerned there [were] no mitigating circumstances of which [jury] should be aware." 550 U.S. at 480. Petitioner's continued insistence on his innocence and his waiver of penalty defense in apparent protest of his conviction are not, as *Strickland* expert Sawyer may suggest, necessarily inconsistent with his penalty objection and reasons supporting it. (*See* EH Ex. 5 at ¶ 87.) But rather these considerations seem to have motived that objection. (*See* EH Ex. 12 at Ex. 4 thereto at 5.)

Finally, the Court finds unavailing Petitioner's citation to the following cases in which penalty defense investigations seemingly more extensive than Hoover's general investigation

---

[9] Petitioner did not attribute his lack of recollection to the pain medication he was taking at the time. (EHRT 344-46.) He testified the pain medication did not affect his memory or competence. (EHRT 350-51.)

were found deficient. Defense counsel in *Caro v. Woodford* was found ineffective at the penalty phase by failing to investigate and present evidence of organic brain damage and resulting behavioral problems suffered as a result of Caro's severe abuse and accidental trauma throughout his childhood and extraordinary history of exposure to neurotoxicants. This even though counsel was on notice of facts and medical test results suggesting mental impairment and had no strategic reason for his omissions. 280 F.3d 1247. In contrast, Petitioner has not adduced facts suggesting Hoover was on notice of a history of extraordinary exposure to precursors of brain damage, and mental and behavioral impairments. Moreover, Petitioner objected to, waived and actively interfered with a mitigation defense.

Defense counsel in *Lambright v. Schriro* was found ineffective at the penalty phase by presenting a scant mitigation defense that failed entirely to present any mitigating psychiatric or psychological evidence including mental health history. 490 F.3d 1103, 1118 (9th Cir. 2007) This even though counsel was aware of indications in his psychosocial history that Lambright was mentally ill including mental instability and substance abuse relating to traumatic combat in Vietnam including hallucinations and suicide attempts resulting in psychiatric hospitalization and diagnosed antisocial personality disorder. But here, Petitioner has not adduced evidence showing indications of such mental state factors and conditions sufficient to place Hoover on notice of a need for further investigation. Moreover, Petitioner objected to, waived and actively interfered with a mitigation defense.

### d. Conclusions Regarding Performance

Petitioner has not demonstrated that Hoover was deficient by failing to investigate, develop and present a penalty defense given Petitioner's objection, waiver, threats, and out-of-court and in-court interference and obstruction including direction not to present mitigating evidence or argument or cross-examination of prosecution witnesses.

Upon his appointment to represent Petitioner, Hoover assembled a defense team which conducted a general investigation of Petitioner's background including his social, educational, employment and criminal histories.

Hoover and Petitioner met and discussed the penalty phase and Petitioner's objection to a penalty defense on more than several occasions.

Hoover requested and received a continuance prior to the penalty phase so that Petitioner could be evaluated by a psychiatrist and further counseled on his penalty objection by independent counsel, his parents and the trial court.

Petitioner competently made a knowing and informed in-court waiver of a mitigation defense at the penalty trial, in the presence of family members including his parents.

Petitioner has not demonstrated that Hoover, even with the benefit of the proffered mitigation evidence could have persuaded him from his objection or presented a mitigation defense over his objection, under the facts and circumstances faced by Hoover.

### 3.     Petitioner has not Demonstrated Prejudice

Petitioner alleges there is a reasonable probability that absent Hoover's allegedly deficient conduct and had the proffered mitigation evidence been presented to the jury, the sentencing outcome would have been different (*see* DOC. No. 346 at 2, *quoting* DOC. No. 180 at 3), that is at least one juror would have been persuaded to spare his life (*see* DOC. No. 359 at 28).

Petitioner argues the proffered mitigation evidence shows a level of deprivation, poverty, instability, neglect, emotional and physical abuse, and mental dysfunction vital to the jury's assessment of his moral culpability and sufficient to undermine confidence in the sentencing verdict.  He asserts this is because

> [D]efendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems, may be less culpable than defendants who have no such excuse.  [Citation] Thus, a history of abuse and privation is highly relevant to and might well influence the jury's appraisal of the appropriate punishment. [Citation]

(DOC. No. 372 at 81, *citing Douglas*, 316 F.3d at 1090, *quoting Boyde v. California*, 494 U.S. 370, 382 (1990).)

Petitioner argues that in pre-AEDPA cases like this one, the Ninth Circuit has found

prejudice were counsel failed to present the type of classic mitigation evidence proffered in this proceeding. *See e.g., Wharton v. Chappell*, 765 F.3d 953, 977-78 (2014) (prejudice found where counsel failed to present evidence of repeated sexual abuse); *Stankewitz v. Wong*, 698 F.3d 1163, 1173-76 (9th Cir. 2012) (prejudice found where counsel failed to present substantial evidence of deprived and abusive upbringing, potential mental illness, and long history of drug use); *Hamilton*, 583 F.3d at 1130-35 (prejudice found where counsel failed to present evidence of abusive home environment and mental illness); *Karis v. Calderon*, 283 F.3d 1117, 1139-41 (2002) (prejudice found where counsel presented mere 48-minute mitigation case that did not include evidence of abusive home environment); *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015) (*quoting Frierson*, 463 F.3d at 989) (prejudice found where counsel failed to conduct further investigation of potentially mitigating facts known to him that suggested a history of severe neglect and sexual abuse in prison).

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604; *see also Eddings v. Oklahoma*, 455 U.S. 104, 113-114 (1982) (*adopting rule in Lockett*).

However, assuming arguendo that Hoover was deficient as alleged, the Court finds that for the reasons stated *ante* and *post*, Petitioner is precluded by *Landrigan* from showing prejudice, and even if he were not the evidence he proffers, when considered in the context of the total evidentiary record developed in this proceeding, has only minor mitigating value.

### a. Determining Prejudice under the *Strickland* Standard

The prejudice determination requires the court consider counsel's errors against "the totality of the evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Wiggins*, 539 U.S. at 536; *accord Strickland,* 466 U.S. at 668, 695; *Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009). The Supreme Court has explained that a petitioner's "reasonable probability" showing must be "substantial, not just conceivable." *Richter*, 562 U.S.

at 111–12 (*citing Strickland*, 466 U.S. at 693).  That is, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Richter*, 562 U.S. at 104 (*quoting Strickland*, 466 U.S. at 687).

Under this standard, "[we ask] whether it is 'reasonably likely' the result would have been different." *Richter*, 562 U.S. at 111 (*quoting Strickland*, 466 U.S. at 696).  In determining whether counsel's deficient performance prejudiced the outcome of petitioner's trial, the court "must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Webster*, 2014 WL 2526857, at *21; *see also Strickland*, 466 U.S. at 695 (court must consider the totality of the evidence before the judge or jury in assessing prejudice).

The prejudice analysis considers "the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Hovey*, 458 F.3d at 929 (*quoting Stankewitz*, 365 F.3d at 716).

Prejudice is demonstrated where "there is a reasonable probability that at least one juror would have struck a different balance'' between a death and LWOP sentence.  *Wiggins*, 539 U.S. at 537; *see also Mak*, 970 F.2d at 621.  Notably "[t]he bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases.*" Cox v. Ayers*, 613 F.3d 883, 897 (9th Cir. 2010) (*citing Silva*, 279 F.3d at 847) (stating that "we must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing"); *see also Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) (*quoting Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999)) (although trial counsel's lack of effectiveness was not prejudicial at the guilt phase, during sentencing, where mitigation evidence may well be the key to avoiding the death penalty, the analysis differs).

### b.    Prejudice Preclusion under *Landrigan*

The Supreme Court in *Landrigan* found that counsel's failure to present additional mitigating evidence cannot be a basis for prejudice under *Strickland* where the defendant interfered with the penalty phase investigation and refused to allow the presentation of mitigating

evidence.  *See* 550 U.S. at 477; *see also Hamilton*, 583 F.3d at 1118-19.

The Ninth Circuit has applied *Landrigan* to allow a showing of prejudice absent threaten obstruction of counsel's presentation of mitigating evidence.  For example, in *Stankewitz*, the Circuit Court stated

> We have already rejected [ ] expansive reading of [*Landrigan*], a post-AEDPA case [in which] the defendant actively obstructed counsel's investigation and outright refused to allow counsel to present any mitigating evidence. [Citation] As we noted, the defendant in [*Landrigan*] explicitly instructed witnesses not to testify and repeatedly interrupted his lawyer's presentation to the court. [Citation] We held that [*Landrigan*] is inapplicable where the defendant did not threaten to obstruct the presentation of any mitigating evidence that counsel found. [Citation] Here, the district court specifically found that despite his alleged objection to the presentation of mitigation evidence, [defendant] did not interrupt or try to sabotage trial counsel's presentation.  [*Landrigan*] is thus inapposite.

698 F.3d at 1170.

A petitioner then is precluded from showing prejudice only where his refusal to cooperate in the penalty defense makes counsel's limited investigation and presentation of mitigating evidence reasonable under the circumstances.  *See e.g.*, *Hamilton*, 583 F.3d at 1119 (petitioner could show prejudice where he did not threaten to obstruct the penalty phase defense and where counsel did present [insufficient] mitigating evidence); *Stankewitz*, 698 F.3d at 1170, n.2 (petitioner in non-AEDPA case could show prejudice where his penalty defense objection was limited to testimony of family members); *but cf. Cox*, 542 F.3d at 682-83 (petitioner could not show prejudice where he continuously objected to mitigating drug use evidence and the trial judge considered such evidence to be aggravating).

The Court takes note of the interpretations of *Landrigan* in other circuits as argued by the parties in their briefs.  *See Taylor v. Horn*, 504 F.3d 416, 455-56 (3d Cir. 2007) (petitioner could not show prejudice where he told counsel not to present mitigating evidence and phoned witnesses telling them not to testify); *Owens v. Guida*, 549 F.3d 399, 412 (6th Cir. 2008) (petitioner could not show prejudice where he interfered with her attorney's attempts to present mitigating evidence); *Loden v. McCarty*, 778 F.3d 484, 499 (5th Cir. 2015) (petitioner could not show prejudice where he instructed counsel not to present mitigating evidence, cross-examine

witnesses, make objections, or argue at the penalty phase); *Cummings v. Secretary*, 588 F.3d 1331, 1357-1358 (11th Cir. 2009) (mentally competent petitioner could not show prejudice where he clearly instructed counsel not to investigate and present mitigating evidence as the decision whether to present mitigation belongs to the defendant); *cf. Thomas v. Horn*, 570 F.3d 105, 124, 128-129 (3d Cir. 2009) (petitioner could show prejudice where his penalty defense objection was focused on his refusal to testify and did not reach mental state mitigating evidence).

### i.    *Application of Landrigan to this Case*

Petitioner argues that *Landrigan* should not apply here because *Landrigan* is a post-AEDPA case and requires the defendant actually interfere with counsel's presentation of mitigating evidence. (DOC. No. 321 at 83.)

### (1)    Pre-AEDPA Applicability of *Landrigan*

Petitioner argues the holding in *Landrigan* accorded 28 U.S.C. § 2254(d)(2) [i.e., AEDPA] deference, such that it is inapplicable in the instant pre-AEDPA context. 550 U.S. at 477, 481.

However, Petitioner has not demonstrated *Landrigan's* prejudice preclusion is limited to deferential review. He does not cite to specific language in *Landrigan*, or Ninth Circuit authority dictating such a result. Moreover, the Supreme Court has applied post-AEDPA precedent to decide pre-AEDPA claims. For example, in *Ayers v. Belmontes*, the Supreme Court relied upon *Brown v. Payton*, 544 U.S. 133 (2005), a post-AEDPA California capital case, to resolve a pre-AEDPA claim in a capital case. 549 U.S. 7, 9-17 (2006).

Petitioner has not persuaded the Court that within the Ninth Circuit, the Supreme Court decision in *Landrigan* does not apply to pre-AEDPA cases on the facts and circumstances of this case. Notably, the Ninth Circuit Court has applied *Landrigan* in a pre-AEDPA context to find counsel deficient for failure to present mitigating evidence where defendant did not threaten to obstruct counsel's presentation of that evidence. *See Hamilton*, 583 F.3d at 1119; *Stankewitz*, 698 F.3d at 1170 at n.2.

### (2)    *Landrigan* Precludes a Showing of Prejudice by Petitioner

Petitioner alleges that in any event, the preclusive effect of *Landrigan* does not apply here because Petitioner did not "actively obstruct [ ] his attorney's presentation of [ ] mitigating evidence in court." (DOC. No. 359 at 16.)

Specifically, Petitioner argues that he did not persistently interfere in court during the penalty phase (DOC. No. 359 at 15-28; DOC. No. 206 at 14-19; EH Ex. 12 at ¶ 48; EHRT 156), distinguishing him from *Landrigan*. He argues his penalty objection did not alone constitute in-court interference for purposes of *Landrigan*, but rather was a common initial position taken by capital defendants. (DOC. No. 321 at 106-07, 126-33.) In other words, Petitioner argues that his penalty objection was a position that could have been overcome by guidance from counsel (*id.*). *See Hamilton*, 583 F.3d at 1182 (counsel's limited investigation and presentation of mitigating evidence unreasonable where defendant refused to cooperate in, but did not impede the penalty defense - in a pre-AEDPA case); *Stankewitz*, 698 F.3d at 1170 at n.2 (counsel ineffective for inadequate penalty phase investigation where defendant did not want his family called but otherwise was not opposed to penalty phase investigation, and warning against an "expansive reading of *Landrigan*" – in a pre-AEDPA case).

However, for the reasons stated *ante*, summarized here, the evidentiary record suggests that Petitioner engaged in active interference of the penalty defense within *Landrigan*. Petitioner provided Hoover with background information that could not be corroborated. Petitioner otherwise failed to cooperate in the development of mitigating evidence for presentation in court. He objected to and waived a mitigation defense open court. Significantly, he instructed Hoover of "his desire that [Hoover] not present any evidence at all in his behalf" and that he "rationally and lucidly and honestly cannot accept life in prison without parole." (DOC. No. 360 at 11:4-11, *citing* RT 1823-1824; *see also* DOC. No. 322 at 28); *see also Landrigan*, 550 U.S. at 475 (prejudice preclusion applied where defendant plainly informed counsel not to present any mitigating evidence).

Hoover told the trial court that this "attitude is not new." (RT 1823; DOC. No. 360 at

11.)  Hoover testified at the evidentiary hearing that Petitioner "never wavered in [this] position" (EHRT 123; *see also* DOC. No. 360 at 11), and that Petitioner went so far as to state that an LWOP sentence would cause him to "try to crawl over the wall and be shot by a guard." (EHRT 139; *see also* DOC. No. 360 at 11.)

Petitioner's further argument that he could not have interfered with Hoover's presentation of mitigation evidence because in fact Hoover made no such presentation ignores Petitioner's noted threats, interference and obstruction preventing presentation of a penalty defense.  For example, prior to the penalty phase, Hoover spoke with Petitioner's wife Marian about testifying in mitigation (EHRT 126-35; *see also* EH Ex. 12 at ¶ 45; EH Ex. 38 at 36-41) and her concern that she would have to reveal Petitioner's violence toward her.  (EHRT 134; EH Ex. 38 at 39; *see also* EH Ex. 1 at ¶ 213.)  Hoover also spoke with Petitioner's parents regarding potential testimony at the penalty trial.  (EH Ex. 12 at ¶ 43.)  But separately, Petitioner instructed Hoover not to participate in any mitigation defense.

For the reasons discussed above and below, Hoover's failure to present a mitigation defense including testimony by Marian, Petitioner's parents, and other potential witnesses in favor of LWOP (s*ee e.g.,* EH Ex. 31 at ¶ 2) did not occur in isolation as Petitioner suggests, but rather seems the product of Petitioner's ongoing campaign against presentation of any defense at the penalty stage.  Furthermore, the noted record reflects that members of Petitioner's family were present in court at the penalty trial and presumably could have testified at some point regarding noted mitigating factors in Petitioner's background had he allowed them to do so.  (RT 1843.)

The Court finds that on the fully developed record Petitioner actively threatened to and did interfere with and obstructed Hoover's investigation and presentation of mitigation evidence so as to preclude a showing of prejudice under *Landrigan*.

### c.     No Prejudice under *Strickland*

Assuming arguendo that the prejudice preclusion of *Landrigan* does not apply, Petitioner claims that Hoover's alleged deficiencies caused him prejudice under *Strickland*.  He argues that

confidence in the sentencing verdict is undermined by Hoover's failure to present proffered

mitigating evidence of his troubled life.  *See e.g.*, *Wiggins*, 539 U.S. at 535 (mitigation evidence

showing a "troubled history" aids in assessing "moral culpability").

This Court in its 2001 order denying the petition considered and rejected similar

allegations of prejudice on the then developed record, stating that

> [Petitioner's] claim that defense counsel failed to investigate and failed to adequately inform him of the available [penalty phase] evidence does not establish prejudice. The record shows that members of [Petitioner's] family were available to testify, but that [Petitioner] decided against presenting any defense. It is not reasonably likely additional investigation would have changed [Petitioner's] mind about waiving the penalty defense. Defense counsel had discussed the possibility of a penalty defense with [Petitioner] over the entire course of his representation, and [Petitioner] discussed his waiver decision with numerous persons prior to the start of the penalty phase. [Citation] Counsel's acquiescence in [Petitioner's] decision not to present a penalty defense does not undermine reliability of the penalty verdict.

(DOC. No. 148 at 66-67, *citing* RT 1824, 1834-37, 1842-44.)

It appears settled that a court may assign less weight to mitigating factors that did not

influence a defendant's conduct at the time of the crime.  *See Hedlund v. Ryan*, 854 F.3d 557,

587 at n.23 (9th Cir. 2017).  "The United States Supreme Court has said that the use of the nexus

test [i.e. nexus between the mitigating event and defendant's behavior in the crime charged] in

this manner is not unconstitutional because state courts are free to assess the weight to be given

to particular mitigating evidence."  *Schad v. Ryan*, 671 F.3d. 708, 723 (2011) (*overruled in part

by McKinney v. Ryan*, 813 F.3d 798, 819 (2015)) (*citing Tennard v. Dretke*, 542 U.S. 274, 289

(2004)) (rejecting any requirement to prove a "nexus" between mitigating evidence and the

charged offense).

Accordingly, "[i]t is well-established … that state courts have the discretion to assess the

appropriate weight of sentencing-related evidence."  *Schad*, 671 F.3d at 724, *citing Harris v.

Alabama*, 513 U.S. 504, 512 (1995).  Causal nexus and any lack thereof may be considered in

assessing the quality, strength and overall weight of the mitigating evidence.  *See e.g., State v.

Newell*, 212 Ariz. 389, 405 (2006) (failure to establish a causal connection between the

mitigating factors and the crime may be considered in assessing the quality and strength of the mitigation evidence).

Upon consideration of the fully developed record in this proceeding it remains that Petitioner has not demonstrated prejudice under the *Strickland* standard, for the reasons discussed *ante* and *post*.

### i. *Social History*

### (1) Evidence of Poverty, Alcoholism, Mental Illness, Abuse and Dysfunction

Petitioner argues mitigation value in his family's dust bowl legacy and his multigenerational and immediate family history of poverty, alcoholism, mental illness, abuse and dysfunction. (EH Ex. 1 at ¶¶ 10-13, 29-33; EH Ex. 22 at ¶ 16; EH Ex. 23 at ¶ 9; EH Ex. 25 at ¶¶ 3-6, 32; EH Ex. 33 at ¶¶ 17-20, 31-32.) However, for the reasons stated, Petitioner has not shown this evidence influenced his crimes or would have had more than minor mitigating weight given the facts and circumstances of this case and the totality of the evidence developed in this proceeding. *Hedlund*, 854 F.3d at 587.

Petitioner's mother, Tomi, had the first of her six children at age sixteen. (EH Ex. 1 at ¶ 40; EH Ex. 25 at ¶ 10.) Tomi argued and fought with Petitioner's birth father, Don. (EH Ex. 33 at ¶ 52; EH Ex. 1 at ¶¶ 56-57; EH Ex. 26 at ¶ 30.) Don was largely disinterested in Petitioner and the other children. (EH Ex. 1 at ¶¶ 45, 47, 51; EH Ex. 17 at ¶ 25; EH Ex. 25 at ¶ 12; EH Ex. 26 at ¶ 28.) Both Don and Tomi sometimes beat the children, especially Petitioner and his brother Steve. (EH Ex. 1 at ¶¶ 58, 67, 103; EH Ex. 25 at ¶ 15; EH Ex. 35 at ¶ 8.)

Petitioner also argues mitigation value in the physical and emotional deprivation and frequent relocation he endured as a youth. (*See e.g.*, EH Ex. 1 at ¶ 41; EH Ex. 21 at ¶ 46.) Petitioner's family often changed residences, making friendships and stability in school difficult to find. Petitioner was hit by a car when he was ten years old leaving him in a body cast for weeks (EH Ex. 1 at ¶ 106; EH Ex. 17 at ¶ 37), causing him to miss a substantial amount of school (*id.*), exacerbating his academic difficulties (SHCP Ex. 612 at 18).

Tomi and Don divorced in 1960; Petitioner was eight years old at that time. (EH Ex. 1 at

¶¶ 82-88; EH Ex. 25 at ¶ 17; EH Ex. 89.)  The children were shuttled between the parents and other relatives (EH Ex. 1 at ¶ 124; EH Ex. 17 at ¶ 33; EH Ex. 21 at ¶ 56; EH Ex. 26 at ¶ 31; EH Ex. 35 at ¶ 16), and generally are said to have had a "rough time" after the parents divorced (SHCP Ex. 612 at 12-13; SHCP Ex. 613 at 7; SHCP Ex. 615 at 5-7; SHCP Ex. 616 at 13). Petitioner's mother, in addition to her alcoholism suffered apparent chronic and sometimes severe depression.  (EH Ex. 1 at ¶¶ 12, 14-15, 28; EH Ex. 26 at ¶ 29.)  Petitioner's father, Don, was "drinking, gambling, and getting into fights" during those times Petitioner stayed with him. (EH Ex. 25 at ¶ 20.)

Petitioner wanted to spend time with his father after the divorce, but at times was unable to do so because his mother had custody of him.  (SHCP Ex. 612 at 14; SHCP Ex. 615 at 6.) After the divorce, Petitioner and his siblings were often unsupervised.  (SHCP Ex. 612 at 16.)

Certainly these factors suggest that Petitioner had a difficult home-life with little supervision, guidance and assistance from his parents.  But as discussed above, the sentence selection phase focuses upon an "individualized determination on the basis of the character of the individual and the circumstances of the crime."  *Tuilaepa*, 512 U.S. at 972.  The jury is to exercise its sentencing discretion variously by considering "the specific context behind a particular case [and] a myriad of factors to determine whether death is the appropriate punishment."  *Ervin*, 2016 WL 3253942, at *7.

When considered in light of these sentencing standards and for reasons discussed below and summarized here, these social history factors do not appear overly sympathetic or remarkable.  *Hedlund*, 854 F.3d at 587.  Nor do these factors suggest more than minor mitigating value when considered in light of facts and circumstances surrounding the capital crimes and Petitioner's participation in those crimes.  *Webster*, 2014 WL 2526857, at *44.  Significantly, the testimony by Petitioner's family members does not appear to indicate that as a result of his family and home-life Petitioner suffered any residual mental or behavioral issues other than seemingly unrelated childhood hyper-activity.  (*See e.g.*, EH Ex. 17 at ¶ 23, EH Ex. 26 at ¶ 23, EH Ex. 35 at ¶ 11.)

1  Nor has Petitioner demonstrated that he suffered any significant anxiety or depression
2  around the time of the capital crimes. *Hedlund*, 854 F.3d at 587. Dr. Matychowiak's
3  contemporaneous evaluation is not suggestive of depression; Petitioner expressly denied
4  depression at that time. (EH Ex. 12, at Ex. 4 thereto at 4-5.) Any anxiety seems related only to
5  fear of being linked to the botched attempted robbery mere days before the capital crimes.
6  Moreover, Petitioner's siblings for the most part were raised in the same nuclear and extended
7  family environment as Petitioner. Yet his sisters and brothers largely avoided the type of
8  criminal justice history and related institutionalization that Petitioner earned. While such a
9  sibling comparison is not alone a basis to discount the mitigation proffer or to judge his moral
10 culpability - it does suggest the mitigating value of these social history factors might be less than
11 otherwise would be the case.

12  The habeas declarations filed by family members suggest that the beatings Petitioner and
13 his brother Steve received at home, although harsh, were largely disciplinary in nature (SHCP
14 Ex. 615 at 5-6) and not generally extreme or severe. (EH Ex. 1 at ¶¶ 45, 47, 51; EH Ex. 17 at ¶
15 25; EH Ex. 25 at ¶¶ 15-17; EH Ex. 26 at ¶¶ 19-28; EH Ex. 28 at ¶¶ 9-10); EH Ex. 35 at ¶¶ 9-13);
16 *Hedlund*, 854 F.3d at 587. For example, Petitioner was said to be over-active as a youth and
17 sometimes ran off in the middle of the night (EH Ex. 25 at ¶ 14) leading to occasional severe
18 whippings and beatings from his father for not minding. (SHCP Ex. 616 at 8-9.)

19  Petitioner, in spite of the adversity he faced was described as likeable and friendly as a
20 youth (SHCP Ex. 614 at 8); protective of his family (*id.* at 9); willing to take blame for others
21 (*id.* at 10; SHCP Ex. 615 at 6); interested in his Native American heritage (SHCP Ex. 613 at 2);
22 artistically talented (SHCP Ex. 613 at 2; SHCP Ex. 615 at 13); at times helpful to family and
23 friends (SHCP Ex. 613 at 10; SHCP Ex. 615 at 9); and especially fond of his half-Cherokee
24 Grandmother Ruth (SHCP Ex. 614 at 1). It then seems that such adversity did not have a
25 significant effect on him. *Hedlund*, 854 F.3d at 587.

26  Though the family was poor and in the view of at least one sibling occasionally did not
27 have enough food to eat (SHCP Ex. 621 at 1), it does not appear that subsistence needs went

28

unmet. Don's whippings of Petitioner and his older brother Steve were not so unusual or severe as to prevent Petitioner from wanting to live with Don following the parent's divorce. (*Id.;* SHCP Ex. 620 at 3-4); *Hedlund*, 854 F.3d at 587.

"[T]he ultimate question for the sentencer is simply whether the aggravating circumstances, as defined by California's death penalty law [Penal Code section 190.3], so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole." *People v. Delgado*, 2 Cal. 5th 544, 589 (2017). While the jury can consider any mental or emotional condition as circumstance extenuating the gravity of the crimes, *People v. Cox*, 30 Cal. 4th 916, 965-66 (2003), (*disapproved on other grounds by People v. Doolin*, 45 Cal. 4th 390, 421 (2009)), as well as character and background evidence, *People v. Odle*, 45 Cal. 3d 386, 418 (1988) (*abrogated in part by People v. Prieto*, 30 Cal. 4th 226, 256 (2003)), such factors as discussed above have only minor mitigating weight given the instant record. *Hedlund*, 854 F.3d at 587.

Given the weak mitigation value of Petitioner's proffered evidence, the aggravating evidence is of sufficient weight to support a finding that a jury would not have sentenced petitioner to life without the possibility of parole had they been presented with the available mitigation evidence. *Hedlund*, 854 F.3d at 587; *Webster*, 2014 WL 2526857, at 46; *see also Mann v. Ryan*, 828 F.3d 1143, 1161 (9th Cir. 2016) (finding no prejudice in failing to develop potentially mitigating evidence given facts showing significant aggravation).

### (2) Evidence of Problems at School, with Law Enforcement and in the Military

Petitioner argues mitigation value in his adolescent underperformance at school, chronic and increasingly serious problems with the law, and his underage enlistment in the military. (*See* DOC. No. 372 at 25-48.)

In school, Petitioner tested in the low-average intelligence range (EHRT 218; EH Ex. 1 at ¶ 96); his grades mostly C's and D's (EH Ex.'s 115-17).

Petitioner began to have trouble with law enforcement around the age of fourteen. (CT March 3, 1982 at 4-5.) He was arrested multiple times for burglary and theft (EH Ex. 1 at ¶¶

111, 113; EH Ex. 119) and as a result spent time in CYA custody (EH Ex. 25 at ¶ 19; EH Ex. 36 at ¶ 3; EH Ex. 119) and ultimately was found to be incorrigible (EH Ex. 1 at ¶ 131; EH Ex. 119). Upon grant of CYA probation and release, Petitioner serially re-offended and returned to CYA custody. (EH Ex. 1 at 135; EH Ex. 118; 5 CT 1213-14.) During his time at the CYA, Petitioner performed poorly in his classes. (EH Ex. 118.) After he was paroled from CYA custody at age sixteen, Petitioner drifted from one relative to another and did not return to regular high school. (EH Ex. 1 at ¶ 140; EH Ex. 16 at ¶¶ 18-19; EH Ex.'s 118-119.)

Still sixteen, Petitioner enlisted in the Army by using his older brother Steve's name and identification. (EH Ex. 1 at ¶ 148; EH Ex. 114.) He performed poorly on the Armed Forces Qualification Test, scoring 21 out of 100. (EH Ex. 114.) But he apparently performed well once enlisted. *(See* SHCP Ex. 613 at 7.) However, his military service was terminated six months later when Army officials discovered he was underage. (*Id.*) Petitioner then lived on the streets or with family (EH Ex. 119), incurring additional arrests and CYA custody placement. (*Id.*; EH Ex. 1 at ¶¶ 164-65.)

Petitioner's academic under-achievement and CYA history suggest some mitigating value. This evidence highlights Petitioner's lack of any family support structure to deal with the causes and consequences of his above noted struggles. (EH Ex. 1 at ¶¶ 19, 40.) His mother Tomi often worked long hours, leaving him and his siblings to fend for themselves. (EH Ex. 1 at ¶ 52; EH Ex. 17 at ¶ 35; EH Ex. 26 at ¶ 51; EH Ex. 33 at ¶ 54.) Don and Tomi both remarried, but according to Petitioner the introduction of step-relatives made him feel even more insecure. (DOC. No. 372 at 26, *citing* EH Ex. 1 at ¶¶ 47, 57-58, 119, 172; EH Ex. 26 at ¶¶ 39-41.) Additionally, Don traveled as a race horse trainer from 1969 to the mid-1980's and was largely unavailable to Petitioner and his siblings. (EH Ex. 25 at ¶ 22.)

However, the evidence also includes information weakening its overall mitigating effect. For example, Petitioner's CYA records show an apparent runaway from CYA custody. (SHCP Ex. 672.) Petitioner repeatedly re-offended, lapsed into substance abuse, failed CYA parole four times and dropped out of high school never to return. (EH Ex. 1 at Ex. 367.) These negative

1    events occurred notwithstanding Petitioner's access to some level of support and assistance

2    within his extended family.  (*See e.g.*, EH Ex. 1 at Ex. 350.)

3        Petitioner's enlistment in the military also suggests some mitigating value, showing his

4    interest in and apparent ability to get his life going in a positive direction.  But here again the

5    evidence includes information that has potentially negative mitigating value.  Petitioner's entry

6    into the military and brief time as a soldier suggest both a level of capability potentially

7    inconsistent with alleged mental health issues discussed *post*, and a knowing deception to gain

8    underage enlistment.  (*See e.g.,* EH Ex. 25 at ¶ 24.)  Furthermore, this evidence would likely

9    have revealed that Petitioner suffered substance withdrawal symptoms while in the military (EH

10   Ex. 119 at 1-3); that his enlistment violated conditions of his CYA parole (*see* EH Ex. 119 at 2-

11   3); and that he was absent without leave for 1 of the 6 months he was in the military (*see* SHCP

12   Ex. 500 at ¶¶ 184-85; EH Ex. 119 at 4).

13       As noted, the sentence selection phase focuses upon an "individualized determination on

14   the basis of the character of the individual and the circumstances of the crime."  *Tuilaepa,* 512

15   U.S. at 972.  The jury is to exercise its sentencing discretion variously by considering "the

16   specific context behind a particular case [and] a myriad of factors to determine whether death is

17   the appropriate punishment." *Ervin*, 2016 WL 3253942, at *7.  For the reasons stated *ante* and

18   *post*, the foregoing social history factors relating to Petitioner's adolescence have only minor

19   mitigating value in the context of the aggravating evidence in the fully developed record.

20   *Hedlund*, 854 F.3d at 587.

21       ***ii.     Mental Health History***

22       Petitioner alleges mitigating value from an alleged multigenerational and individual

23   history of mental health conditions and deficits and struggles with substance abuse.  (*See* DOC.

24   No. 372 at 47-81.)  However, for the reasons discussed above and those set out below, Petitioner

25   has not shown this evidence influenced his crimes and has more than minor mitigating weight

26   given the facts and circumstances of this case and the totality of the evidence developed in this

27   proceeding.  *Hedlund*, 854 F.3d at 587.

28

### (1)  Family and Personal History

Petitioner points to his mother's chronic severe depression and attempted suicide.  (EH Ex. 1 at ¶¶ 93-94; EH Ex. 17 at ¶ 28; EH Ex. 26 at ¶¶ 29, 48-51; EH Ex. 32 at ¶ 2; EH Ex. 36 at ¶ 2.)  He points to his uncle's suicide while in prison.  (EH Ex. 57; EH Ex. 1 at ¶ 167.)

Petitioner alleges that he and his siblings engaged in substance abuse fueled by his parents' divorce and his father's absence from the home.  (EH Ex. 1 at ¶¶ 51-101.)  He points to evidence that as an early teen he used amphetamines, LSD, and barbiturates (EH Ex. 1 at ¶ 153; EH Ex. 114); and that by age eighteen he was using LSD, hashish, marijuana, alcohol, speed and mescaline (EHRT 230; EH Ex. 1 at ¶¶ 174, 177; EH Ex. 2 at ¶ 19; EH Ex. 3 at ¶ 26; EH Ex. 9 at ¶¶ 31, 34, 40, 46-61; EH Ex. 15 at ¶ 5; EH Ex. 25 at ¶ 23; EH Ex.'s 122, 124, 126).  He argues that he and his siblings suffered varying degrees of mental and emotional impacts from their substance abuse.  (EH Ex. 1 at ¶¶ 78-80, 137-39, 145, 149, 186-86 and 193; EH Ex. 9 at ¶ 35.) He notes the drug-related death of his younger sister Dianne.  (*Id.*)

The jury is free to consider any mental or emotional condition as circumstance extenuating the gravity of the crimes.  *Cox*, 30 Cal. 4th at 965-66.  But even if "evidence of . . . drug abuse and addiction can be compelling mitigation evidence" supporting a finding of prejudice (*see* DOC. No. 372 at 83:1-5); *see also James v. Ryan*, 679 F.3d 780, 819- 20 (9th Cir. 2012) (*cert. granted, judgment vacated*, *Ryan v. James*, 133 S.Ct. 1579, *and incorporated by reference on remand in James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013)) (history of chronic drug abuse was part of available but unpresented mitigating evidence), the mitigating weight of the evidence proffered here appears minor given the facts and circumstances in this case, discussed below.  *Hedlund*, 854 F.3d at 587.

While Petitioner's alleged substance abuse around the time of the 1970 robberies is potentially mitigating, his admission that he planned and participated in those five robberies in order to fund his drug habit discounts the mitigating weight.  (RT 1855-1894.)  Moreover, he has not demonstrated that his alleged mental health and substance abuse influenced his capital crimes and has more than minor mitigating weight.  *Hedlund*, 854 F.3d at 587.  In particular, the

testimony by Petitioner's family members does not appear to suggest that he was then significantly involved with drugs (*see e.g.*, EH Ex.'s 17, 26, 28, 35; DOC. No. 318-1 at 21), or suffered from any mental or behavioral issues.  (*See e.g.*, EH Ex. 17 at ¶ 23, EH Ex. 26 at ¶ 23, EH Ex. 35 at ¶ 11).  Instead, the record suggests the capital crimes were planned, purposeful and without any apparent indication that Petitioner was then altered by drugs or alcohol.  In the course of these crimes it appears that Petitioner solicited the involvement of others in order to eliminate witnesses to his botched robbery mere days before.  (1 CT 41); *see also Sanders*, 51 Cal. 3d at 485-89; *Mann*, 828 F.3d at 1161 (finding no prejudice in failing to develop potentially mitigating evidence given facts showing significant aggravation).  *Hedlund*, 854 F.3d at 587.

Petitioner has not demonstrated that contemporaneous with his trial he suffered any significant anxiety or depression.  Dr. Matychowiak's contemporaneous evaluation is not suggestive of depression; Petitioner expressly denied depression at that time.  (EH Ex. 12 at Ex. 4 thereto at 4-5.)  Here again, any anxiety seems related only to fear of being linked to the botched attempted robbery days before the capital crimes.  *Hedlund*, 854 F.3d at 587.

Additionally, Petitioner's siblings for the most part were raised in the same nuclear and extended family environment as Petitioner.  Yet the siblings largely avoided the type of criminal justice history and related institutionalization that Petitioner earned - suggesting the mitigating value of these social history factors might be less than otherwise would be the case.  *Hedlund*, 854 F.3d at 587.

### (2)    Habeas Expert Opinion

Petitioner alleges mitigating value in the opinions of his habeas mental health experts who suggest that he grew up traumatized (EH Ex. 1 at ¶¶ 35, 74-75; EH Ex. 3 at ¶¶ 30-31) and without the benefit of support systems inside and outside the family to help him cope with the alleged familial and personal issues relating to mental health and substance abuse.  (*See e.g.*, EH Ex. 1 at ¶¶ 123, 128, 210.)

These defense experts suggest Petitioner suffered from untreated childhood ADD-H that carried into his adulthood and led to poly-substance abuse and PTSD (EH Ex. 1 at ¶¶ 40-193; EH

98

Ex. 3 at ¶ 31; EH Ex. 9 at ¶¶ 18-40, 46-53; EH Ex. 26 at ¶ 23; EHRT 235, 241-48), impairing his self-regulatory functions (EH Ex. 3 at ¶¶ 17, 19, 22, 26, 28).

Petitioner alleges these mental health factors contributed to his history of frequent discipline at home (EH Ex. 1 at ¶ 76; EH Ex. 3 at ¶ 33); referrals to a school psychologist as a youth (EH Ex. 1 at ¶ 69; EH Ex. 25 at ¶ 13); youthful insomnia and repeated incidents of running away from home (EH Ex. 1 at ¶¶ 77, 141; EH Ex. 25 at ¶ 14); and self-medicating with alcohol and illicit drugs in his teens (EH Ex. 1 at ¶ 130; EH Ex.'s 119, 124).

### (a)    *1994 Findings of State Habeas Experts Drs. Foster and Riley*

Defense psychiatrist Dr. David Foster, who interviewed Petitioner for two days in 1994 (SHCP Ex. 501 at ¶ 7), opined that Petitioner's psychiatric disorders and impairments would have prevented him from understanding the true nature of the penalty phase and left him mentally incompetent to waive a penalty defense (*id.* at ¶¶ 61, 83, 86).

Dr. Foster noted that Petitioner presents himself as more intelligent than he is (*id.* at ¶ 14), and demonstrates childhood and adult anxiety disorder (*id.* at ¶ 23). Dr. Foster also noted Petitioner's history of head injuries as reported by Dr. Riley and discussed *post*; signs of PTSD (*id.* at ¶ 32) and ADD-H (*id.* at ¶ 36); bipolar disorder with severe mood swings (*id.* at ¶¶ 38-39); and serious drug abuse (*id.* at ¶ 43). Dr. Foster suggested that at the time of his penalty defense objection and waiver, Petitioner would have tended to dissociate and be inflexible in his thought process. (*Id.* at ¶¶ 45-50.) Dr. Foster suggests that these factors drove Petitioner to refuse a mitigation defense largely because it would have caused family members to revisit his traumatic past. (*Id.* at ¶ 58.)

Dr. Foster acknowledges but discounts Dr. Matychowiak's pre-penalty evaluation on grounds that report relied solely on Petitioner's self-reported personal history (*id.* at ¶ 65), and included indications of the above noted mental health issues which were not then pursued by either Dr. Matychowiak or Hoover (*id.* at ¶ 61).

Defense neuropsychologist Dr. Nell Riley, who interviewed Petitioner for two days in 1994 (EHRT 179; EH Ex. 3 at ¶ 5; DOC. No. 307 at 179-180), noted a family history of

dyslexia, mood disorders, depression, alcoholism and substance abuse (EH Ex. 3 at ¶ 11).  Dr. Riley found Petitioner to demonstrate "overall average intellectual ability" (EHRT 210), but with moderate impairment in multiple cognitive abilities associated with ADD-H (*see* EH Ex. 3 at ¶¶ 10, 14, 26-33) which she suggests may have placed him at greater risk of abuse as a child (DOC. No. 264 at ¶ 33) and continued into his adulthood (EH Ex. 3 at ¶ 26; EHRT 183-86).

At the evidentiary hearing Dr. Riley testified her examination of Petitioner showed deficits in neuropsychological functions including in areas of attention and concentration, learning, cognitive flexibility and inhibition.  (EHRT 212-14; *see also* EH Ex. 3 at ¶¶ 17, 19-26.) She also mentioned possibly contributing physical trauma suffered when Petitioner was hit by a car as a youth and later as a teenager when he was hospitalized following an attack where he was beaten in the head with chains and suffered disfiguring swelling.  (EH Ex. 2 at ¶ 7; EH Ex. 3 at ¶¶ 8-9.)  Regarding the latter, she notes Petitioner self-reported that for almost a year thereafter he suffered headaches, blackouts and memory impairment.  (*Id.*)

However, the mitigating value of the evidence provided by Drs. Foster and Riley is weakened to the extent its diagnostic reach is couched in speculative and tentative terms.  *See Leavitt v. Arave*, 646 F.3d 605, 614 (9th Cir. 2011) ("Such [diagnostic] opinions, which couch results in tentative language, are simply not enough to show prejudice."); *Rhoades v. Henry*, 638 F.3d 1027, 1050 (9th Cir. 2011) ("Speculation about potential brain dysfunctions or disorders 'is not sufficient to establish prejudice.' "); *Hedlund*, 854 F.3d at 587.

Similarly this evidence suggests weakened mitigating value to the extent it lacks support in the fully developed record.  *Hedlund*, 854 F.3d at 587.  Petitioner stated that he had a "pretty good childhood."  (DOC. No. 307 at 200.)  It does not appear that Petitioner ever was diagnosed with ADD-H as a child.  (*See* EH Ex. 9 at ¶ 31.)  Dr. Riley acknowledged in her 2008 supplemental habeas declaration that she was unable to complete neuropsychological testing due to Petitioner's pre-existing medical conditions.  (DOC. No. 264 at 3-4.)  Dr. Riley conceded at the evidentiary hearing that ADD-H was not largely recognized as an adult condition at the time of Petitioner's proceeding.  (EHRT 183-89.)  Petitioner's self-reported symptoms secondary to

the alleged head trauma upon which these experts relied in part appear to be otherwise uncorroborated in the record. Notably, Petitioner's prison medical records from 2007 make no mention of such trauma or any residuals therefrom. (*See* EH Ex.'s 108, 109, 110.)

Furthermore, other factors may have influenced the findings of Drs. Foster and Riley. Each interviewed Petitioner twelve years after his trial, suggesting the passage of time and prison conditions may have played a part in their findings. (EHRT 179, 182.) This is particularly notable given the disparity in the contemporaneous (with trial) findings of Dr. Matychowiak.

Additionally, Dr. Riley's interview notes stated that Petitioner had slept only three hours the night before the evaluation (EHRT 197-98), and that he was then taking the sedating drug Benadryl (EHRT 203-05). Although Dr. Riley's overall sense was that "[Petitioner's] medication probably was not a significant factor in his test performance" (EHRT 209), she does not appear to be conclusive in this regard.

Even if one were to credit the conclusions of Drs. Foster and Riley that Petitioner showed average overall intellectual ability but with signs of problems associated with ADD-H and PTSD including in the areas of attention/concentration, learning new information, cognitive flexibility and inhibition of over-learned responses - Petitioner has not demonstrated on the fully developed record that his penalty position was influenced thereby. *Hedlund*, 854 F.3d at 587. To the contrary, the record noted, *ante*, suggests Petitioner was attentive at trial; that he took notes and expressed himself without any suggestion of mental issue or aberration; and that his penalty position was variously in protest of his conviction. For the reasons stated, Petitioner's penalty position can be seen as knowing, informed and premised in a rational thought process.

### (b) *2007 Findings of State Habeas Expert Dr. Kriegler*

Defense psychologist Dr. Julie Kriegler interviewed Petitioner three times in 2007, approximately twenty-five years after his trial. (EHRT 222-23.) Dr. Kriegler then prepared a psychosocial history of Petitioner. (EH Ex. 1 at ¶ 6.) Contemporaneously, Dr. Kriegler interviewed Petitioner's surviving siblings and reviewed select social history and habeas documents and consulted with federal habeas counsel. (*Id.* at ¶ 7.)

Dr. Kriegler relied upon and concurred in Dr. Riley's findings regarding ADD-H. (EH Ex. 1 at ¶¶ 40-193; EHRT 227.) Dr. Kriegler concluded that at the time Petitioner objected to and decided to forego a penalty defense, he was impacted by his past and by a perceived sudden need to act. (EHRT 225.)

However, Dr. Kriegler's findings do not appear to be significantly mitigating. *Hedlund*, 854 F.3d at 587. Dr. Kriegler evaluated Petitioner decades after trial, suggesting the passage of time and prison conditions may have played a part in her findings. Especially so given any disparity in the contemporaneous findings of Dr. Matychowiak.

Dr. Kriegler also relies upon the questionable findings of Drs. Foster and Riley. (EHRT 220-21.) She conceded during testimony at the evidentiary hearing that she did not review any medical history documentation but rather relied only upon apparently anecdotal information provided by Petitioner and his family. (EHRT 220-21.) Moreover, she testified that during the 2007 interviews Petitioner was in pain and taking morphine and that he had a very difficult time remembering his personal history. (EHRT 222-23.)

Even if credited, Dr. Kriegler's conclusion regarding the impact of factors in Petitioner's psychosocial history on his penalty defense objection that Petitioner needed support and assistance from trusted friends and advisors to resolve his objection (EH Ex. 1 at ¶ 237) has only minor mitigating weight because Hoover seems to have sought out such support and assistance including during the noted pre-penalty continuance.

*(c)     2007 Findings of State Habeas Expert Dr. Stewart*

Defense psychiatrist Dr. Pablo Stewart interviewed Petitioner three times in 2007, approximately twenty-five years after his trial. (EHRT 233-34; EH Ex. 9 at ¶¶ 11-12.) Dr. Stewart reviewed the reports and opinions of Drs. Riley and Kriegler, the 1994 social history compiled by state habeas defense expert Susan Hanks, Ph.D., the habeas declarations by family, friends and trial counsel and Petitioner's institutional records. (*Id.*)

Dr. Stewart concurred in the above noted ADD-H diagnosis and additionally diagnosed Petitioner as of the time of trial with PTSD (EH Ex. 9 at ¶¶ 45, 55, 57, 63-64, 72-73; EHRT 230-

35), in part a result of his "genetic proclivities" (EH Ex. 9 at ¶ 59). Dr. Stewart opined that at the time of his trial Petitioner suffered from and was motivated by anxieties resultant from these conditions and his traumatic and chaotic life history. (*Id.*)

Dr. Stewart noted Petitioner's mixed substance abuse at least during thirteen to eighteen years of age. (EH Ex. 9 at ¶¶ 45, 55, 63-64, 72-73.) He suggested substance abuse may have been an attempt to self-medicate untreated mental disorders (EH Ex. 9 at ¶¶ 31, 34, 40) creating a vicious cycle of substance abuse (*id.*).

Dr. Stewart stated that LWOP resistance is not usually an insurmountable problem. (EH Ex. 9 at ¶ 74.) He suggested that Hoover should have taken control over the penalty defense notwithstanding Petitioner's threat to interfere because Petitioner was neuropsychologically compromised in his ability to consider penalty phase strategies (EH Ex. 9 at ¶¶ 71-72; *see also* EH Ex. 5 at ¶¶ 99-101) and in his ability to use information to solve problems (EH Ex. 9 at ¶ 42). Especially so here, Dr. Stewart suggested given that Hoover's delay in addressing Petitioner's penalty objection and failure to obtain a psychosocial history at the time of trial otherwise impeded effective persuasion. (EH Ex. 9 at ¶ 74.)

However, Dr. Stewart's findings, when considered in context of the fully developed record, do not appear to have more than minor mitigating value. As was the case above, Dr. Stewart evaluated Petitioner decades after trial, suggesting the passage of time and prison conditions may have played a part in his findings. Particularly given any disparity in the contemporaneous findings of Dr. Matychowiak.

Moreover, Dr. Stewart conceded that Petitioner was never diagnosed with ADD-H as a child. (*See* EH Ex. 9 at ¶ 31.) Dr. Stewart reviewed and presumably relied upon the questionable reports of Drs. Foster, Riley and Kriegler which themselves are not significantly mitigating for the reasons stated, *ante*. Dr. Stewart admitted that he did not administer any neuropsychological testing during his evaluation of Petitioner. (EHRT 234; *see also* DOC. No. 267 at 5-6.)

Dr. Stewart acknowledged that at the time of Petitioner's trial PTSD was not widely

diagnosed in circumstances such as the instant.  (EHRT 236-49.)  He nonetheless suggested that this psychiatric condition had been known to exist "for years" and was not limited to "combat exposure" (EHRT 236-49), but could result from traumatic experiences and physical and emotional abuse (*id.*; EH Ex. 9 at ¶ 47).  In any event, the mitigating value of Dr. Stewart's assessment that Petitioner suffers from PTSD is significantly weakened by his ready admission that this diagnosis does not satisfy the requirements of the Diagnostic and Statistical Manual - III (hereinafter "DSM") for this condition.  (EHRT 245-48.)

Dr. Matychowiak's above discussed sanity findings following evaluation of Petitioner at the time of trial differ markedly from Dr. Stewart's findings twenty-five plus years later that ADD-H and PTSD driven anxieties and neuropsychological impairments compromised Petitioner's penalty defense reasoning.  Dr. Matychowiak found that Petitioner "appeared at above-average intelligence" and was "oriented for time, place, and person," with "no evidence of hallucinations [or] delusions. . . ."  (EH Ex. 12 at Ex. 4 thereto at 2.)  As discussed, *ante*, Dr. Matychowiak acknowledged the reasons and reasoning underlying Petitioner's objection, as did Hoover.  Similarly, the contemporaneous observations of Hoover, Simrin and the trial judge were that Petitioner did not demonstrate any mental impairment or deficit during his capital proceedings.  Dr. Matychowiak ultimately found that Petitioner was then competent for purposes of his penalty defense waiver.  (*Id.* at 5.)

Additionally, Petitioner was taking medication at the time of Dr. Stewart's examination. In Dr. Stewart's case, Petitioner was taking opiates as pain medication (EHRT 234), suggesting that medication may have played a role in Dr. Stewart's finding.

Like Dr. Kriegler, Dr. Stewart found Petitioner to be a poor personal historian.  (EHRT 244-45; EH Ex. 9 at ¶ 16.)  Dr. Stewart noted that a lot of what Petitioner told him was not objectively reinforced by third party source(s).  (*Id.*).  This seems congruent with Hoover's conclusion that Petitioner was providing misinformation and not cooperating in the penalty defense effort, as discussed *ante*.

Even if credited, Dr. Stewart's conclusions that at the time of trial Petitioner suffered the

effects of ADD-H, PTSD, mixed substance abuse and resultant anxieties and impaired decision-making have minor mitigating weight for the reasons discussed above. *Hedlund*, 854 F.3d at 587. Dr. Stewart's conclusions as to the appropriate course of action also seem largely reflected in the action taken by Hoover in seeking the noted pre-penalty phase continuance and assistance with Petitioner's objection.

### (3)    Institutional Mental Health History

Petitioner alleges mitigating value in his institutional mental health history.

Petitioner first points to correctional records relating to his prior armed robbery conviction as suggesting he was "easily led" and "grossly insecure" with an "immature personality" and "many emotional problems." (EH Ex. 1 at ¶¶ 168, 176-178, 180-82, 196; EH Ex. 9 at ¶¶ 69-70; EH Ex.'s 119, 122, 129 and 130.) He notes a 1973 pre-parole prison psychiatric evaluation that found him to be "very cooperative, sensitive and insightful." (*See* EH Ex. 1 at ¶ 195.)

Petitioner next points to Kern County correctional records relating to the capital crimes as suggesting he suffered personality problems, insomnia, anorexia, a belief he would be released for lack of evidence, a belief his attorney quit the case, and showing a correctional officer referral for psychiatric observation. (EH Ex. 1 at ¶ 222; EH Ex. 139.)

However, for the reasons discussed above, this evidence does not appear to be significantly mitigating. *Hedlund*, 854 F.3d at 587. The contemporaneous observations of Hoover, Simrin and the trial judge were that Petitioner did not demonstrate any mental impairment or deficit during his capital proceedings. Dr. Matychowiak found that Petitioner was then sane and competent for purposes of his penalty defense waiver. (EH Ex. 139 at 5.)

Additionally, this evidence appears to add little if anything of substance to the noted opinions of the defense habeas experts, but instead is part of the information reviewed and discussed by these experts. The recommendations of the defense experts for dealing with Petitioner's penalty objection appear largely reflected in the actions taken by Hoover in seeking pre-penalty phase continuance and assistance with Petitioner's objection.

### iii.     *Criminal History*

Petitioner alleges mitigating value in aspects of his participation in and conviction for the *circa* 1970 armed robberies. (*See* DOC. No. 372 at 71-76.)

#### (1)     Five Armed Robberies in 1970

When he was eighteen years old, Petitioner was arrested for and confessed to five armed robberies in Orange County, committed with two of his friends; all three of whom were allegedly then intoxicated by drugs and alcohol. (*See* EH Ex.'s 120-24.) Petitioner pleaded guilty to one such robbery, was sentenced to state prison, and then paroled in 1973. (*Id.*; EH Ex. 1 at ¶ 181; EH Ex. 1 at Ex. 366 thereto; *see also* 5 CT 1229-31.)

At the penalty phase, the prosecution presented testimony from eight witnesses that Petitioner participated in and had admitted to these robberies. (RT 1844-1911.)

Petitioner argues mitigating value in that he was only eighteen at the time of the robberies; he robbed only because he needed money; none of the victims was injured; he was then suffering from the above alleged mental conditions and impairments and substance abuse; he tended to accept blame for others and that his sentence was more severe than his older and equally culpable co-defendants in the robberies. (RT 1855-1894.)

Petitioner points in support to statements in the habeas declarations of his co-participants in the robberies, Rudy Perez and Miguel Casanova, that the three needed money and did not want to hurt robbery victims. (EH Ex. 1 at Ex.'s 328-29 thereto; *see also* DOC. No. 266 at ¶ 54.)

However, evidence from Petitioner's accomplices, both of whom pleaded guilty to those offenses, would likely have been of only minor mitigating value. *Hedlund*, 854 F.3d at 587. The record reflects that of the three participants in the robberies, Petitioner had the primary role; he gave the orders, carried the loaded handgun and pointed it at the victims. (RT 1856-83, 1891-1904, 1911; *see also* EH Ex. 1 at ¶ 176.) It was Petitioner of the three who threatened to kill robbery victims (RT 1876), variously by stating "if [the victim] called the pigs, he was going to blow the place up" (RT 1882). It was Petitioner who admitted participating in all the robberies and that the robberies were committed to get money to buy not only food but also drugs

including heroin. (RT 1892-1909; *see also* EH Ex. 1 at Ex. 367 thereto at 2.)

The prosecutor presented evidence that Petitioner was positively identified by fingerprints as the individual who was booked into the Orange County Jail in 1970 for the noted armed robberies (RT 1998-99), and that Petitioner was identified by police lineup as a participant in the robberies by three of the victims (RT 1909-11).

The mitigating value of evidence of Petitioner's alleged substance abuse surrounding the 1970 robberies also appears to be minor, for the same reasons discussed above. *Hedlund*, 854 F.3d at 587. Notably in this regard, one robbery victim described Petitioner as "calm … almost as if [the robbery had been] rehearsed" (RT 1882), suggesting that Petitioner may not have been altered by substance abuse at that time.

Additionally, Petitioner argues mitigating value in evidence in his positive adjustment to institutional life during his 3 year incarceration on the robbery conviction. He points to his programming for drug treatment (EH Ex. 124 at 6; EH Ex. 1 at ¶ 180); above average participation in his work assignment (EH Ex.'s 127, 129; EH Ex. 1 at Ex. 367 thereto); participation in prison educational programming including junior college courses (*id.*; EH Ex. 1 at Ex.'s 341-42 thereto); and his low rating for violence (*id.*; EH Ex. 1 at Ex.'s 366-69 thereto).

Petitioner argues that this evidence of good conduct in prison in the past would have suggested to the sentencing jury his ready adjustment to an LWOP sentence and that he was not incorrigible notwithstanding his CYA background. *See Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (*quoting Lockett*, 438 U.S. at 604) ("[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.")

However, as mentioned, Petitioner's institutional records from his incarceration on the robbery conviction include information potentially undermining mitigating value. *Hedlund*, 854 F.3d at 587. The noted records suggest repeated criminal activity; a potential for violence; a failure to accept the consequences of his actions; and difficulty adjusting to prison life. Petitioner's institutional psychiatric evaluation suggests a history of deep anger against prison staff and authority figures; a failure to participate in group counseling; and a moderate history for

unarmed and armed violence outside prison including that Petitioner "carried knives, twice pointed guns at people and once broke a person's jaw." (EH Ex. 1 at Ex. 364 thereto at 1-2; EH Ex. 1 at Ex. 367 thereto at 2; EH Ex. 126 at 1; SHCP Ex. 669.) Notably, defense psychologist Dr. Kriegler stated in her report that in 1971, during Petitioner's incarceration on his armed robbery conviction, one correctional officer noted that he was "an unstable individual … having a great deal of difficulty functioning in the [general population] and could be considered for a restricted wing." (EH Ex. 1 at ¶ 182.)

Also as mentioned, this evidence could have negative mitigating value to the extent potential mitigation witnesses were otherwise unaware of it. (*See* DOC. No. 377 at 11, *citing Allen*, 395 F.3d at 1003-1004 (proposed mitigation witnesses did not know of Allen's crimes)). Although Petitioner's mother and immediate family member(s) may have known of the armed robbery evidence, Petitioner has not demonstrated that other potential mitigation witnesses, for example Arlene Fangmeyer (*see* SHCP Ex. 601), Albert Hurst (SHCP Ex. 602) and Clifford Hurst (SHCP Ex. 603), were so aware. (*See* DOC. No. 389 at 18); *Hedlund*, 854 F.3d at 587.

### iv.     *Aggravating Facts and Circumstances of the Capital Crimes*

Petitioner alleges mitigating value to the extent the crimes against Allen and Boender did not fall within recognized categories of highly aggravated crimes such as multiple murder, sexual assault and torture, but rather involved a less aggravated murder during a failed attempt to rob Boender of drugs and money. (*See* RT 109-16, 165-67, 200, 644-45, 661-67, 1065-66; DOC. No. 389 at 9-13, 16); *see also Sanders*, 51 Cal. 3d at 485-89. In support, he points out that the prosecutor did not seek the death penalty against accomplice Cebreros following Petitioner's death sentence. (DOC No. 389 at 13; RT 1933; 7 CT 1884.)

Petitioner also revisits his above lingering doubt argument. He questions the nature and extent of his participation in the capital crimes, the reliability and credibility of testimony from Boender and Allen and the lack of physical evidence linking him to the capital crimes. He argues that surviving victim Boender was unsure which assailant (Petitioner or Cebreros) struck him and Allen. (DOC. No. 389 at 9-13.)

But the record demonstrates the substantial facts in aggravation of the capital crimes and Petitioner's involvement therein. *See* e.g., *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997) ("[W]here the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigating evidence"); *cf. Hovey*, 458 F.3d at 930-31 (although aggravating evidence was strong, it was not so overwhelming as to preclude the possibility of LWOP); *Smith v. Stewart*, 189 F.3d 1004, 1113 (1999) (horrific nature of crime does not preclude prejudice).

As discussed above, Petitioner participated in planning the first attempted robbery and was the assailant in that criminal venture. (RT 655-65.) Petitioner's fingerprints were found on a roll of duct tape like that meant for use in binding the victims in the botched first robbery. (RT 387, 397-401.) Petitioner actively solicited the involvement of Cebreros and witness [Maxwell] in the capital crimes, in part due to his expressed fear of being identified as the assailant in the first robbery. (RT 128-29.) During the capital crimes, victims Allen and Boender were blindfolded, bound hand and foot, dragged into separate rooms and bludgeoned, Allen fatally so. (RT 674-93; *see also* RT March 3, 1982 at 8); *Sanders*, 51 Cal. 3d at 485-89. Allen's four inch head wound was severe enough that brain matter was exposed externally. (RT 475.) Even in that condition, she remained alive for "some period of time." (RT 479.)

When Petitioner and Cebreros entered the apartment of Allen and Boender, Petitioner was the one holding the gun. (RT 675-76); *see also Sanders*, 51 Cal. 3d at 485-89. A gun similar to one later found in the possession of Cebreros. (RT 715-17, 953-56; 1 CT 36.) A bag of marijuana found in Cebreros's possession apparently matched the bag of marijuana missing from the victim's apartment. (RT 581-82, 953-56; 1 CT 37.)

In assessing the likelihood of whether a proper penalty phase presentation would have rendered a different result, the court must assess petitioner's crime and his responsibility in the context of the evidence adduced in the guilt phase. *Webster*, 2014 WL 2526857, at *44. As was the case above, the prosecution has the right to establish the gruesome consequences of the instant capital crimes. *Jackson,* 58 Cal. 4th at 756.

It remains that "[w]hat is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972. "[T]he purpose of [Penal Code section] 190.3(a) is to provide the jury with discretion to consider the specific context behind a particular case when making its sentencing decision … [T]he jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Ervin*, 2016 WL 3253942, at *7. Petitioner has not demonstrated on the fully developed record that his sentencing jury proceeded in some other fashion.

Significantly, at the sentence selection phase, evidence that a defendant committed the capital murder for which he was convicted is one of the most crucial circumstances of the crime admissible as a capital sentencing factor under Penal Code section 190.3(a). *Jackson*, 58 Cal. 4th at 754. Such evidence, noted above, was before Petitioner's sentencing jury.

For the reasons stated *ante*, summarized here, any lingering doubt has only minor mitigating weight. *Hedlund*, 854 F.3d at 587. Surviving victim Boender identified Petitioner as an accomplice to and the assailant in the attempted first robbery occurring a few days before the capital crimes; accomplice Maxwell provided corroboration. (1 CT 110; RT 857-58; 901-03); *see also Sanders*, 51 Cal. 3d at 485-89.

Petitioner recruited Cebreros for the capital crimes after he expressed the need to eliminate Allen and Boender as witnesses to the attempted first robbery. (RT 1488.) When Cebreros was arrested after the capital crimes he had in his possession a gun similar to the weapon Boender said Petitioner brandished the night of the murder. (RT 903-10.) Boender described the manner of speech of the murder scene assailant who wanted to stay on scene in a way that was similar to the description of Petitioner's speech given by one of the Orange County robbery victims. (2 CT 426; RT 1881.)

The joint alibi defense appears inconsistent with Petitioner's statements to authorities as to where he was when the capital murders occurred; statements which were themselves inconsistent with each other. (RT 1487-88); *see Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir.

1994) (*overruled in part by Coleman v. Calderon*, 210 F.3d 1047, 1049 at n.1 (9th Cir. 2000)) (counsel reasonably could have concluded the sentencing jury would not be persuaded by a lingering doubt of guilt argument in mitigation).  Given the accomplice theory charged in this case, the prosecutor's decision not to seek the death penalty against co-defendant Cebreros does not alone suggest mitigating value vis' a vis' Petitioner.  As noted, the identity of the actual murderer was in issue at trial.

While the failure to present mitigating evidence may render the sentencing determination unfair or unreliable even in the face of substantial evidence of aggravation, *Hendricks*, 70 F.3d at 1044, here the potential mitigating value of Petitioner's proffer appears minor given the facts and circumstances of this case, for the reasons stated.  *Hedlund*, 854 F.3d at 587.  The Ninth Circuit has acknowledged that "where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigating evidence." *Gerlaugh*, 129 F.3d at 1033.

This seems particularly so here, as Hoover's decision to forego a penalty defense was not unreasonable given Petitioner's objection, waiver, threats, and out-of-court and in-court interference and obstruction and direction not to present mitigating evidence or argument or cross-examination of prosecution witnesses.

Petitioner's further argument to the contrary is unpersuasive to the extent the cases upon which he relies are distinguishable on their facts.  (DOC. No. 372 at 95:3-96:8); *see Douglas*, 316 F.3d at 1090-91 (heroic war veteran with organic brain damage); *Hamilton*, 583 F.3d at 1123-1129 (severe abuse, incest and mental illness with suicide attempts along with a single prior aggravating offense); *Williams*, 529 U.S. at 367-368 (borderline mentally challenged defendant who suffered nightmarish childhood, and who aided prison officials in breaking a drug ring); *Wharton*, 765 F.3d at 977-78 (severe sexual abuse within the family that impacted the crimes defendant committed); *Rompilla*, 545 U.S. at 391-392 (defendant in the mentally challenged range with organic brain damage impairing cognitive function); *Karis*, 283 F.3d at 1139-41 (severe physical abuse by parents that impacted the crimes defendant committed);

*Stankewitz*, 698 F.3d at 1174-75 (severely violent and alcoholic home resulting in severe emotional damage to defendant where the adverse impact of the mitigation proffer was minimal); *Doe v. Ayers*, 782 F.3d at 462 (extensive mitigating evidence including brutal and repeated prison rape and related mental illness and substance abuse, left uninvestigated and unpresented by trial counsel without any strategic rationale).

For the reasons stated, this then does not appear to be a case where "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins,* 539 U.S. at 537; *Hedlund*, 854 F.3d at 587; *cf. Hamilton,* 583 F.3d at 1134 ("[G]iven the compelling evidence of Hamilton's excruciating life history that could have been placed on the mitigating side of the scale, [Citation], we conclude that there is a reasonable probability that at least one juror would have struck a different balance between life and death."); *Karis,* 283 F.3d at 1140 ("A reasonable probability exists that a jury would find this information important in understanding the root of [petitioner's] criminal behavior and his culpability.").

### v. *Petitioner's Positive Attributes*

Petitioner alleges mitigating value in evidence showing his positive character and conduct.

Petitioner points to his actions as a youth that were protective of his siblings, often taking the blame and the parental beatings for them. (EH Ex. 1 at ¶¶ 80, 137-39; EH Ex. 25 at ¶¶ 16, 25; EH Ex. 28 at ¶¶ 6, 9.) However, any such youthful inclination to protect others seems wholly removed from his actions in aggravation and subject to discount to that extent. *Hedlund*, 854 F.3d at 587.

Petitioner points to his emotional reaction to the loss of his seventeen year old younger sister Dianne, who died from hepatitis related to drug abuse in the early 1970's while Petitioner was in prison on the robbery conviction and unable to attend her funeral. (EH Ex. 22 at ¶ 19; EH Ex. 129.)

This evidence appears to have only minor mitigating value. *Hedlund*, 854 F.3d at 587.

The circumstances surrounding Dianne's drug related death are sympathetic. But when considered relative to Petitioner's character in mitigation, *Tuilaepa*, 512 U.S. at 972, such sympathetic weight appears subject to discount. The record reflects that during Petitioner's adolescence he was largely separated from his siblings including Dianne. (DOC. No. 268 at 43.) During those occasions when he was with Dianne, Petitioner shared illicit drugs with her. (*Id.* at 49.) Petitioner's request to corrections staff to attend Dianne's funeral was denied in part because of his prior history of instability and history of narcotics addiction. (*Id.* at 65.) Petitioner was in prison for a robbery motivated by a need for money to buy illicit drugs. (*See* EH Ex. 1 at Ex. 367 thereto at 2.)

Petitioner points to the emotional loss in the late 1970's of his cousin Gary Sanders, to whom Petitioner had been close, in a motorcycle accident. (EH Ex. 1 at ¶ 210; *id.* at Ex. 49 thereto at ¶ 2; EH Ex. 26 at ¶ 5.) The accidental death of a close extended family member can be sympathetic. But here, such sympathetic weight relative to Petitioner's character in mitigation, *Tuilaepa*, 512 U.S. at 972, appears subject to discount. *Hedlund*, 854 F.3d at 587. Petitioner has not demonstrated that his close relationship and contact with Gary as a youth continued into late adolescence and adulthood. (*See e.g.*, DOC. No. 268 at 70-71; EH Ex. 11 at ¶¶ 7-11.)

Petitioner points to the affection he had for his Grandmother Ruth - that she was his connection to his part-Cherokee identity. (*See e.g.*, DOC. No. 228 at ¶¶ 12-13.) Here again, the jury would likely find only minor sympathetic value relative to Petitioner's character in mitigation, *Tuilaepa*, 512 U.S. at 972, from what seems genuine but unremarkable affection for a grandparent. Any such sympathetic weight seems subject to discount to the extent Petitioner does not point to facts showing the nature of his relationship with Grandmother Ruth during his late adolescence and adult years. (*See e.g.*, DOC. No. 228 at ¶¶ 12-13); *Hedlund*, 854 F.3d at 587.

Petitioner references his allegedly settled and seemingly stable family life; his employment in the oilfields; and marriage following parole on the robbery conviction. (EH Ex. 1 at ¶¶ 201-06, 209-11; EH Ex. 11 at ¶¶ 2, 10; EH Ex. 22 at ¶¶ 12, 27; EH Ex. 29 at ¶¶ 4-6.) The

record suggests that following his parole on the armed robbery conviction, Petitioner may have worked several or more short term oilfield jobs in Canada and California, as well as occasionally working the race horse circuit with his father. (*See id.*; EH Ex. 17 at ¶ 51.) However, the record also suggests that contrary to his noted representations to Hoover, Petitioner was unemployed at the time of the capital crimes (1 CT 44-45), discounting the sympathetic weight of this evidence relative to Petitioner's character in mitigation. *Tuilaepa*, 512 U.S. at 972; *Hedlund*, 854 F.3d at 587.

Some of the information from Petitioner's prior employment further discounts the overall mitigating weight of this evidence. *Hedlund*, 854 F.3d at 587. For example, Petitioner's work with his father may have violated his parole. (*See* EH Ex. 1 at ¶ 202.) A defense investigation of Petitioner's employment resulted in comments reflecting negatively upon Petitioner from a former employer. (EHRT 131.)

Petitioner's married life with Marian and his role as stepfather to her son Jody is somewhat sympathetic. But the record suggests Petitioner was violent toward Marian (*see e.g.*, EH Ex. 1 at ¶¶ 211-17), discounting the sympathetic weight of this evidence relative to Petitioner's character in mitigation. *Tuilaepa*, 512 U.S. at 972; *Hedlund*, 854 F.3d at 587.

Finally, Petitioner claims sympathetic value in his occasional acts of kindness to family members and friends. For example, as an adult, Petitioner offered isolated minor financial assistance and friendship to Arlene Fangmeyer. (EH Ex. 1 at ¶ 204; EH Ex. 11 at ¶ 9; SHCP Ex. 601.) He also assisted his brother Roger by bailing him out of jail on a DUI charge. (EH Ex. 1 at ¶ 218; SHCP Ex. 617 at 7.) While this evidence has some minor sympathetic weight relative to Petitioner's character in mitigation, *Tuilaepa*, 512 U.S. at 972, it too seems subject to discount. *Hedlund*, 854 F.3d at 587. For example, Petitioner paid Roger's bail the day after the capital crimes, possibly with the proceeds of those crimes given that Petitioner was unemployed at the time.

### vi. *Penalty Phase Jury Instructions*

Petitioner alleges that Hoover's failure to present a penalty defense effectively mandated

a death sentence because the jury was instructed that it "shall impose a sentence of death" if "the aggravating circumstances outweigh the mitigating circumstances." (DOC. No. 372 at 97; RT 1919-25.)

Petitioner points out that the prosecutor emphasised as much during penalty phase closing argument. (RT 1912-19); *see Karis*, 283 F.3d at 1135, *citing Boyde*, 494 U.S. at 380 (evidence of defendant's background and character important as mitigating evidence).

The record reflects that the jury was instructed with former CALJIC 8.84.2 (*see* 7 CT 1894), that

> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.

(RT 1922.)

The record reflects that the jurors also were instructed that in making the sentence determination they were to consider the CALJIC 8.84.1 (1979 revision) sentencing factors including, as applicable

> Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

(7 CT 1893.)

The California Supreme Court considered and rejected on direct appeal Petitioner's allegation that the instructions improperly restricted the jury's sentencing discretion and directed a verdict of death, stating that

> [U]se of the word "outweigh" in the statute "connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all the various factors he is permitted to consider,

115

including [section 190.3,] factor 'k' as we have interpreted it. [Citation] By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances." [Citation]

Whether the unadorned "shall" instruction requires reversal depends on the facts of each individual case. Every case "must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." [Citation] Our inquiry on appeal requires us to consider whether the jury instructions, read in conjunction with the prosecutor's arguments, adequately informed the jury of "its weighing and decision-making responsibility." [Citation]

…

[T]he prosecutor in defendant's case carefully went through each statutory factor, concluding that several were present and that no mitigating factors were apparent. In concluding death was the "proper" penalty, the prosecutor did not argue that the jury was divested of its discretion but that after weighing the statutory factors, the "proper" penalty was death…. [W]e cannot agree that [the prosecutor's] statements, read as a whole, misinformed the jury about its weighing and sentencing discretion.

*Sanders*, 51 Cal. 3d at 522-24.

The Supreme Court held in *Lockett* that

[T]he Eighth and Fourteenth Amendments require that the sentencer … not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.... Given that the imposition of death by public authority is so profoundly different from all other penalties, ... [the sentencer must be free to give] independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation[.]

438 U.S. 604-05 (finding Ohio death penalty statute invalid where it permitted consideration of only three mitigating circumstances); *see also McKinney*, 813 F.3d at 802 (*citing Eddings*, 455 U.S. at 114) (a sentencer in a capital case may not refuse to consider, as a matter of law, any relevant mitigating evidence offered by the defendant).

Here, Petitioner argues the record relating to jury deliberations suggests a reasonable probability at least one juror would have voted for LWOP had the proffered mitigation evidence been presented. (*See* DOC. No. 372 at 102-04.) He suggests the instructions given caused the

jury difficulty in reaching a sentencing verdict.  He supports this argument by pointing to the jury's mid-deliberation question to the trial court asking of the consequences should the jury be unable to reach a unanimous sentencing decision (RT 1926-27); and to the trial court's response that the jury's decision must be unanimous and that the consequence of any failure to reach a unanimous decision should not be considered (RT 1927-28).

Petitioner points to the death verdict the jury returned just twenty-eight minutes after the court's response to the jury's question.  (RT 1929); *see Wharton*, 765 F.3d at 978 (finding prejudice where jury question suggested an impasse in reaching a unanimous verdict notwithstanding defense presentation of some mitigating evidence); *Stankewitz*, 698 F.3d at 1175 (finding prejudice where a jury question suggested the jury had a difficult time reaching a unanimous verdict on death); *Silva*, 279 F.3d at 847 (prejudice found where anemic penalty defense was emphasized by the prosecution); *Karis*, 283 F.3d at 1134-35 (same).

Petitioner points to the 1993 habeas declaration of juror Gail Freker stating that

> We all wanted to give [Petitioner] the life without parole sentence, but the judge's instructions required us to give him death. We discussed how the instructions left us no choice in what sentence to give. I remember arguing to the other jurors during the penalty phase that while we might want to give him life, the instructions left us no choice but to find for death. We discussed how the instructions meant we couldn't consider humane factors like sympathy and pity, because the instructions were so direct.

(SHCP Ex. 7 at 1.)

Petitioner also points to the 1993 habeas declaration of juror Dinah Davis stating that

> [T]he jurors discussed how the court's instructions left us little choice about what penalty we had to find. It was very clear cut. We felt that you had to match up the instructions with what we had been given, and that led us to find for death.

(SHCP Ex. at 2.)

However, any inference of prejudice arising from this evidence, even if admissible for such purpose (*see* DOC. No. 148 at n.34, *citing* Fed. R. Evid. 606(b)), appears weak.  *Hedlund*, 854 F.3d at 587.

Juror statements regarding deliberations are subject to limited admissibility, as follows

> During an inquiry into the validity of a verdict ... a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The Court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b). The Ninth Circuit has applied Rule 606(b) when considering juror declarations in federal habeas proceedings. *See e.g., Fields v. Brown*, 503 F.3d 775, 778 (9th Cir. 2007) (juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not be considered by a reviewing court). For example, the Ninth Circuit has instructed that "the appellate court on appeal must consider allegations of juror misconduct using only that evidence properly subject to consideration." *United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981), *citing* Fed. R. Evid. 606(b). Consistent with Ninth Circuit precedent

> Juror testimony cannot be used to impeach a verdict unless extrinsic influence or relationships have tainted the deliberations. [Citation] Rule 606(b)(1) of the Federal Rules of Evidence prohibits juror testimony about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. Rule [606(b)(1)] states that [t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters. [Citation] The only exceptions to the Rule concern questions of whether extraneous prejudicial information was improperly brought to the jury's attention, outside influence was improperly brought to bear on any juror, or a mistake was made in entering the verdict onto the verdict form. [Citation]

*Garza v. Ryan*, No. CV-14-01901-PHX-SRB, 2016 WL 4591854, at *1 (D. Ariz. Sept. 2, 2016).

"Jurors may [not] be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts." *Bagnariol*, 665 F.2d at 884-85; *see also Roybal v. Davis*, 148 F. Supp. 3d 958, 1037-38 (S.D. Cal. 2015) (same); *Lawley v. Wong*, No. 1:08-CV-01425-LJO, 2009 WL 3586150, at *3 (E.D. Cal. Oct. 27, 2009) (same); *cf. Pena-Rodriguez v. Colorado*, 137 S.Ct. 855, 857 (2017) (rule against inquiring into statements during jury deliberations gives way only where juror makes a

118

clear statement of racial stereotyping or animus).

These standards apply where juror declarations are offered in support of ineffective assistance of counsel claims, such that

> [C]ourts have rejected the proposition that juror affidavits may be considered under Rule 606(b) in support of ineffective assistance of counsel claims. [Citation] … Under [Rule 606(b)], these post-verdict juror affidavits cannot be considered as evidence in support of petitioner's ineffective assistance of counsel claim.

*Garza*, 2016 WL 4591854, at *2.

Here, even if juror declarations were admissible to prove this claim, Petitioner has not made a showing of prejudice on the fully developed evidentiary record. *Hedlund*, 854 F.3d at 587. Petitioner contends the noted juror statements demonstrate jurors were misled by the CALJIC 8.84.2 instruction that the jurors "shall impose a sentence of death" upon concluding that "the aggravating circumstances outweigh the mitigating circumstances." (RT 1922.) However, the Supreme Court specifically has found the "shall impose" language of CALJIC 8.84.2 does not prevent individualized assessment by the jury. *Boyde*, 494 U.S. at 377.

Furthermore, the juror statements do not alone demonstrate the instructions given including CALJIC 8.84.2 precluded the exercise of discretion and moral judgment or that the jury failed to make an individualized assessment of the appropriateness of the death penalty upon consideration of all the evidence in this case including any extenuating circumstances. *Id.* at 377-78; (see SHCP Ex. 7). For example, the declarations of Jurors Freker and Davis suggest that during their penalty deliberations the jurors discussed extenuating circumstances in the form of potentially mitigating lingering doubt. (SHCP Ex. 7 at 1; SHCP Ex. 8 at 2.)

Relatedly, the 1993 habeas declaration of petit juror Joyce Nelson, to the extent admissible, states that the jurors "read all the sentencing factors" which would include the CALJIC 8.84.1 factor allowing consideration of

> Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

1    (7 CT 1893.)   Juror Nelson states in her declaration that only after reading these factors did she

2    feel "it was like the death sentence was the only option available." (SHCP Ex. 9 at 1.)   It

3    appears that the weighing process described by juror Nelson is consistent with the individualized

4    assessment contemplated by *Boyde*, that is

5           [T]he requirement of individualized sentencing in capital cases is satisfied by
            allowing the jury to consider all relevant mitigating evidence. [Citation]
6           Although [defendant] … did not present any mitigating evidence at the penalty
            phase of his capital trial, the [noted] legal principle … requires rejection of [the]
7           claim … because the mandatory language of CALJIC 8.84.2 is not alleged to have
            interfered with the consideration of mitigating evidence.
8

9    *Boyde*, 494 U.S. at 377.

10          At bottom, Petitioner has not demonstrated the jury instructions in his proceeding

11   precluded the jurors from considering and giving mitigating weight to any and all of the evidence

12   presented at his trial.  *See McKinney,* 813 F.3d at 802.  Nor has Petitioner demonstrated that the

13   prosecutor argued otherwise or suggested to the jurors that they could not consider sympathy and

14   mercy and extenuating circumstances in reaching a sentencing verdict.  (*See* RT 1912-19.)

15          Although the prosecutor argued at penalty closing that there were no mitigating

16   circumstances present in this case (RT 1914, 1919), the jury was expressly advised that this

17   argument was not evidence (RT 1912).  The jury was instructed to base its sentencing decision

18   on the facts and the law as stated by the judge.  (7 CT 1727.)  The jury was instructed to consider

19   all of the evidence presented at trial.  (7 CT 1892; RT 1920.)  The jury was instructed that

20   applicable guilt phase instructions including regarding weighing witness credibility and

21   evaluating evidence applied in the penalty phase.  (RT 1919; 7 CT 1729, 1897.)  The jury was

22   instructed that Petitioner's aggravating prior criminal acts and his prior felony had to be proved

23   beyond a reasonable doubt.  (7 CT 1898; RT 1922; *see also* 7 CT 1809.)  The jury was instructed

24   that they were to consider the CALJIC 8.84.1 sentencing factors including any circumstances

25   which extenuate the gravity of the crime.  (7 CT 1893.)  The jurors were instructed that their

26   penalty options were death or LWOP.  (RT 1920.)

27          Here, apart from asking the trial court what would happen if they could not reach a

28
                                                    120

unanimous verdict, the jurors in Petitioner's sentencing trial did not question the penalty instructions or indicate they did not understand those instructions. The jurors did not question the trial court's response to their inquiry regarding unanimity.

Jurors are presumed to have followed the penalty phase instructions given by the trial court including as to mitigation. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (a jury is presumed to follow its instructions; a jury is presumed to understand a judge's answer to its question); *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997) (juries are presumed to follow the court's instructions); *Fields*, 503 F.3d at 782 (same).

Petitioner's reliance upon *Correll*, wherein a sparse penalty defense without any strategic underpinning "all but assur[ed] the imposition of a death sentence under Arizona law", 539 F.3d at 947, (*quoting Summerlin*, 427 F.3d at 640), appears misplaced. The trial judge in *Correll* was mandated under Arizona law to impose the death penalty where an aggravating circumstance was found and no "sufficiently substantial" mitigating evidence was presented. *Id.* at 974. For the reasons stated, the sentencing discretion of Petitioner's Kern County, California jury was not so constrained. *Hedlund*, 854 F.3d at 587.

Finally, the fact the jury in this case reached its sentencing verdict after only a few hours of deliberation seems to suggest they were not having difficulty in reaching their verdict. This inference finds strength in the noted substantive aggravating evidence. *Id.*

### d. Conclusions Regarding Prejudice

Petitioner has not demonstrated inapplicability of *Landrigan's* prejudice preclusion given the facts and circumstances of this case. Petitioner actively threatened to and did interfere with and obstruct Hoover's investigation and presentation of mitigation evidence at the penalty trial so as to come within the *Landrigan's* prejudice preclusion.

Even if arguendo *Landrigan's* preclusion of prejudice is inapplicable, Petitioner has not demonstrated a reasonable likelihood that the sentencing verdict would have been different absent Hoover's alleged deficiencies and upon consideration of Petitioner's proffered mitigation evidence. The proffered evidence, individually and cumulatively has only minor mitigating

value relative to the totality of evidence developed in the record.

Petitioner has not demonstrated his jury was unconstitutionally deprived of sentencing discretion.

## VI.

## CERTIFICATE OF APPEALABILITY

Because this is a final order adverse to the Petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability ("COA"). Accordingly, the Court has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. 28 U.S.C. § 2253(c); *see Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides as follows

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Court may issue a COA only "if jurists of reason could disagree with the district

court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). While a petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that, with respect to the following claim, reasonable jurists could disagree with the Court's resolution or conclude that the issues presented are adequate to deserve encouragement to proceed further

1)     Claim 38: Whether trial counsel's failure to investigate and present mitigation constituted ineffective assistance of counsel and precluded a voluntary, knowing, intelligent, and competent waiver of a penalty defense.

Therefore, a certificate of appealability is granted as to this claim.

As to the remaining claims, the Court concludes that reasonable jurists would not find the Court's determination that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby declines to issue a COA as to the remaining claims and requests for evidentiary hearing.

## VII.

## ORDER

Accordingly, for the reasons stated, it is HEREBY ORDERED that:

1.     The unscheduled second stage evidentiary hearing is vacated (DOC. No. 180),

2.     Claim 38 is DENIED following evidentiary hearing,

3.     The third amended petition for writ of habeas corpus (DOC. No. 147) is DENIED,

4.     A certificate of appealability is ISSUED as to the Court's resolution of claim 38, and DECLINED as to the remaining claims and requests for evidentiary hearing, and

5.     The Clerk of the Court is directed to substitute RON DAVIS, Warden of San

Quentin State Prison as the Respondent warden in this action, and to enter

judgment accordingly.

IT IS SO ORDERED.

Dated:   __June 15, 2017__                    _____/s/ Lawrence J. O'Neill_____
                                                    UNITED STATES CHIEF DISTRICT JUDGE